**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**--------------------------------------------------------------X**
**CEFERINO ADONIAS (AKA STEVEN DIAZ),**
**GERMAN MERCENARIO VELAZQUEZ,**
**ANTONIO ARANDA and HERMENEGILDO**         Index No.  16-cv-07266 (LTS)
**MERCENARIO VELAZQUEZ,**
*individually and on behalf of others similarly*        **DEFENDANTS' REVISED**
*situated,*                                              **FINDINGS OF FACT AND**
                                                         **CONCLUSIONS OF LAW**

                              **Plaintiffs,**


                      **-against-**


**AL HORNO LEAN MEXICAN KITCHEN**
**INC. (d/b/a AL HORNO LEAN MEXICAN**
**KITCHEN), AL HORNO LEAN MEXICAN**
**57, INC. (d/b/a AL HORNO LEAN**
**MEXICAN KITCHEN) and CHRIS**
**PIZZIMENTI**

                              **Defendants.**
**--------------------------------------------------------------X**


        Based on the evidence entered in this matter, defendants Al Horno Lean Mexican

Kitchen Inc. (d/b/a Al Horno Lean Mexican Kitchen), Al Horno Lean Mexican 57, Inc. (d/b/a

Al Horno Lean Mexican Kitchen) and Chris Pizzimenti ("Defendants") respectfully request

that the Court make the following findings of fact and conclusions of law[1]:

                          <u>**FINDINGS OF FACT**</u>

        1.      At all times relevant hereto, defendants operated a Mexican restaurant known as

Al Horno Lean Mexican Kitchen located at 417 West 47th Street, New York, New York

(hereinafter "the Restaurant"). Tr. 321:10-14.

---

[1] The parties have already stipulated as to jurisdiction and coverage of the defendants under the
applicable New York and federal statutes implicated herein. *See* Joint Pre-Trial Statement of
Sections b(1) through b(5)

2.      Prior to opening the Restaurant, Pizzimenti operated New York City restaurants known as "Fuel" and "Stamina".  In early 2014, Fuel was sued by employees for wage and hour violations, and the case was settled prior to trial.  Subsequently, Pizzimenti and Fuel were sued by employees alleging wage and hour violations, and the case proceeded to trial with a resulting finding that Pizzimenti had no liability.  Pizzimenti and the Restaurant were additionally sued in yet another wage and hour case, which was voluntarily dismissed by the plaintiff. Tr. 315:20-317:4.

3.      In early 2014 Pizzimenti obtained a lease for the Restaurant at 417 West 47th Street.  Because he funded the opening of the Restaurant with his own money, he found the cheapest retail space he could locate.  Tr.320:9-11; 328:21-24.

4.      The Restaurant opened for business in May 2014, and commenced making deliveries to customers in late June 2014.  An initial complement of delivery employees was hired in July 2014.   320:15-21; 292:8-9.

5.      During the period of plaintiffs' employment at the Restaurant, Pizzimenti visited the location once every week or two.  He also monitored events at the Restaurant by phone calls with management throughout the day and additionally viewed live video from the Restaurant on his cell phone multiple times per day. Tr. 271:14-24; 273:14-25.

6.      Djibril Zakari at all times relevant hereto, served at the Operations Manager for the Restaurant.  Djibril Zakari previously worked for Pizzimenti at Fuel for seven to eight years, and was hired by Pizzimenti as Operations Manager in May 2014. Tr. 365:14-22.

7.      From May through December 2014 Zakari also worked at Stamina Restaurant, and split his time between Stamina and the Restaurant.  Tr. 366:4-15; 274:22-25.

2

8.      In his capacity as Operations Manager, Zakari was primarily responsible for compliance with the Restaurant's wage and hour policies regarding its employees. Tr. 366:22-367:22; 323:12-25; 276:5-11.

9.      Samuel Solis began work at the Restaurant in September 2014 as a Cook.  In or about August 2015 he became a Cashier, and was promoted to Manager in early 2016.  Tr. 404:7-15.

10.     When the Restaurant first opened, it was managed by Jimmy Sanchez, who was also a minority owner.  Sanchez stopped working at the Restaurant sometime in June or July 2014.  Sanchez was primarily responsible for maintaining time records and administering payroll during the brief period he worked at the Restaurant.  Tr. 268:15-24; 278:22-25; 290:19-23

11.     After Sanchez was terminated, the Restaurant was managed by Ricardo Gomez until he was subsequently replaced by Samuel Solis in early 2016.  Tr. 416:11-20.

12.     The Restaurant is located on a side street (West 47th Street) between Ninth and Tenth Avenue in Manhattan on the ground floor of a residential apartment building.  The entire facility comprises 900 square feet of space including a small basement, a kitchen, a customer counter and a dining area consisting of twelve seats encompassing 150 square feet.  The sidewalk in front of the Restaurant is approximately 14 feet in total length.  Tr. 321:10-25.

13.     After the Restaurant opened for business, its hours were 7:00 a.m. to 10:00 p.m. After a month or two, the hours were changed to 8:00 a.m. to 10:00 p.m.  Tr. 285:23-286:4

14.     Ninety (90%) percent of the orders fulfilled by the Restaurant each day are for delivery.  At all times relevant, the Restaurant serviced a large delivery zone running from 12th Avenue to 3rd Avenue and from 32nd to 62nd Street.  Tr. 324:3; 339:17-20.

15.     At all times relevant, the Restaurant did between 300 and 400 deliveries per day.  Tr. 339:23; 375:23.

16.     Prior to opening the Restaurant, Pizzimenti engaged in substantial efforts to educate himself about applicable wage and hour laws and regulations and to ensure that the Restaurant would be operated in full compliance therewith.  Tr. 317:8.

17.     Pizzamenti familiarized himself with federal and state wage and hour law, and reviewed the New York State Hospitality Wage Order.  He obtained an account on this Court's PACER system and reviewed published decisions on wage and hour cases, particularly those handled by the Faillace law firm.  Tr. 317:10-23.

18.     After the Restaurant opened, Pizzimenti engaged in an ongoing dialogue with representatives of the New York State and United States Departments of Labor including dozens of exchanged emails in which Pizzimenti sought advice concerning employer obligations including credit card processing fees, tools of the trade and the New York "80/20 Rule." Tr. 318:10-319:3.

19.     Pizzimenti retained counsel and sought additional advice and consultation concerning compliance with wage and hour laws. Tr. 319:23-320:1.

20.     Pizzimenti personally trained Zakari and all of the other managers at the Restaurant in compliance with wage and hour laws and implemented policies and practices intended to achieve full compliance. Tr. 322:9-11.

21.     Pizzimenti purchased a time clock system at the time the Restaurant opened to be used to capture employee working hours.  It took several weeks for the staff to be trained on the system and for it to be properly installed, and the time clock became operational in August 2014.  Employees were required to punch in and out from then on, although at times they admittedly forgot to do so. Tr. 322:13-18; 335:24-336:18; 75:6-7; 168:18-19.

22.      Plaintiffs acknowledge the accuracy of the Restaurant's time keeping system. Tr. 30:13; 187:9.

23.      Pizzimenti instructed Zakari and the managers to make sure that all employees executed and were given a copy of a completed New York State Wage Theft Prevention Act form (hereinafter "Wage Form") at the time of their initial hiring and after any change in their compensation.  He instructed Zakari and the managers to carefully explain to each employee how they were being paid; whether a tip credit was being taken by the Restaurant and about the 3% credit card processing fee that was being applied to any tips they earned.  Tr. 322:9-11; 323:12-324:22.

24.      Because Zakari is not fluent in Spanish, he regularly had a Spanish speaking manager translate for him when he explained the Wage Form to employees.  Tr. 269:11-16; 301:23-302:3.

25.      Pizzimenti also instructed Zakari and the managers to make sure that employees be paid overtime compensation for any hours worked in excess of 40 in any workweek and to provide an extra hour of pay at the applicable minimum wage rate in the event that any employees' work shift exceeded ten hours.  Tr. 366:25-367:19; 323:12-25.

26.      With respect to delivery employees, Pizzimenti was well aware of the potential problems created when employers had delivery people "wearing different hats" and thus instructed Zakari and his managers that delivery personnel at the Restaurant were to *only* do deliveries and not perform *any* other work. Tr. 333:2-7.

27.      Accordingly, when delivery personnel were not making deliveries or waiting for orders to be filled, they either sat in the dining area or waited outside for their next order to be ready.  Tr. 333:8-15; 367:24-25; 323:1-3.

28.     Moreover, Pizzimenti made it a point to schedule a sufficient complement of non-delivery personnel in the Restaurant at all times so there would be no need whatsoever to have delivery personnel perform non-delivery functions. Tr. 332:17-23.

29.     The Restaurant's staffing included delivery personnel, cooks, prep workers, dishwashers, cashiers and porters.  Tr. 343:9-346:7.

30.     Delivery personnel made deliveries, and performed no other functions at the Restaurant.  They received tips from customers in connection with making deliveries.  The Restaurant utilized the statutory tip credit for such delivery personnel. Tr. 345:22-25; 323:1-25.

31.     During the entire time plaintiffs worked at the Restaurant, there was never a time where any delivery person earned less than the applicable minimum wage during any shift taking into account their hourly wage and earned tips. Tr. 337:13-19.

32.     Prep workers were assigned to unpack delivered supplies to the Restaurant; to bring the supplies to the kitchen; to cut vegetables and meats and prepare sauces and dressings for orders prepared by the cooks. Tr. 343:9-17.

33.     Cooks were assigned to cook and prepare food for customers and for deliveries. Tr. 342:17-21.

34.     Dishwashers were assigned to wash dishes; assist the prep workers unpacking supplies delivered to the Restaurant; to put supplies away after they were delivered and to clean the basement and kitchen with the Porter. Tr. 343:18-24.

35.     Porters were assigned to take out the garbage, clean windows and clean all areas of the Restaurant including the basement, kitchen and dining area.  Tr. 343:3-5.

36.     Cashiers were assigned to work at the customer counter taking orders, operating the cash register and maintaining the dining room.  They were responsible for cleaning the

customer tables, sweeping and mopping the dining area and stocking the refrigerator in the front of the Restaurant containing sodas and juices. Tr. 343:25-344:5.

37.     The Restaurant received deliveries of supplies, including food and paper goods, at approximately 6:00 a.m. every morning.  Tr. 342:1.

38.     At 6:00 a.m. a dishwasher and two prep workers began work.  Their primary duties were to unpack the delivered supplies and put them away and begin preparing food for the cooks. Tr. 342:2-3.

39.     At 7:30 a.m., one cook began work preparing breakfast orders.  Tr. 342:19.

40.     At 8:00 a.m., a second cook began work together with three cashiers and two delivery people. Tr. 342:20-21.

41.     A porter also began work sometime between 7:00 a.m. and 8:00 a.m. each morning. Tr. 343:5-6.

42.     The Restaurant operates a breakfast business between the hours of 8:00 a.m. and 10:00 a.m. except for its first month of operation when it began offering breakfast at 7:00 a.m. Approximately 20-25 deliveries go out daily during this breakfast period. Tr. 340:5-10.

43.     After breakfast is completed, the Restaurant gets much busier and begins preparing and staffing for the rest of the day.  From 10:00 a.m. through 10:00 p.m. when the Restaurant closes, the staffing includes 5 cooks, 5 cashiers, 2-3 prep people, 2 dishwashers, 1 porter and 10-12 delivery persons. Tr. 348:9-349:2.

44.     The Restaurant is located in a residential apartment building that employs a building superintendent.  Each day the building superintendent cleans the sidewalk in front of the entire building including the Restaurant.  The Restaurant does not assign any of its employees to clean the sidewalk. Tr. 346:13-15; 374:20-23.

45.     When it snows, the building superintendent clears the snow from the sidewalk in front of the entire building, including the Restaurant.  The Restaurant does not assign any of its employees to clear the snow in front of its sidewalk. Tr. 347:3; 375:3-5.

46.     Delivery personnel *never* engage in activities in the Restaurant other than making deliveries.  Tr. 350:3-6; 345:18-20; 375:19-21.

47.     All of the supplies delivered to the Restaurant each morning are unpacked and put away by dishwashers, prep personnel and with respect to paper products, by the cashiers. Tr. 344:11-20; 373:10-25.

48.     Prep workers are assigned to carry bags of vegetables and meat from the basement to the kitchen.  This work is never done by delivery personnel.  Tr. 344:21-25.

49.     The Restaurant generates between 5 and 10 bags of garbage each day.  The garbage is collected and taken to the curb by the dishwasher and porter.  Delivery personnel do not perform any work concerning garbage at the Restaurant. Tr. 349:3-17; 374:16-17.

50.     During the period from when plaintiffs were initially hired through August 2014, their work hours were manually recorded by Sanchez and/or Ricardo Gomez.  Their wages were calculated based on their actual worked hours, and they were paid $5.00 per hour together with overtime compensation and spread of hour pay where appropriate and additionally received sufficient tips to bring their hourly rate of pay above the applicable minimum wage.  Their hours and weekly pay were reviewed with them by their managers at the time they were paid. Tr. 288:5-24; 336:19-337:10; 337.

51.     After the time clock became operational in August 2014 the recorded work times of each of the plaintiffs were used to calculate their wages. Tr. 336:7-15.

52.     Plaintiffs were always paid appropriate minimum wage, overtime compensation and spread of hour pay even though the initial paperwork generated from the Restaurant may

not have always reflected it.  Commencing in or about October 2014, plaintiffs were given a copy of a written statement reflecting their wages each week which included their hours of work; rate of pay; overtime compensation; spread of hour pay and any deductions made to their wages.  Tr. 381:24-383:6.

53.     At the conclusion of every shift they worked, plaintiffs were able to review receipts for all of the orders they had delivered and could calculate the exact amount of tips left by customers.  Plaintiffs then reviewed the tips with their manager, recorded their tips on a written sheet and signed their name documenting that they had received the correct amount of tips for that shift.  Tr. 383:10-8; 398:13-24.

54.     Each of the plaintiffs was presented with a copy of a fully and properly executed Wage Form, printed in English and Spanish, at the time they were hired and each time they received a wage increase.  At the time of presentation, plaintiffs met with Zakari and a Spanish speaking manager who carefully explained the information on the form to them and answered their questions.   Tr. 368:10-25; 369:11-17; 369:23-372:4.

55.     The Restaurant was charged a three (3%) percent processing fee pursuant to its contracts with GrubHub, Seamless and other on-line delivery platforms.  As permitted under New York law, the Restaurant passed along this charge by deducting a similar percentage from tips earned by delivery personnel.  Tr. 350:1-351:1.

56.     Delivery personnel were informed of this processing charge on the Wage Form they executed; on their weekly wage statements and personally by Zakari.  Def's Exh. "A," "B," "C," "D," "U," "V," "W"; Tr. 384:15-17.

### *Hermenegildo Mercenario*

57.     Hermenegildo Mercenario claims to have started work at the Restaurant on June 17, 2014. However, the Wage Form he executed at the conclusion of his employment is dated July 25, 2014.  Tr. 19:7; Def's Exh. "D-1".

58.     Hermenegildo Mercenario also testified that he punched the time clock, which became effective in early August 2014, for his entire employment except for his first two or three weeks. This would place his initial date of employment at or about July 25, 2014. Tr. 73:16-23.

59.     Hermenegildo Mercenario always had a second job while he was employed at the Restaurant which required him to stop work by no later than 3 p.m. Tr. 70:19-24.

60.     During his employment at the Restaurant, Hermenegildo Mercenario worked a shift from 10 a.m. to 3 p.m., 7 a.m. to 2 p.m., or from 8 a.m. to 2 p.m. Tr. 26:2-22.

61.     During his employment at the Restaurant, Hermenegildo Mercenario never worked in excess of 40 hours in any week nor did he work any shift longer than 10 hours. To the extent the Restaurant's time record reflect any shift longer than 10 hours, it was the result of his failure to punch out at the end of his shift. Tr. 74:18-24.

### *German Mercenario*

62.     German Mercenario claims that he began work at the Restaurant in May 2014. However, he admitted during cross examination that he does not actually remember when he started work at the Restaurant. Tr. 104:10-11; 135:11-12.

63.     After he was initially hired, German Mercenario worked at the Restaurant for approximately one month and resigned. Tr. 104:22-25.

64.     During this one month period, he never worked in excess of 40 hours in any week nor did he work any shift longer than 10 hours. Tr. 109:19.

65.   German Mercenario returned to work at the Restaurant in February 2015 and continued to work until July 2016. Tr. 105:4.

### *Antonio Aranda*

66.   Antonio Aranda claims that he worked at the Restaurant from June 2014 through September 2016. Yet, he testified at his deposition that he worked from June 2013 until January 2016. Tr. 218:17; 219:4; 247:10-20; 348:19.

67.   The Wage Form executed by Antonio Aranda at the time he commenced employment at the Restaurant is dated July 25, 2014. Def. Exh. "C-1".

68.   Antonio Aranda was initially onboarded at the Restaurant in July 2014, but did not start working regularly until December 2014 because he was still working at another job. Tr. 355:11-23.

### *Ceferino Pacheco*

69.   Ceferino Pacheco claims that he worked at the Restaurant from May 2014 through August 2016. Tr. 164:4-8.

70.   While employed at the Restaurant, Ceferino Pacheco used the name "Steven Diaz", which he admitted was a phony name. Ceferino Pacheco had jobs in restaurants both before and after his employment with defendants, and admitted that he used his real name when he worked for these other employers. Tr. 194:23; 195:23-25.

### *The Wage Forms*

71.   Plaintiffs' nearly identical testimony concerning their execution of the Wage Forms produced by defendants appeared orchestrated and was not credible. Tr. 55:10-60:1; 117:20-120:6; 240:6-241:10; 179:20-25.

72.   Plaintiffs acknowledge actually signing each one of the forms produced by defendants. Tr. 55:1, 118:25; 240:1; 179:9.

73.     Plaintiffs' nearly identical testimony that the forms were only partially filled out when executed is at odds with the extent of their recollection of other events and documents from the same time period.

74.     Plaintiffs' nearly identical testimony that Zakari was not present when the Wage Forms were signed and that they never saw him at the Restaurant prior to 2015 was rebutted by the consistent and credible testimony of Pizzimenti, Solis and Zakari. Tr.365:14-22; 274:22-25.

75.     As noted by Pizzimenti, the wage rate information reflected on the Wage Forms was indeed accurate and thus defendants had no reason nor benefit to be derived from falsifying the Wage Forms or having its executed without being filled out. Tr. 253:4-7.

76.     Plaintiffs' testimony that they did not receive copies of weekly pay stub receipts is also not credible.  Pizzimenti and Zakari both testified that copies of employees' pay stubs were printed in the office and given to employees every week.  Tr.287:9-14. Defendants had purchased an electronic time clock for the purposes of record keeping when the store opened and it was in full use from in or around August 2014.  Tr. 336:1-15; 380:20-22.  The time clock would give generate pay receipts which would then be copied and given to employees.  Tr. 380:20-381:12.  Prior to August 2014, the manager kept time and the amount of tips received and employees signed for their pay each week.  Tr. 336:16-25; 381:13-23.

### *The 80/20 Claims*

77.     Plaintiffs' substantial testimony about their daily work duties and their performance of tasks other than delivery was not credible and was rebutted and undermined in multiple ways.

78.     For example, Hermenegildo Mercenario and Aranda's testimony that they only made on average only two deliveries each between 8:00 a.m. and 10:00 a.m. is inconsistent with undisputed testimony by defendants that the Restaurant was fully staffed during these

hours. No rational business owner would deploy a full staff to cover only 4 breakfast orders per day.  Tr. 50:16-17; 253:1.

79.     Similarly, defendants' consistent and credible testimony demonstrated that plaintiffs' claims about performing activities such as cleaning the sidewalk in front of the Restaurant; cleaning the basement, kitchen and dining area and unpacking food deliveries that arrived at 6:00 a.m. could not possibly be truthful.

80.     Moreover, defendants' testimony about the staffing protocol at the Restaurant negates any claim by plaintiffs that they were required to perform substantial non-delivery functions as there was always sufficient number of non-delivery workers on duty throughout the hours of operation to cover all of the tasks in question.

81.     Plaintiffs' testimony about the extensive non-delivery tasks they were required to perform is also rebutted and negated by undisputed testimony about the small size of the Restaurant; the number of delivery orders taken out each day at the Restaurant; the large geographic area serviced by the Restaurant for delivery and the inconsistent sworn testimony provided by plaintiffs at their depositions.

### *Tip Theft*

82.     Plaintiffs' nearly identical testimony contending that two or three times each week Solis withheld a substantial portion of tips they earned on "large orders" was not credible and was rebutted by defendants' undisputed testimony. Tr. 173:20; 228:8; 35:18-19; 123:4.

83.     Plaintiffs testified that they each delivered large orders where the tip was between $100.00 and $200.00 two or three times each week. Tr. 173:23; 35:21; 126:8-15.

84.     It is undisputed that an average customers tip was approximately ten (10%) percent of the total cost of a delivery. This would mean that the "large orders" described by

plaintiffs had to have reflected delivery orders of between $1,000.00 and $2,000.00. Tr. 406:21; 378:4.

85.    However, orders of such size needed to be arranged in advance so that the Restaurant could purchase extra supplies and provide additional staff required to fulfill the order. They clearly could not have been done on a daily basis. Tr. 351:18-24.

86.    Pizzimenti, Zakari and Solis each testified that the Restaurant obtained large orders of the size described by plaintiffs very infrequently, perhaps once every one or two months. Tr. 351:12; 378:10; 405:15-16.

87.    Solis squarely rebutted plaintiffs' claims that he never once withheld any portion of tips earned by them except to split tips if more than one worker actually delivered a large order. Tr. 407:17-408:1.

### *Tools of the Trade*

88.    When the Restaurant opened, Pizzimenti purchased 60 safety vests to be used by delivery personnel. Tr. 334:11-2.

89.    During plaintiffs' employment, the Restaurant obtained 15 bicycle helmets from "Grubhub" to be used by delivery personnel. Tr. 334:18-25.

90.    Hermenegildo Mercenario admitted he received a vest from the Restaurant. Tr. 96:9.

91.    Antonio Aranda initially testified that he purchased two bicycles for his job at the Restaurant. However, he admitted that his bicycle was actually purchased before he was hired at the Restaurant. He also admits that there were vests in the Restaurant to be used by delivery personnel, and that no one from management told him to buy his helmet, which he still owns. Tr. 256:30; 256:16; 256:1-6.

14

92.    Cerefino Pacheco admits he purchased his bicycle before he was hired at the Restaurant. Tr. 196:14.

## CONCLUSIONS OF LAW

93.    Plaintiffs have not satisfied their burden of proving that they were paid below minimum wage; spent over twenty (20%) percent of their work shift performing non-tipped work; had tips from large catering orders withheld; did not receive spread of hours pay; did not receive separate and proper wage statements each week or that they had to pay for their own tools.

### *Plaintiffs were paid at the appropriate minimum wage, overtime and spread of hour*

94.    The FLSA and NYLL require employers to pay employees a statutory minimum wage for each hour worked.  29 U.S.C. §206; NYLL §652.  The full FLSA minimum wage at all relevant times was $7.25 per hour.  The full NYLL minimum hourly wage was $8.00 per hour from the beginning of plaintiffs' employment until December 31, 2014.  On January 1, 2015, the minimum wage increased to $8.75 per hour.  On January 1, 2016, the minimum wage increased to $9.00 per hour.  12 NYCRR §146-1.2.  For tipped employees in the food service industries, the minimum wage was $5.00 per hour with a maximum tip credit of $3.00 from the beginning of plaintiffs' employment until December 31, 2014, provided that the total of tips received plus the wages equals or exceeds $8.00 per hour.  On January 1, 2015, the minimum wage for tipped employees in the food service industries remained at $5.00 per hour with a maximum tip credit of $3.75, provided that the total of tips received plus the wages equals or exceeds $8.75 per hour.  On January 1, 2016, the minimum wage for tipped employees in the food service industries was increased to $7.50 per hour with a maximum tip credit of $1.50, provided that the total of tips received plus the wages equals or exceeds $9.00 per hour.  12 NYCRR §146-1.3(b).

15

95.     In addition to properly compensating an employee at the statutory minimum wage, an employer must also compensate an employee at one and one half times the employee's regular rate of hours worked in excess of 40 hours per workweek. 29 U.S.C. §207; 12 NYCRR §146-1.4.

96.     Under New York law, "[o]n each day in which the spread of hours exceeds 10, an employee shall receive one hour's pay at the basic minimum hourly wage rate before allowances, in addition to the minimum wages otherwise required in this Part." 12 NYCRR §146-1.6.

97.     Plaintiffs were always paid the appropriate minimum wage, overtime compensation and spread of hour where appropriate.  Defendants demonstrated through credible witness testimony as well as documentary evidence that plaintiffs' wages were *always* calculated based on their actual hours worked, and that they were paid the proper minimum wage rate per hour for tipped employees together with overtime compensation and spread of hour where appropriate and additionally received sufficient tips to bring their hourly rate of pay above the applicable full minimum wage.  Furthermore, Pizzimenti and Zakari both testified that plaintiffs were notified upon hire, in both English and Spanish, that they would be paid at the tipped hourly rate of pay, and their testimony was corroborated by the wage forms that were signed by each of the plaintiffs at the commencement of their employment.  Plaintiffs have failed to produce any credible or reliable evidence to rebut defendants' testimony and records.

### ***Plaintiffs did not perform any non-tipped work***

98.     Pursuant to 12 NYCRR §146-2.9, a food service worker who performs non-tipped functions for two hours or more, or for more than 20 percent of his shift, whichever is less, the wages of the employee shall be subject to no tip credit for that day (the "80/20 Rule").

99.     Defendants utilized the statutory tip credit for delivery personnel at the Restaurant.  Pizzimenti testified that he went to great lengths from the time the Restaurant opened to ensure compliance with the 80/20 Rule.  Defendants hired sufficient non-delivery personnel at all times so that there would never be a need to have delivery personnel perform non-delivery functions.  The credible evidence is that Pizzimenti actually instructed the managers to ensure that delivery personnel were to *only* do deliveries and not perform any other work.  Contrary to plaintiff's broad claims that they spent more than 20% of their time doing non-tipped worked, the credible and undisputed evidence demonstrates that defendants had specific inside staff assigned to every single task that did not involve making deliveries.  Furthermore, it is virtually impossible for plaintiffs' claims to be accurate given the large number of deliveries they made during their shifts each day.

### *Defendants did not withhold any tips*

100.     Under New York law, an employer is prohibited from demanding or accepting, directly or indirectly, any tip left for an employee.  NYLL §196-d; 12 NYCRR §146-2.18.

101.     When tips are charged on credit cards, an employer is not required to pay the employee's pro-rated share of the service charge taken by the credit card company for the processing of the tip.  The employer must return to the employee the full amount of the tip charged on the credit card, minus the pro-rated portion of the tip taken by the credit card company.  12 NYCRR §146-2.20.

102.     Plaintiffs failed to prove that defendants withheld *any* portion of the tips received by them from deliveries.  Plaintiffs' unsubstantiated claim that two or three times each week management withheld a substantial portion of tips they earned on "large orders" is simply not credible.  The only credible evidence established that the Restaurant did not often receive large orders, and that Defendants and their management *never* withheld any portion of

17

tips earned by plaintiffs on any orders delivered whatsoever.  To the extent that plaintiffs allege that defendants inappropriately withheld tips that were charged on credit cards, defendants have unequivocally negated that claim.  Pizzimenti testified that he went to great lengths to seek clarification on the law in this area from the Department of Labor and only withheld the pro-rated portion of any tips that were actually taken by the credit card company, in full compliance with the law.

### *Plaintiffs received proper wage forms and statements*

103.   Employers must maintain and preserve records of an employee's total daily and weekly hours worked, total daily and weekly earnings, and total weekly premium for overtime hours for a period of six years.  12 NYCRR §146-2.1.  Prior to the start of employment and prior to any time the employee's hourly rates of pay is changed, an employer must give written notice of the employee's regular hourly pay rate, overtime hourly pay rate, the amount of tip credit, if any, to be taken from the basic minimum hourly rate, and the regular payday.  This notice must be provided in English and any other language spoken by the employee as his primary language and an acknowledgment of receipt must be signed by the employee and kept for six years.  12 NYCRR §146-2.2.  Employers must also provide to each employee a statement with every payment of wages listing hours worked, rates paid, gross wages, credit claims (e.g. for tips) if any, deductions and net wages.

104.   Plaintiffs' trial testimony regarding defendants' alleged failure to maintain appropriate records is wholly inconsistent with their deposition testimony and is therefore not credible.  Defendants, on the other hand, have produced wage forms signed by the plaintiffs in both English and Spanish in full compliance with the law.  Plaintiffs acknowledged signing each one of the wage forms produced by defendants.

105.   Furthermore, even if the signed wage forms are found to be insufficient, the Labor Law nevertheless protects employers from a mere technical violation of the notice provision.  NYLL §198(1-b) and (1-d) provide that, when an individual is not provided with the requisite notice, the employer will not be liable where the employee was always paid an amount equal to or above the minimum wage throughout his employment.  *Ahmed v. Morgans Hotel Group Mgt., LLC*, 2017 N.Y. MISC. LEXIS 638.

106.   In this case the documentary and testimonial evidence clearly demonstrate that plaintiffs were *always* paid an amount equal to or above the minimum wage for every single shift during their employment and plaintiffs suffered no actual injury even if they were not technically given sufficient notice.

107.   Defendants have also produced undisputed evidence of substantial payroll records that were maintained as well as wage statements that were produced and provided to plaintiffs with their weekly payment of wages in contradiction to plaintiff's claims.

### ***Plaintiffs were not required to purchase their own tools***

108.   Employers are not permitted to reduce an employee's pay below the legal minimum wage by requiring employees to purchase, without reimbursement tools of the trade required to perform their jobs.  29 U.S.C. §206(a); 29 C.F.R. §531.35.

109.   Plaintiffs alleged that they were required to purchase safety vests, bicycle helmets and bicycles for their employment at the Restaurant that was not reimbursed by defendants.  Defendants have rebutted this claim with credible evidence that defendants in fact purchased safety vests to be used by delivery personnel and also provided bicycle helmets to be used by delivery personnel.  Pizzimenti testified that he went to the trouble of speaking to the Department of Labor on this issue and was advised that employers did not need to provide delivery persons with bicycles or pay for their repairs.  Plaintiffs themselves changed their

testimony at trial and admitted that they had already purchased their bicycles before they were hired by defendants.

### *Plaintiffs are not entitled to liquidated damages, pre-judgment or post-judgment interest*

110.     Under the FLSA and NYLL, a plaintiff who demonstrates that he was improperly denied minimum wages, overtime wages and/or spread of hours pay may recover, in addition to reimbursement of unpaid wages, "liquidated damages," unless the employer demonstrates that it acted in good faith and had reasonable grounds for believing that it had not violated the FLSA or the NYLL. 29 U.S.C. §§216(b), 260; NYLL §§198(1-a), 663(1).

111.     An employer may avoid liquidated damages if it demonstrates that its actions were in good faith and that it had reasonable grounds for believing its actions or omissions did not violate the FLSA.  29 U.S.C. §260.

112.     In the event that the Court finds that there were minor violations during particular weeks relevant to this action, the record is clear that defendants made very substantial efforts to fully comply with the law.  Pizzimenti went to the extent of initiating and maintaining an ongoing dialogue with both the New York State and United States Departments of Labor as well as obtaining legal advice from counsel throughout the relevant period to ensure that defendants were not in violation of any federal or state wage and hour laws. Pizzimenti also carefully reviewed the New York State Hospitality Wage Order and obtained his own account on the PACER system to review published decisions on wage and hour cases in order to keep himself updated with the case law.  Pizzimenti personally trained all his managers on implementing policies and procedures at the Restaurant to ensure that all wage and hour laws were being complied with.  Clearly, Pizzimenti has acted in good faith and gone above and beyond what any small business owner would have done in order to ensure that

defendants were in compliance and he had reasonable grounds for believing that they have not

violated the FLSA or NYLL.  Thus, if there is a finding of any minor or technical violations,

defendants should not be found to have acted intentionally.  Rather, any such violations should

be considered minor clerical errors and defendants should not be punished when the record

demonstrates that they have done everything possible in order to fully comply with the law.

Respectfully submitted,

Dated: New York New York
          February 14, 2018

**HOFFMANN & ASSOCIATES**

By:  _____/s/Andrew S. Hoffmann_____
          **Andrew S. Hoffmann, Esq.**
          *Attorneys for Defendants Al Horno Lean Mexican*
          *Kitchen Inc. (d/b/a Al Horno Lean Mexican*
          *Kitchen), Al Horno Lean Mexican 57, Inc. (d/b/a*
          *Al Horno Lean Mexican Kitchen) and Chris*
          *Pizzimenti*
          **450 Seventh Avenue, Suite 1400**
          **New York, New York 10123**
          **Tel (212) 679-0400**
          **Fax (212) 679-1080**