I1nWado1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CEFERINO ADONIAS, a/k/a
"Steven Diaz," et al.,

                 Plaintiffs,

            v.                              16 Civ. 7266 (LTS)


AL HORNO LEAN MEXICAN 57,
INC., d/b/a "Al Horno Lean
Mexican Kitchen," et al.,
                                            Trial

                 Defendants.

------------------------------x
                                            New York, N.Y.
                                            January 23, 2018
                                            9:00 a.m.

Before:

                    HON. LAURA TAYLOR SWAIN,

                                            District Judge


                         APPEARANCES

MICHAEL FAILLACE
      Attorney for Plaintiffs
BY:  COLIN MULHOLLAND

ANDREW S. HOFFMANN
      Attorney for Defendants


Also Present:   Selva Nebbia
                Matilde deFerrari
                Interpreters (Spanish)

                Kaylynn Wong, Paralegal

1          (Trial resumed)

2          THE COURT:  Good morning.  Please be seated.

3          Is there anything that we need to address before we

4   resume with the cross-examination of Mr. German Mercenario?

5          MR. MULHOLLAND:  Yes, your Honor.

6          I'd like to ask the Court for more time over the

7   six-hour limit that I expressed in my letter, to try and use

8   the full seven and a half hours that the individual rules

9   provide for.  The testimony is taking a little longer.

10         THE COURT:  You need to use the microphone.  You don't

11  have to lean in; just pull it closer to you and speak louder,

12  please.

13         MR. MULHOLLAND:  I'd like to ask the Court for more

14  time to present the plaintiffs' case.  I originally submitted a

15  letter to the Court stating I intended to use six hours.  The

16  testimony is taking a little bit longer than I expected, and I

17  was hoping I could use the full seven and a half hours the

18  rules provide for.

19         THE COURT:  Mr. Hoffmann, it looked like you were

20  about to stand up.  Did you want to say anything here?

21         MR. HOFFMANN:  I'm happy to do my case in six hours,

22  and I take no position regarding the request.

23         THE COURT:  I had originally allocated seven and a

24  half hours.  There will be no extensions beyond seven and a

25  half hours, but you may use the time that I had allocated to

I1nWado1                          G. Mercenario – Cross

1    you.

2             MR. MULHOLLAND:  Thank you, your Honor.

3             THE COURT:  All right, then.

4             Mr. German Mercenario, please return to the witness

5    stand.  Thank you.

6     GERMAN MERCENARIO, resumed.

7             THE COURT:  Mr. Hoffmann.

8             MR. HOFFMANN:  Thank you.

9    CROSS-EXAMINATION CONTINUED

10   BY MR. HOFFMANN:

11   Q.  Good morning, Mr. Mercenario.

12   A.  Good morning.

13   Q.  I only have a few more questions.

14       I want to go back to your testimony about some of the

15   equipment that you used when you worked at Al Horno.  Did you

16   ever go into the manager's office at the 47th Street store?

17   A.  Yes.

18   Q.  Did you see the 60 vests that were sitting there that

19   Mr. Pizzimenti purchased when the store was opened for use by

20   all the delivery people?

21   A.  No.

22   Q.  Did you see any pile or collection of vests that people,

23   that delivery people could use when they were riding their

24   bicycle?

25   A.  No, and we were told nothing about that.

I1nWado1                         G. Mercenario - Cross

1    Q.  Well, where did you get a vest when you were given one?

2    A.  I bought one.

3    Q.  You were never given one by the store?

4    A.  No.

5    Q.  Now, you also testified about a helmet.  Isn't it true that

6    the store had free helmets for all the delivery people who

7    worked that were provided by Grubhub, and that anybody could

8    use one?

9    A.  They never commented about that, nor did I ever receive

10   that helmet.

11   Q.  I want to refresh your recollection.  These were red

12   helmets that were in the store that are supplied to many

13   delivery -- many small restaurants that have delivery, by

14   Grubhub, as a promotion.

15   A.  In my case, I never saw them.

16   Q.  Let me ask you.  How many delivery people -- in the

17   afternoon, how many delivery people were on duty at 47th Street

18   when you worked there?

19   A.  In the afternoon, like six or eight or ten.

20   Q.  Wasn't there between 10 and 12 delivery people working in

21   the afternoons when it was busy?

22   A.  It could be.  I never counted them.

23   Q.  OK.  Did you ever see any of them wearing a red helmet?

24   A.  No.

25   Q.  Now, you testified at length yesterday about, I'm going to

I1nWado1                         G. Mercenario - Cross

1   call it side work, all the work that you did other than

2   deliveries.  Now, have you ever heard that term, "side work"?

3   A.  No.

4   Q.  All right.  You testified about a number of things that you

5   did other than deliveries.  Do you remember that?  You told us

6   that you had to open up the deliveries to the store and you

7   washed the street and you washed the windows and you took out

8   the trash and you mopped the floors.  Do you remember all of

9   that?

10  A.  Yes.

11  Q.  And you told us that when you worked a long shift, you

12  actually spent 60 percent of your time doing this kind of work

13  rather than deliveries.  Do you remember telling us that?

14  A.  Yes.

15  Q.  And you heard your brother testify yesterday, right?

16  A.  Yes.

17  Q.  And he said it was, for him, it was 65 percent of his time

18  doing nondelivery work.  Do you remember hearing that?

19  A.  Yes.

20  Q.  So here's my question.  Was it just you two that did this

21  kind of work, or did the other ten delivery people that were on

22  in the afternoon have the same duties as you and your brother?

23  A.  Well, if I -- in the afternoon, it was -- we were already

24  preparing also for the closing, so if the delivery guys in the

25  afternoon were out, like in somewhere -- or were out and I was

1    still there and didn't have a delivery, then I would start

2    taking out the garbage.  I would start mopping.  I would start

3    putting the chairs up, and I would start mopping the lunch area

4    or the eating area, and taking the garbage out.

5    Q.  Thank you, sir.  I understand what you said, but you didn't

6    really answer my question.

7        You and your brother were delivery people, and you said

8    that you spent the majority of your time doing things other

9    than delivery.  What I'm asking you is, was that the same for

10   all of the other delivery people that were employed at the

11   store?

12   A.  Yes, the majority had to do some of that work, because you

13   couldn't be seen standing around in that place.

14   Q.  So what you're telling us is that the 10 to 12 delivery

15   people that were there in the afternoon, like you and your

16   brother, spent the majority of their time doing work other than

17   delivery; that's your testimony?

18   A.  Yes.

19   Q.  Thank you.

20       Now, I want to bring you back to the day you came to my

21   office for my deposition.  You told a very, very different

22   story about your work duties when you were asked questions in

23   my office under oath, didn't you, sir?

24   A.  Yes, but he was intimidating us, and I had to speak as

25   fast, respond as fast as I could.

I1nWado1                        G. Mercenario - Cross

1    Q.  I'm a little confused.  You admit that you gave very

2    different testimony under oath when you were in my office for

3    your deposition?

4    A.  Not all of it, no.

5    Q.  Did you testify differently in my office about what your

6    duties were when you worked at Al Horno, sir?

7    A.  No.

8    Q.  So you believe you said more or less the same story that

9    you gave here today?

10   A.  Yes.

11   Q.  All right.  Well, let's refresh your recollection, sir.

12   Let's turn to your, I'm going to read to you from your

13   deposition, starting at page 24, and I'm going to read you some

14   passages, and let's first see if you remember saying that.  OK?

15       Starting at line 22, on page 24:

16   "Q.  So when you worked a four-hour shift, you made about 15

17   deliveries?

18   "A.  Yes, from 11 to 15.  Yes.

19   "Q.  And when you worked a nine-hour shift, you made 30 to 35

20   deliveries, right?

21   "A.  Yes.

22   "Q.  So you were pretty busy all day making deliveries, weren't

23   you?

24   "A.  Yes, that is why I didn't take my breaks.

25   "Q.  Because you were so busy making deliveries, right?

1   "A.   Yes, even though I told them, even though I told them we

2   were not busy, sometimes I wanted to take my breaks and get

3   something to eat, and they just told me to work all the way

4   through."

5       Do you remember testifying to that at your deposition?

6   A.   But as I said before, he was yelling at me, and he was

7   intimidating me more, and I had to just answer quickly.

8   Q.   I'm sorry.  Who was intimidating you?

9   A.   You were.

10  Q.   So are you telling us that you were intimidated during your

11  deposition, and therefore, you didn't testify truthfully?

12  A.   Well, you know, and I -- the thing is that I hadn't seen

13  the paperwork yet, but also, when you asked me about doing,

14  when you said -- when I said I did 30 to 35 in 10 hours, I was

15  just doing a quick multiplication in my mind.  If it was 8 to

16  11 in a four-hour shift, then I just multiplied and came up

17  with that figure.

18  Q.   Sir, your attorney was present during the deposition,

19  correct?

20  A.   Yes.

21  Q.   Do you remember your attorney making any objections or

22  making any kind of statement about you being screamed at or

23  intimidated during your deposition?

24  A.   I'm not sure.

25  Q.   Why aren't you sure?

I1nWado1                          G. Mercenario - Cross

1    A.  Because I'm not sure.  I don't recall.

2    Q.  Do you feel intimidated today when I'm asking you

3    questions?

4    A.  A bit.

5    Q.  Sir, going back to the testimony that was just read to you,

6    you were asked twice -- twice -- if you were busy all day doing

7    deliveries, and both times you said yes.  Do you remember that?

8    A.  Well, yes, but not that I did 30 to 35 every day, every

9    time, because when I took a look at the books and the records,

10   the maximum I did was 22.

11   Q.  Sir, did you answer my questions during the deposition

12   about whether you were busy all day doing deliveries, did you

13   answer that affirmatively because it was true, or were you

14   lying because you were intimidated?  Can you please explain?

15   A.  Well, when you spoke about the whole day, I thought you

16   were speaking the whole day without a break.

17   Q.  Are you saying you didn't -- when I asked you, "So you were

18   busy all day making deliveries, weren't you," are you telling

19   me you didn't understand that question?

20   A.  No, and if you'll recall, we also had problems with the

21   translator who was at your office.

22   Q.  Did you make any complaints about the translator during

23   your deposition?

24   A.  Yes.

25   Q.  Who did you make the complaint to, because I didn't hear

1    any?

2    A.  I told my attorney, and I think that's the reason why they

3    brought another translator afterwards.

4    Q.  Are you saying there was more than one translator at your

5    deposition?

6    A.  Yes.

7    Q.  Are you aware that I used the same translator that I used

8    for you for all of the plaintiffs in this case?

9    A.  I didn't hear your question.

10   Q.  Do you remember if the translator was a man or a woman?

11   A.  First it was a woman, then a man.

12   Q.  All right.

13              THE COURT:  Did you want to ask or consult with

14   Mr. Hoffmann?

15              MR. MULHOLLAND:  Yeah.

16              THE COURT:  Please.

17   BY MR. HOFFMANN:

18   Q.  Let me direct you to another portion of your transcript.

19   Do you remember I asked you about whether you did any work

20   besides deliveries during your deposition?

21   A.  I'm sorry?

22   Q.  Whether you were asked at your deposition about any work

23   that you did other than deliveries.

24   A.  Yes.

25   Q.  And do you remember how you answered that question?  Did

I1nWado1                    G. Mercenario - Cross

1  you explain about breaking down deliveries and cleaning the

2  street and doing the windows and putting the soda away?  Did

3  you tell me all about that when I asked you that question at

4  your deposition?

5  A.  Yes.

6  Q.  You said, you mentioned all those things?

7  A.  Yes, because we did those things.

8  Q.  OK.  Let's go to your transcript again.  We'll refresh your

9  recollection, sir?

10        MR. HOFFMANN:  And I'm on page 27, line 22:

11  "Q.  What duties were you required to perform when you worked

12  at Al Horno in addition to taking out deliveries?

13  "A.  Taking garbage out, cleaning the living room/dining room.

14  "Q.  Taking garbage out?

15  "A.  Yes, taking out the cardboard from the basement and, uh,

16  we needed to clean the hallway that goes into the kitchen.

17  "Q.  Anything else?

18  "A.  No."

19  Q.  Do you remember giving that testimony?

20  A.  Yes.

21  Q.  Did you forget when you were answering the question about

22  all the other things you told us yesterday that you did?

23  A.  No.

24  Q.  Well, when I was asking you questions under oath, why

25  didn't you tell me about all those things that you now claim

I1nWado1                         G. Mercenario - Cross

1   that you did?

2   A.  I told you so.

3   Q.  OK.  Can you please go through the transcript, and I'd like

4   you to --

5         THE COURT:  I don't think there's any testimony he

6   reads English, so unless you have a Spanish version of the

7   transcript --

8   Q.  I'm going to represent to you that there is absolutely

9   nothing in the transcript where you mentioned any of these

10  other activities.  Can you explain?

11  A.  Which ones?

12  Q.  Unpacking the deliveries to the store, putting away the

13  soda, cleaning the windows, cleaning the street out in front of

14  the store; all those things you told us about yesterday, sir.

15  A.  So I don't really understand your question.  What is it

16  that you're telling me?

17  Q.  I'm going to move on.

18        Do you remember being asked how long it took you to perform

19  these additional duties when you were working at Al Horno, when

20  you were at your deposition?

21  A.  I don't remember.

22  Q.  Do you remember telling me that you had to take out the

23  trash at the end of your shift?

24  A.  Yes.

25  Q.  And you remember you said you had to clean the hallway at

I1nWado1                          G. Mercenario - Cross

1   the end of your shift as well, correct?

2   A.  Yes.

3   Q.  And do you remember telling me that when you finished work

4   at three in the afternoon, you didn't have to do any of these

5   things?

6   A.  Well, when I worked until 3 p.m., we had to take out the

7   garbage from the kitchen.  We had to sweep the floors and we

8   have to clean the windows, because all the other tasks were

9   done by the people who were in the afternoon shifts.

10  Q.  Sir, are you saying that you never told me that when you

11  finished at 3:00, you didn't have to do any of these

12  activities?  Did you or did you not say that at your

13  deposition?

14  A.  But that was on the last months that I was there, one or

15  two.

16  Q.  Sir, did you or did you not say it at your deposition?

17          THE INTERPRETER:  I'm sorry?

18          MR. HOFFMANN:  Did you or did you not say that at your

19  deposition?

20  A.  I said -- oh, actually, when, when we did that, it's

21  actually because Samuel got angry because we did not pay

22  attention to what he would tell us.

23  Q.  Sir, I don't mean to be repetitive, but I don't think

24  you've answered my question.  Did you or did you not say that?

25          THE COURT:  Let her interpret that part.

I1nWado1                          G. Mercenario - Cross

1          MR. HOFFMANN:  I'm sorry.

2          MR. MULHOLLAND:  I would like to say, for the record,

3  I think that Mr. German did answer the question, just an

4  element of the answer wasn't translated at the beginning of his

5  statement.

6          THE COURT:  Let's have the question put again.

7          MR. HOFFMANN:  I'm going to move on, if that's OK,

8  your Honor.

9          THE COURT:  All right.

10 BY MR. HOFFMANN:

11 Q.  Are you telling us now that when you left at 3:00, you took

12 the garbage out and put it on the street?

13 A.  No.  We would put them away in the containers that were in

14 the back of the restaurant.

15 Q.  All right.  I'm going to read to you again from your

16 transcript, and let's see if we can refresh your recollection,

17 sir.

18         MR. HOFFMANN:  I'm on page 31, line 2:

19 "Q.  When did you do this, at the end of the shift?

20 "A.  Yes.

21 "Q.  When you finished work at three, you didn't have to do any

22 of those things?

23 "A.  No.

24 "Q.  It was only when you worked until 10:00?

25 "A.  Yes."

1            MR. HOFFMANN:  No, I didn't ask that question yet.

2            THE INTERPRETER:  OK.

3            MR. HOFFMANN:  I ended at line 9.

4            THE INTERPRETER:  OK.

5    BY MR. HOFFMANN:

6    Q.  Now, do you agree that that's what you said during your

7    deposition?

8    A.  I agree, but that was in the last, last months.

9    Q.  Did you say that at your deposition?

10   A.  No, but I'm sure this is what it is, because -- but because

11   I wanted to leave that job, I wasn't earning any money there.

12   Q.  You wanted to leave the job, but what does that have to do

13   with the question that I asked you, sir?

14   A.  The explanation is that I wasn't paying any attention to

15   Samuel.

16   Q.  Thank you for clarifying that.

17        Didn't you also tell me at your deposition that when you

18   worked --

19   A.  I have something else to say, and that is when he started

20   treating, started mistreating us, he didn't treat us as real

21   people.  He was really very condescending with us and he wasn't

22   treating us right.

23   Q.  Thank you, sir.

24        Didn't you also tell me at your deposition that when you

25   worked an 11-hour shift, the only thing you had to do besides

1    delivery was at the end of your shift, and it took 20 to 25

2    minutes?

3            THE INTERPRETER:  Hold on a second.

4    A.   The only thing you had to do was at the end of your shift,

5    and it took 20 to 23 minutes?

6            THE INTERPRETER:  I'm sorry.

7            MR. HOFFMANN:  20 to 25 minutes.

8    A.   Well, that happened at the end of the delivery at 11, but

9    if we arrived at 11 a.m., we had to do different things.  Like,

10   we had to maybe do a delivery, then finish what has not been

11   finished, that kind of thing.

12   Q.   Mr. Mercenario, I think I'm asking you pretty simple

13   questions, and my question is, did you testify at your

14   deposition that at the end of your shift, when you worked 11

15   hours, the side work that you had to do took 20 to 25 minutes?

16   Did you or did you not say that at your deposition?

17           THE COURT:  Are you asking for a yes-or-no answer?

18           MR. HOFFMANN:  I am.

19   A.   Well, at the end of the night shift, yes, it was a job that

20   took 20 or 25 minutes, but during the shift, we have to do

21   other things, like take the garbage out or clean the windows,

22   that kind of thing.

23   Q.   When I asked you at your deposition --

24   "Q.   When did you do this, at the end of your shift?"

25           THE INTERPRETER:  I'm sorry.  Where are you?

1           MR. HOFFMANN:  I'm on page 31, line 2.

2     Q.  -- wasn't that during a line of questioning that I had with

3     you about taking out the garbage and mopping?  Isn't that what

4     we were talking about?

5     A.  Yes, but I was hired to do deliveries.  I wasn't hired to

6     clean the restaurant and take the garbage out.

7     Q.  Last question, sir.  Are you going to stick by your

8     testimony that when you worked the longer shift, you spent 60

9     percent of your day doing work other than making deliveries?

10    And we're here in court; this is your trial.  I want to know if

11    that is indeed your final testimony, sir.

12    A.  Please, I -- I need the last part of the question, please.

13          MR. HOFFMANN:  Can you please read it back to him?

14    Madam interpreter, can you please read it back to him?

15          THE INTERPRETER:  Yes, I will.

16          MR. HOFFMANN:  Thank you.

17    A.  No.

18    Q.  Do you want to change your testimony?

19    A.  All I know is that when -- the way I thought during the

20    deposition was different than the way I thought after I saw the

21    records, because at the deposition, we were -- I gave you

22    estimates of the time I spent.

23    Q.  Sir, you told me yesterday here in open court that you

24    spent 60 percent of your time doing nondelivery work.  Do you

25    remember saying that to me?

I1nWado1                        G. Mercenario – Cross

1    A.  Yes.

2    Q.  And you're sticking with that story?  That's your final

3    word on the subject?

4    A.  Well, if we would count the time you would use to make

5    deliveries and to make nondelivery jobs, you would realize

6    that.

7    Q.  Sir, I know -- I'm not sure why you're --

8                  THE INTERPRETER:  I'm sorry.

9                  THE COURT:  Wait.  Wait, Mr. Hoffmann.

10                 MR. HOFFMANN:  I'm so sorry.

11   A.  So you're asking me if my testimony was true.  Well, if you

12   were doing that, what we did, you would understand it.  Yeah,

13   that's what I wanted to add.

14   Q.  You're sticking with your story about 60 percent, sir?

15   That's a yes-or-no question.

16   A.  Well, approximately, from 60 percent to 55 percent, maybe.

17   Q.  And that was the same -- last question.

18       And that was true for all the delivery people, right?

19   A.  Not for all of them, because some of them left at three.

20   Q.  The ones that worked with you -- you already told us this;

21   you said it was the same -- they worked the same way as you and

22   your brother, right?

23   A.  Yes, because for instance, if the deliverer had to be

24   cleaning the window today, had to leave, we had to really hurry

25   up and finish that job he was doing.

1   Q.   Is there a reason that you don't --

2   A.   Excuse me.  So we all did the same thing.

3   Q.   Is there a reason that you won't answer my simple questions

4   with a yes or no?

5   A.   So, to answer your questions for yes or no?

6   Q.   Thank you, sir.

7           THE COURT:  Anything further?

8           MR. MULHOLLAND:  Just briefly, your Honor.

9   REDIRECT EXAMINATION

10  BY MR. MULHOLLAND:

11  Q.   Mr. Mercenario, do you recall telling Mr. Hoffmann at the

12  deposition that he was screaming loudly?

13  A.   Yes.

14          MR. MULHOLLAND:  I'd like to read a portion of

15  Mr. Mercenario's deposition for the purposes of rehabilitating

16  his credibility to the extent that Mr. Hoffmann brought up that

17  there may be a lack of notation about the tone of his voice at

18  the deposition, on page 18, line 3 through 11.

19  Q.   Mr. Mercenario, I'd like to read this portion to you to

20  refresh your memory:

21  "A.   I do not understand.

22  "Q.   What do you not understand?

23  "A.   You are screaming at me.  You are screaming at me, and I

24  cannot hear what you said.

25  "Q.   So if I scream at you, you would not be able to hear?

I1nWado1                         G. Mercenario - Redirect

1   "A.  You are screaming.  I am talking at the same time to him,

2   (indicating), so --

3   "Q.  We will try to fix that."

4        Remember saying that?  Do you remember making that comment

5   in the deposition?

6   A.  Yes.

7   Q.  OK.  Mr. Mercenario, what's your highest level of

8   education?

9   A.  I did elementary school, and I never had any problem with

10  anybody, but you know, when people start screaming at me, I

11  start getting nervous, and I cannot answer.

12  Q.  How many years did you spend in elementary school?

13  A.  Seven.

14  Q.  OK.  Have you been back to school since then?

15  A.  No, only I was held back a few grades.

16  Q.  OK.

17            MR. MULHOLLAND:  That's all for redirect, your Honor.

18  I would like to ask the Court for one accommodation, if I could

19  have my paralegal, Ms. Maria Cedenio, sit at the table.

20            THE COURT:  Yes.

21            MR. MULHOLLAND:  Thank you.

22            THE COURT:  Mr. Mercenario's testimony is concluded?

23            MR. HOFFMANN:  Yes.

24            MR. MULHOLLAND:  Yes.

25            MR. HOFFMANN:  Thank you.

I1nWado1                          Adonias Pacheco - Direct

1          THE COURT:  Thank you, Mr. Mercenario.

2          THE WITNESS:  Thank you.

3          (Witness excused)

4          THE COURT:  Plaintiffs may call the next witness.

5          MR. MULHOLLAND:  Plaintiff would like to call

6    Mr. Ceferino Adonias.

7     CEFERINO ADONIAS PACHECO,

8          Plaintiff, called as a witness on his own behalf,

9          having been duly sworn, testified as follows:

10          THE COURT:  How do you spell your first name, sir?

11          THE INTERPRETER:  The interpreter will -- I did not do

12   it.

13          THE WITNESS:  A-D-O-N-I-A-S.

14          THE COURT:  Ceferino.

15          THE WITNESS:  C-E-F-E-R-I-N-O.

16          THE COURT:  Thank you.

17          MR. MULHOLLAND:  Thank you, your Honor.

18   DIRECT EXAMINATION

19   BY MR. MULHOLLAND:

20   Q.  Mr. Adonias or Mr. Pacheco?

21   A.  Pacheco's fine.

22   Q.  Mr. Pacheco, did you ever work at a restaurant called Al

23   Horno?

24   A.  Yes.

25   Q.  OK.  And did you work there under the name Marco Steven

I1nWado1                     Adonias Pacheco - Direct

1    Diaz?

2    A.  Yes.

3    Q.  OK.  When did you first start working at Al Horno?

4    A.  Like at the end of May 2014.

5    Q.  Did there come a time when you left Al Horno?

6    A.  Yes.

7    Q.  Do you recall when that was?

8    A.  Like in August 2016.

9    Q.  Did you work continuously for Al Horno between May of 2014

10   and August of 2016?

11   A.  For a while my schedule changed.

12   Q.  I understand that.  We'll get to your schedule in a second.

13   I just want to clarify for the Court that you were working,

14   whether or not you were working continuously for Al Horno that

15   entire period of time.

16   A.  Yes.

17   Q.  OK.  When you were hired in May of 2014, who hired you?

18   A.  Jimmy Sanchez.

19   Q.  OK.  Do you know if you were the first generation of

20   employees to work for Al Horno?

21   A.  Yes.

22   Q.  Do you know when -- which location were you hired at?

23   A.  47th Street and Seventh Avenue -- and Tenth Avenue.  Excuse

24   me.

25   Q.  Do you know when that location had opened?

I1nWado1                      Adonias Pacheco - Direct

1    A.  No, because when I got there, it was already open.

2    Q.  OK.  When you were hired by -- withdrawn.

3        How long did you work with Jimmy Sanchez?

4    A.  Four or five months?  That I recall.

5    Q.  What happened to him?

6    A.  No, I don't know.  He just didn't show up to the

7    restaurant.

8    Q.  OK.  Did there come a time when a new manager arrived?

9    A.  Not really, because one who replaced Jimmy Sanchez was

10   already working there.

11   Q.  Who was the one who replaced Jimmy?

12   A.  Ricardo.

13   Q.  How long was Ricardo the manager for?

14   A.  I think that it was -- well, the time, that I was there,

15   more than a year.

16   Q.  Were there any other managers during the time you worked at

17   Al Horno besides Ricardo and Jimmy?

18   A.  Samuel.

19   Q.  Any other managers?

20   A.  Not that I know of.

21   Q.  Did you ever hear of a gentleman named Mr. Djibril Zakari?

22   A.  Yes.

23   Q.  Who is he?

24   A.  Well, he would come to the restaurant as a supervisor, but

25   they never gave us information on what he did or why he came to

1   the restaurant.

2   Q.  Did you ever have any conversations with him?

3   A.  No.

4   Q.  When was the -- do you recall when the first time you saw

5   him at the restaurant was?

6   A.  I don't recall.

7   Q.  Do you recall if he was there in 2014?

8   A.  I think so.

9   Q.  Do you recall if Mr. Zakari would spend two to three hours

10  at the 47th Street location while you were there?

11  A.  Well, I saw him for a while, and I think then he left.

12  Q.  What do you mean by a while?

13  A.  Well, like I said, I would see him when he'd come, like,

14  supervise, but I wouldn't see him for two or three hours.

15  Q.  Did he ever give you orders?

16  A.  No.

17  Q.  When you were hired in 2014, what was your pay rate?

18  A.  $5 an hour.

19  Q.  How was that paid to you?

20  A.  In cash.

21  Q.  All right.  Who told you you would be paid $5 an hour in

22  cash?

23  A.  Jimmy.

24  Q.  Did Jimmy ever explain to you why you were being paid less

25  than the minimum wage?

I1nWado1                         Adonias Pacheco - Direct

1    A.  No.

2    Q.  Did there come a time when you were paid in something other

3    than cash?

4    A.  After a while, they started paying us with personal checks.

5    Q.  OK.  Do you recall when that happened?

6    A.  Like -- I don't remember.  Like, at the end of 2014,

7    approximately.

8    Q.  OK.  Did there come a time when your pay rate changed from

9    $5 to something else?

10   A.  Yes.

11   Q.  How did it change and when?

12   A.  Well, they told us that they were supposedly going to pay

13   us 5.65.

14   Q.  And when did that happen?

15   A.  Like at the end of 2014.

16   Q.  OK.  Did there come a time when your pay rate changed

17   again?

18   A.  Yes.

19   Q.  How and when?

20   A.  They told us that they were going to pay us 7.50.  I think

21   that was already in 2015.  I think.

22   Q.  OK.  How were you paid in 2016?

23   A.  Company checks.

24   Q.  All right.  And what was your pay rate in 2016?

25   A.  I think that it showed 7.50.  I think.

I1nWado1                          Adonias Pacheco - Direct

1   Q.  OK.  How did you keep track of your time at Al Horno?

2   A.  At the beginning, the managers told us that he kept the

3   schedule.

4   Q.  All right.  Did there come a time when a machine arrived?

5   A.  Yes.

6   Q.  Do you recall when?

7   A.  Like in August 2014, I think.

8   Q.  Could you tell the Court what kind of machine it was and

9   how it worked?

10  A.  With a computer, and they'd give us a card for us to put

11  in.

12  Q.  Did you use it when you entered and left?

13  A.  Yes.

14  Q.  All right.  So once the machine arrived in August 2016, did

15  you use it faithfully all the way to August -- sorry.

16      When it arrived in 2014, did you use the machine faithfully

17  all the way until August 2016?

18  A.  Well, basically when the machine came to scan the card, I

19  would scan the card, but basically sometimes I would forget.

20  Q.  OK.  Did you use it more or less faithfully?

21  A.  Yes.

22  Q.  All right.  How many times would there be an error with the

23  machine per week?

24          MR. HOFFMANN:  Objection.

25          MR. MULHOLLAND:  Let me rephrase.  That's fine.  I'll

I1nWado1                    Adonias Pacheco - Direct

1   rephrase it.

2   Q.  How many times per week would you forget to punch in or

3   out?

4   A.  Once.

5   Q.  OK.  Were there ever any problems with the machine?

6   A.  Sometimes.

7   Q.  How often per month would there be a problem with the

8   machine?

9   A.  Four or five times.

10  Q.  Have you taken the time during this case to read the --

11  withdrawn, withdrawn.

12      When you first started working in May of 2014, what was

13  your schedule?

14  A.  It was from 11 to 3.

15  Q.  And what were you hired as?

16  A.  To make deliveries.

17  Q.  OK.  How many days a week did you work when you were first

18  hired?

19  A.  Five days.

20  Q.  OK.  Which five days?

21  A.  From Monday through Friday.

22  Q.  Did there come a time when your schedule changed?

23  A.  Yes.

24  Q.  When and how?

25  A.  In August of 2014.

I1nWado1                     Adonias Pacheco - Direct

1    Q.  And how did it change?

2    A.  From 11 to 3 and from 5 to 10.

3    Q.  Could you explain what you mean?

4    A.  My schedule changed from 11 to 3, and I worked, and I

5    worked all day.  I would work from 11 to 3 and then back, come

6    back in from 5 to 10.

7    Q.  It would be fair to say you started working two shifts in a

8    day?

9    A.  Yes.

10   Q.  OK.  How long did you have that schedule for?

11   A.  Almost a year.

12   Q.  Did there come a time when your schedule changed back from

13   11 to 3?

14   A.  Yes.

15   Q.  OK.  And when was that?

16   A.  I think it was October 2015.  I think.

17   Q.  What was your schedule in 2016?

18   A.  From 11 to 3.

19   Q.  OK.  Did the working conditions at Al Horno change markedly

20   in 2016 as compared to the prior years?

21   A.  Yes.  In 2016, it changed.

22   Q.  How?

23   A.  They almost didn't have us do things like they had us do on

24   2014 and 2015.

25   Q.  OK.  So when you first started working -- I want to

I1nWado1                    Adonias Pacheco - Direct

1  redirect your attention to when you first started working in

2  May 2014.  OK.  Did you make tips?

3  A.  Yes.

4  Q.  Did you make tips throughout your entire employ with Al

5  Horno?

6  A.  Yes.

7  Q.  How did the majority of customers pay their tips?

8  A.  With a credit card.

9  Q.  How did you get your tips?

10 A.  At the beginning, they gave us the tips in cash.

11 Q.  And later on?

12 A.  Later on, by check.

13 Q.  How did you -- were you paid the tips on a daily basis or a

14 weekly basis?

15 A.  Weekly.

16 Q.  All right.  How did you keep track of the tips you were

17 entitled to?

18 A.  Because every order had a sheet where it, the tip was,

19 appeared, and I would take the sheets and, during my shift, and

20 then at the end of my shift, I would count my tips, add up my

21 tips and then give my sheets to the manager.

22 Q.  What sheets?

23 A.  The sheets that were attached to each order.

24 Q.  OK.  And when you did that -- withdrawn.

25     Is it fair to say that you did a daily accounting of the

I1nWado1                    Adonias Pacheco - Direct

1   tips that you would earn based on those sheets?

2   A.  Yes.

3   Q.  And with who would you do that calculation with?

4   A.  With the manager.

5   Q.  Which manager?

6   A.  First it was Jimmy Sanchez and then Ricardo.

7   Q.  OK.  Did they ever withhold tips from you that you were

8   entitled -- withdrawn.

9       Did there come a time when any of the management at Al

10  Horno had withheld tips from you?

11  A.  Yes.

12  Q.  OK.  Could you tell the Court how?

13  A.  Well, because in a large order, when we had like a $150

14  tip, the manager would say, Well, I'm only going to give you

15  part of that tip, because he said that he would give the rest

16  to the cooks and to the packers and stuff.

17  Q.  How did you know the tip was that big?

18  A.  Because in those large orders, the sheet would show the

19  tip.

20  Q.  OK.  And how did you know the managers withheld some of the

21  tip from you?

22  A.  Because they would tell me so.

23  Q.  Which managers?

24  A.  Ricardo and Samuel.

25  Q.  Did you ever complain to anybody, either of them, that that

I1nWado1                    Adonias Pacheco - Direct

1   was unfair?

2   A.  I asked them why were they doing that if that was our tips

3   that they, that we, that belonged to us.

4   Q.  Did -- OK.  And how do you know that the tip wasn't

5   included in your weekly or your daily sum?

6   A.  Because I would do my accounting at the end of the shift,

7   and because when we did a large order, they would tell me, I'm

8   not going to give you the whole amount of the tip; I'm just

9   going to give you part.  And when I did the accounting, it

10  didn't show up.

11  Q.  How many times per week would you do one of these large

12  orders?

13  A.  Like three, about.

14  Q.  How many times would they withhold your tips from these

15  orders?

16  A.  Excuse me?

17  Q.  How often would -- I understand you did maybe three orders

18  a week.  Would the management withhold tips every time you did

19  a large catering order?

20  A.  Yes.

21  Q.  OK.  What was the average value of the tip on one of these

22  large orders?

23  A.  200, 150 or more.

24  Q.  Is that the value of the tip itself or the value of the

25  order itself?

I1nWado1                          Adonias Pacheco - Direct

1    A.  Tip.

2    Q.  And how much of the tip would you get?

3    A.  Well, let's say the order had $150 tip.  Well, they gave

4    us, like, maybe 20.  That's just an example.

5    Q.  So how much would they typically give you?  What percentage

6    of the tip would you typically get from management?

7    A.  Well, basically like 10 percent.

8    Q.  What was the value -- what was the price of these orders?

9    A.  Well, I never really noticed, because my concern was the

10   tip.  That was what I was looking for.

11   Q.  How big were these orders?

12   A.  It was -- they were so large that we had to push a cart to

13   deliver them, and there were times when we also had to carry a

14   backpack with that.

15   Q.  How many people would be used to actually transport these

16   orders to the location?

17   A.  Well, if one person could take it -- if one could take it,

18   then one would be the only one taking it.

19   Q.  Would it ever -- was it always one person, or was it

20   sometimes multiple people involved in carrying these orders?

21   A.  Sometimes two.

22   Q.  Ever three?

23   A.  Not that I know of.  I never --

24   Q.  Could you describe this cart to the Court?

25   A.  Like a little larger than this table.

I1nWado1                      Adonias Pacheco - Direct

1   Q.  Did it have multiple shelves?

2   A.  Yes, like three.

3            THE COURT:  And the record will reflect that at "this

4   table," the witness gestured to the small desk with a sliding

5   shelf that the court reporter's monitor is on.

6            MR. MULHOLLAND:  Three and a half meters, two and a

7   half meters?

8            MR. HOFFMANN:  I don't know meters.

9            THE COURT:  30 inches, two and a half feet, by two

10  feet or so?

11           MR. MULHOLLAND:  About four feet long, appears to be

12  the table.  Five feet?

13           THE COURT:  Are we talking about the same table?

14           MR. MULHOLLAND:  Oh, geez.  I thought -- sorry.  Looks

15  to be about three and a half feet.

16           THE COURT:  All right.  That's fine.

17  BY MR. MULHOLLAND:

18  Q.  Did there ever come a time when someone delivered an order

19  that had an error in it?

20  A.  Yes.

21  Q.  And what would happen when that, when a customer complained

22  about the order?

23  A.  Oh, well, they would send us back to go deliver it again.

24  Q.  Did that have any impact on the amount of tips you got for

25  that order?

I1nWado1                    Adonias Pacheco - Direct

1    A.  Yes.

2    Q.  How?

3    A.  Because the one who took the order first would keep the

4    tip, and whoever was around to make the second delivery, they'd

5    say, Just take this because something was missing.  And we

6    would get no tip.

7    Q.  OK.  Were there any other circumstances where the

8    management would deduct your tips?

9    A.  Only with the large orders.

10   Q.  OK.  Did you ever complain to the owner, Mr. Pizzimenti,

11   about the deductions for large catering orders?

12   A.  No.

13   Q.  Do you recognize Mr. Pizzimenti?

14   A.  Yes.

15   Q.  How often was he in the locations where you worked?

16   A.  He would come to the restaurant once or twice -- three

17   times or twice.

18   Q.  In a day, in a week, in a month, something else?

19   A.  A week.

20   Q.  And how long did he stay for?

21   A.  I have no idea.

22   Q.  All right.  More than, more than an hour, more than four

23   hours, something else?

24   A.  Well, I think maybe an hour.

25   Q.  OK.  At any time did you -- withdrawn.

I1nWado1                         Adonias Pacheco - Direct

1        When you were first hired, did anyone ever tell you that

2   your tips were being used as an offset for the minimum wage?

3               THE INTERPRETER:  The witness is asking for the

4   interpreter to explain a word.  Should the interpreter explain

5   the word?

6               MR. HOFFMANN:  Offset?

7               MR. MULHOLLAND:  I could rephrase.

8               THE COURT:  Rephrase the question.

9               MR. MULHOLLAND:  Sure.

10              THE COURT:  The question will be asked again.

11  BY MR. MULHOLLAND:

12  Q.  Did anybody ever explain to you that you were being paid

13  less than the minimum wage because you were making tips?

14  A.  No, not that I know of.

15  Q.  Did there ever come a time when you were employed that you

16  had a discussion with management about how the tips were used

17  to compensate you for the minimum wage?

18  A.  No.

19  Q.  OK.  Could you turn to Defendants' Exhibit A, page 2, 3 and

20  4.  I know they're hard to read.

21              MR. HOFFMANN:  Your Honor, I have cleaner copies,

22  because I noticed they were bad.  I haven't been able to

23  replicate them, because I just got them this morning, but I

24  have a clean set.

25              THE COURT:  All right.  I'll ask Mr. Lee to mark that

I1nWado1                          Adonias Pacheco – Direct

1   as the definitive copy of the exhibit.

2                MR. HOFFMANN:  Absolutely.  I noted when I went

3   through the book that they were really smudged, so I had Chris

4   get us a better set.

5                THE COURT:  Mr. Mulholland, if you'll give them to

6   Mr. Lee, he will mark the group as Defendants' Exhibit A,

7   stapled together.

8                MR. HOFFMANN:  Thank you.

9                THE COURT:  Thank you.

10               MR. HOFFMANN:  Your Honor, could we take a bathroom

11  break sometime in the near future?

12               THE COURT:  I'd been planning to do it at 11.  Would

13  anyone like it to be earlier than that?

14               MR. HOFFMANN:  Yes.  You get to a certain age, your

15  Honor, when nature calls.

16               THE COURT:  We will take a break now and reconvene at

17  10 minutes to 11.

18               MR. MULHOLLAND:  Thank you, your Honor.

19               MR. HOFFMANN:  Thank you.

20               (Recess)

21               THE COURT:  Good morning.

22               Mr. Pacheco, would you please come back to the witness

23  stand.

24               Everyone else can be seated.

25               MR. MULHOLLAND:  May I approach?

I1nWado1                      Adonias Pacheco – Direct

 1              THE COURT:  Yes, you may.

 2   BY MR. MULHOLLAND:

 3   Q.  Mr. Pacheco, please take a look at what's been marked as

 4   Defendants' Exhibit A.  Do you recognize these documents?

 5   A.  Yes.

 6   Q.  Do you see your signature on any of these documents?

 7   A.  Yeah.

 8   Q.  Did you sign under the name Marco Steven Diaz?

 9   A.  Yes.

10   Q.  Do you recall when you were presented with these documents?

11   A.  That's in the beginning of 2015.

12   Q.  Do you remember who gave them to you?

13   A.  No.

14   Q.  Do you remember the circumstances under which you signed

15   them?

16   A.  They simply asked me to sign, and they didn't explain to me

17   why I had to sign.

18   Q.  Were you ever given a copy to take home?

19   A.  No.

20   Q.  When you signed the document, or these documents, was any

21   part of them blank that are now filled out?

22   A.  I remember they were, yes.

23   Q.  Which parts, if any?

24   A.  Basically, I just signed and they would fill out the form

25   themselves.

1          MR. MULHOLLAND:  May I approach the witness to isolate

2     one sheet?

3          THE COURT:  Yes.

4          MR. MULHOLLAND:  Should we stand close in case he

5     gestures?

6          THE COURT:  As long as everyone can see what he's

7     doing, just ask the questions as clearly as you can and we'll

8     then describe it.

9          MR. MULHOLLAND:  Sure.

10    Q.  Would you take a look at the top sheet there.  Do you see

11    the signature beneath yours?  Yes?

12    A.  Yes, I do.

13         THE COURT:  The witness was pointing to the last

14    signature line in the right-hand column of the document, the

15    first page of Exhibit A.

16    Q.  Is that the signature of Mr. Zakari?

17    A.  I don't know.  I didn't see him sign it, but the name is

18    here.

19    Q.  Did he present you with this form?

20    A.  No.

21    Q.  Did he present you with any of the forms that are in

22    Exhibit A?

23    A.  I remember it was one of the managers, but I don't recall

24    who it was.

25    Q.  Which of the managers might it have been?

1    A.   Maybe Ricardo.

2    Q.   Any other manager you had in mind?

3    A.   Now that I'm remembering, I think it was Ricardo.

4    Q.   What hours would Ricardo be in the restaurant?

5    A.   In the shift I had, from 11 to 3, he already was there when

6    I arrived.

7    Q.   OK.  Before we move away from these documents, see on the

8    first document, the very first one, see the date written, a

9    date written underneath your signature?

10   A.   Yes.

11   Q.   What date is that?

12   A.   June 1, 2014.

13   Q.   Who was the manager in June of 2014?

14   A.   I think it was Jimmy Sanchez.

15   Q.   OK.

16   A.   I don't remember exactly.

17   Q.   Did he ever give you this document to sign back in June of

18   2014?

19   A.   I don't recall.

20   Q.   OK.  Was Mr. Zakari a manager back in June of 2014?

21   A.   No.  No, I don't know.

22   Q.   OK.  I'd like to direct your attention to Defendants'

23   Exhibit I.

24            THE COURT:  You'd like him to turn in the book to

25   Defendants' Exhibit I, is that correct?

I1nWado1                        Adonias Pacheco - Direct

1          MR. MULHOLLAND:  Yes, please.

2     Q.  Do you recognize those documents?

3     A.  Yes.

4     Q.  All right.  Do you see the top one, the first page of

5     Exhibit I?  Do you see the top pay receipt there?

6     A.  Yes.

7     Q.  Are these receipts that you were given every week to sign?

8     A.  Yes.

9     Q.  All right.  Did you, in fact, sign them, many of them, at

10    least?

11    A.  Yes.

12    Q.  Did you get a keep -- did you get to keep a copy after you

13    signed it?

14    A.  No.

15    Q.  All right.  See the date at the bottom?  The top receipt,

16    see the date at the bottom?

17    A.  Yes.

18    Q.  What date is that?

19    A.  10 -- September 2014, September 3, 2014.

20    Q.  OK.  Do you always receive a receipt like this to sign that

21    you were paid at Al Horno?

22    A.  For a while.

23    Q.  Did you always get, have to sign a receipt like this when

24    you got your pay?

25    A.  Yes.

I1nWado1                    Adonias Pacheco - Direct

1    Q.  All right.  When you first started working with Jimmy in

2    May of 2014, did he ask you to sign a receipt to get your pay?

3    A.  I don't remember exactly, because in the beginning when I

4    was there, I was paid in cash.

5    Q.  Is there any pay receipt in these records that is older

6    than October of 2014?

7              MR. MULHOLLAND:  Judge, that's OK.  Withdrawn.  You

8    don't have to go through the record.

9    Q.  Do you know what spread-of-hours pay is?

10   A.  Excuse me?

11   Q.  Did you know that -- are you aware that when you worked

12   more than ten hours, you're required to stick around to --

13   worked at a job more than ten hours, including a split shift,

14   that your employer's required to pay you an extra hour pay for

15   that day?

16   A.  I didn't know that before.

17   Q.  OK.  When you worked more than ten hours a day or when you

18   had to work a split shift that covered more than ten hours, did

19   they ever pay you an extra hour to cover that time?

20   A.  I understood that they would pay me for the ten hours, but

21   I didn't hear about them paying me one extra hour.

22   Q.  OK.  If we could turn to page 10 in that same exhibit, see

23   the top receipt there?

24         Do you speak English?

25   A.  No.

1   Q.  Do you read English?

2   A.  No.

3   Q.  Were any of these documents provided to you in English?

4   A.  Yes.

5   Q.  When were these -- these documents were provided to you in

6   Spanish?  Withdrawn.

7           MR. MULHOLLAND:  What was the question again?  I

8   apologize.

9           THE COURT:  You asked whether they were provided to

10  him in English.  Do you want to rephrase the question?

11          MR. MULHOLLAND:  Yes, please.

12  Q.  Were any of these provided to you in Spanish?

13  A.  Not that I remember.

14  Q.  OK.  Well, do you see a word there -- Spanish uses the same

15  alphabet as English, correct?

16  A.  Yes.

17  Q.  The top receipt there, see a word that begins with S-P-R-E?

18  A.  Yes.

19  Q.  All right.  I want you to turn one page ahead, page 9.

20  Before you do that, what's the date of that receipt?

21  A.  May 25, 2015.

22  Q.  All right.  Could you turn ahead one page to page 9?  Page

23  9, so back one.  Sorry.

24      See the receipt in the middle of the page that's dated

25  5/4/15?

I1nWado1                    Adonias Pacheco - Direct

1   A.  Yes.

2   Q.  All right.  Do you see that English word that begins with

3   an S-P-R-E anywhere on that receipt?

4   A.  I don't find it.

5   Q.  OK.  Do you see in any receipt prior to May, mid-May of

6   2014, that begins with that word S-P-R-E?

7             MR. MULHOLLAND:  Let me just make it easier.

8   Q.  Go to page 6.  Do you see that word in any of the page 6?

9   A.  Scheme, that's the word that you were --

10  Q.  S-P-R-E.  That's the beginning of the word.

11  A.  No, I don't find it.

12  Q.  Would it surprise you that that word doesn't appear in any

13  of the pay receipts until May of 2015?

14  A.  Yes.

15  Q.  How often did you work a double shift; how many times a

16  week?

17  A.  Every day.

18  Q.  How many days a week did you work when you worked a double

19  shift?

20  A.  I remember that I worked six days.

21  Q.  OK.  Did anyone at, any of the management at Al Horno

22  explain to you that you were owed an extra hour for those

23  shifts, those double shifts?

24  A.  No.

25  Q.  If you could turn to Defendants' Exhibit E.  All right.  Do

I1nWado1                         Adonias Pacheco - Direct

1    you recognize this document?

2         You've seen this before, haven't you?

3    A.  Yes.

4    Q.  What's the name at the top?

5              THE COURT:  Hold on.  You have to let him answer.

6              MR. MULHOLLAND:  I'm sorry.

7    A.  Yes.

8    Q.  What is the name at the top of Defendants' Exhibit E-1?

9    A.  This is the name I used.

10   Q.  OK.  So what are we looking at here?

11   A.  We are looking at the schedule I worked.

12   Q.  OK.  So you've taken, you've reviewed this document before,

13   right?

14   A.  Yes.

15   Q.  Do you recall if it's a more or less accurate, if it more

16   or less accurately reflects the hours that you were working for

17   the time that you were punching in?

18   A.  If I remember that exactly?

19   Q.  No.  More or less.

20        Withdrawn.

21        My question is, after having reviewed this document, like

22   you just told us, can you tell us whether or not it's a fair

23   reflection of the hours that you worked at Al Horno?

24             MR. MULHOLLAND:  No.  Sorry.  Translation issue.  Not

25   "exactly"; "more or less."

1            THE INTERPRETER:  I didn't hear the "more or less."

2     I'm sorry.

3            MR. MULHOLLAND:  That's all right.

4            THE COURT:  Would you put the question again.

5            MR. MULHOLLAND:  Yes.

6     Q.  Knowing that you've reviewed this document before, could

7     you tell us if this document is more or less a reflection of

8     the hours that you worked at Al Horno?

9     A.  Yes.

10    Q.  Could you look at the last page?  What's the date of the

11    first entry there?

12    A.  August 24, 2015.

13    Q.  Is that when the machine was available, made available for

14    you to use at Al Horno?

15    A.  As far as I remember, yes.

16    Q.  OK.  Mr. Pacheco, were there any duties that you had to

17    perform at Al Horno that were not deliveries?

18    A.  Yes.

19    Q.  What were those duties?

20    A.  Basically, when I start working there at the beginning of

21    May of 2014, we basically -- what we have to do when we got

22    there, we had to finish the work that the, our coworkers did

23    not finish in the -- our morning coworkers had not finished.

24    Q.  What kind of work was that?

25    A.  To put away the merchandise that arrived to the restaurant.

I1nWado1                          Adonias Pacheco - Direct

1   Q.   What did that entail?

2   A.   We had to put away, like, the meat, the soda, the

3   vegetables that arrived at the store.  We had to put them

4   away --

5   Q.   How long did that take you?

6   A.   -- in the refrigerators.

7        20, 25 minutes.

8   Q.   Is that something you had to do every time you came at 11

9   or just for that initial period at the beginning?

10  A.   Well, it all depended what my coworkers who arrived earlier

11  had not finished.

12  Q.   So how often would you have to spend 20 to 25 minutes

13  finishing breaking down the merchandise?

14  A.   It was daily, practically.

15  Q.   Throughout the entire time you worked at Al Horno or just a

16  limited portion?

17  A.   It was during a period of time.

18  Q.   What period of time was it?

19  A.   2014 to almost the end of 2015.

20  Q.   What changed in 2016?

21  A.   They told us that we didn't have to do much of that.

22  Q.   Between 2014 and 2015, apart from breaking down the

23  deliveries, were there any other tasks that you had to perform

24  apart from deliveries?

25  A.   Sweep, mop up, clean up.

I1nWado1                    Adonias Pacheco - Direct

1   Q.  How long would it take you to sweep?

2   A.  Well, we did that together, you know.  Right after we

3   swept, we start mopping up, and that would take like 20, 25

4   minutes.

5   Q.  How many times a day would you do it?

6   A.  When we start working -- when I start working.

7   Q.  Did you ever have to do it at any other point in the day?

8   A.  When I had the day shift, I only did it in the morning.

9   Q.  Are there any other tasks you would have to do during the

10  morning shift?

11  A.  To put away sodas in the freezer.

12  Q.  How long did that take?

13  A.  Like 20 minutes.

14  Q.  How many times a day would you have to do it?

15  A.  During the shift, it would be only once.

16  Q.  Why did it take so long to refill the sodas?

17  A.  Because the sodas were in the basement, so we had to be

18  taking them upstairs.

19  Q.  How big was the refrigerator that housed the sodas?

20  A.  I don't have the exact size.

21  Q.  All right.  Any other tasks you would do in the morning, in

22  the morning tasks, in the morning shift?

23  A.  Sometimes to wipe down tables.

24  Q.  How long would that take?

25  A.  It was fast.  It was like ten minutes.

1   Q.  In the wintertime, did you have any other extra tasks?

2   A.  They would send us to take out the snow that was out on the

3   street.

4   Q.  How long would that take?

5   A.  It took from 20 to 25 minutes.

6   Q.  All right.  Did you have to do anything else with the

7   sidewalk aside from shovel the snow?

8   A.  Salt.

9   Q.  Salt.  What about when it wasn't snowing; is there anything

10  you have to do?

11  A.  We would wash it down with a hose.  We'd sweep.

12  Q.  How long would that take?

13  A.  20 minutes, about.

14  Q.  Anything with the windows?

15  A.  At times I would clean the windows.

16  Q.  How long would that take?

17  A.  15, 20 minutes.

18  Q.  The night shift, did you have any other -- during your

19  night shift, did you have any other tasks that you had to do at

20  night, apart from deliveries?

21  A.  Well, when we were working nights and the manager noticed

22  that the soda refrigerators were empty, he'd send us to fill

23  them up.

24  Q.  How many times a week would you have to do that?

25  A.  That was almost daily.

I1nWado1                    Adonias Pacheco - Direct

1   Q.  All right.  How long would that take?

2   A.  20 minutes.

3   Q.  All right.  Any other tasks during your night shift?

4   A.  Right around closing time, around 9:30 to 9:45, we had to

5   clean the area in the dining room; to sweep and mop up.

6   Q.  How long did that take?

7   A.  20 minutes, about.

8   Q.  Anything with the garbage?

9   A.  Yes.

10  Q.  What?

11  A.  Well, the garbage that had accumulated throughout the day

12  that we had moved out to the garbage containers to the back,

13  now we had to take that garbage out and put it to the front.

14  Q.  All right.  How long did that take?

15  A.  10 to 15 minutes.

16  Q.  How many times a week did you have to do that?

17  A.  That was every evening.

18  Q.  Now, you gave me a lot of -- you told the Court a lot of

19  different tasks that you would have to do on the morning shift.

20  Were those tasks you would have to do every single day, or did

21  you only have to do some of them some days, all of them all

22  days, or something else?

23  A.  Just about every morning.

24  Q.  Could you give me a range of the amount of deliveries that

25  you would do during your time at Al Horno?

I1nWado1                        Adonias Pacheco - Direct

1    A.   In an 11-to-3 shift, the minimum I would do would be about

2    8 deliveries and the maximum would be about 15 to 16.

3    Q.   OK.   What about the night shift?

4    A.   It was just about the same.

5    Q.   How many trips would it take you to do, you know, that

6    many -- withdrawn.

7         When you say you did deliveries, did that mean you made a

8    trip out of the restaurant for every single delivery?

9    A.   Well, you asked me how many deliveries I did in a day, and

10   I said the minimum was 8 and the maximum was 15.

11   Q.   Yes.   Yes, I understand.   Does that mean you would take a

12   trip out of the restaurant for every single delivery?

13   A.   Well, unless they gave us one only to deliver, but that

14   wasn't that frequent.

15   Q.   All right.   How often would you have multiple deliveries on

16   a trip?

17   A.   Four or five times when I would get almost from two to

18   three deliveries.

19   Q.   What would be a typical?   Can you give us a high and a low

20   of how much time it would take to do a delivery trip?

21   A.   Well, it all depends how far you were going.   For instance,

22   if I was going real close by, it would take me from five to ten

23   minutes, but it would depend on the distance.

24   Q.   Sure.   And what would the longest be?

25   A.   It would be like 15 to 20 minutes distance-wise.

I1nWado1                           Adonias Pacheco - Direct

1    Q.  Is that one way or both ways?

2    A.  Round trip.

3    Q.  Did you ever complain to the manager that you were doing

4    too many nondelivery tasks?

5    A.  No.

6    Q.  Did you buy anything for -- buy any vests, helmets,

7    bicycles, or anything, to work at Al Horno?

8    A.  I bought a bicycle.  I bought a lock for the bicycle,

9    lights for the bicycle when I worked at night, and helmet.

10   Q.  How much was the bicycle?

11   A.  Cost me about $800.

12   Q.  How much were the lights?

13   A.  45, like about 45.

14   Q.  How much was the lock?

15   A.  I recall that it was like 80, 85.

16   Q.  All right.  How much was the helmet?

17   A.  Seven -- 75, about.

18   Q.  Did anyone tell you that you had to buy these things?

19   A.  The one in charge told me.

20   Q.  Who was the one in charge?

21   A.  Jimmy Sanchez.

22   Q.  OK.  Did you ever ask to be reimbursed for these purchases?

23   A.  Did I ask them to reimburse?

24   Q.  Yes.

25   A.  Well, I never said anything.

I1nWado1                    Adonias Pacheco - Cross

1    Q.  Did you ask them to be reimbursed or not?

2    A.  No, because I didn't know if they would put -- give us that

3    or we had to provide.

4    Q.  OK.  OK.  Do you have receipts for any of these items?

5    A.  No.

6              MR. MULHOLLAND:  One moment, your Honor.

7              That's all, your Honor.

8              THE COURT:  Thank you.

9    CROSS-EXAMINATION

10   BY MR. HOFFMANN:

11   Q.  Good morning, Mr. Pacheco.

12   A.  Good morning.

13   Q.  You had jobs in restaurants before you started working at

14   Al Horno, did you not?

15   A.  Yes.

16   Q.  And you had jobs after you left Al Horno working in

17   restaurants, right?

18   A.  Yes.

19   Q.  Now, in the jobs that -- you used the name Marco Diaz when

20   you worked at Al Horno, correct?

21   A.  Yes.

22   Q.  That's not your real name, is it?

23   A.  No.

24   Q.  Now, when you worked at places before you were hired at Al

25   Horno, what name did you use?

I1nWado1                          Adonias Pacheco - Cross

1    A.  My name.

2    Q.  Ceferino Pacheco, right?

3    A.  Yes.

4    Q.  And were those delivery jobs?

5    A.  No.

6    Q.  You never had a delivery job before you went to work at Al

7    Horno?

8    A.  No.

9    Q.  And after you left Al Horno, how many restaurants have you

10   worked at?

11   A.  In one.

12   Q.  And what name did you use at the restaurant that you worked

13   at after Al Horno?

14   A.  I don't understand your question.

15   Q.  You worked at a restaurant after you left Al Horno,

16   correct?

17   A.  Yes.

18   Q.  And what name did you give that employer who you worked for

19   after you left Al Horno?

20   A.  My name.

21   Q.  Ceferino Pacheco?

22   A.  Yes.

23   Q.  Isn't it true that the only job you've ever had where you

24   used a phony name was at Al Horno?

25   A.  Yes.

I1nWado1                    Adonias Pacheco - Cross

1    Q.  And that is because you and your colleagues planned, when

2    you went to work there, to sue Al Horno to make money for

3    yourselves, correct?

4    A.  No.

5    Q.  Did anyone at Al Horno tell you that you shouldn't use your

6    real name and you should use a phony name?

7    A.  No.

8    Q.  Do you still -- you claim that you had to buy a bicycle for

9    $800 when you joined at Horno?

10   A.  I remember that's what I paid for the bicycle.

11   Q.  When did you buy it?

12   A.  I don't recall.

13   Q.  You have no idea when you bought it?

14   A.  It was before I start working in Al Horno.

15   Q.  How long before you started working at Al Horno?

16   A.  I don't recall.

17   Q.  Do you still have the bicycle?

18   A.  No.

19   Q.  What happened to it?

20   A.  I sold it.

21   Q.  When did you sell it?

22   A.  Because I don't do deliveries anymore.

23   Q.  Isn't it true that there were helmets that anybody could

24   use, any of the delivery people could use at Al Horno, that

25   were red and had been given to the store as a promotion by one

I1nWado1                    Adonias Pacheco - Cross

1    of the companies that does online ordering?

2    A.  I never learned of anything about that during the time that

3    I worked there.  Maybe now they do, but not back then.

4    Q.  Did anyone at Al Horno tell you that you had to buy a

5    helmet?

6    A.  Yes.

7    Q.  Who told you that?

8    A.  Jimmy.

9    Q.  Anybody else tell you?

10   A.  No.

11   Q.  What did he -- did he tell you why you had to buy a helmet?

12   A.  No, but it's on account of my safety.

13   Q.  All right.  I want to ask you some questions about these

14   catering orders.  So these were orders that you say the tip was

15   between 150- and $200?

16   A.  Yes.

17   Q.  And you say that you personally did three of them a week?

18   A.  Yes, that's true.

19   Q.  And was it your understanding that all of the other

20   delivery people were also handling about three of these big

21   orders a week?

22   A.  Well, yeah, I believe so.

23   Q.  You believe so?  And you heard your two other plaintiffs,

24   your fellow plaintiffs, they testified that they also handled

25   about three of these orders a week.

I1nWado1                      Adonias Pacheco - Cross

```
 1   A.  Yes.
 2   Q.  You heard them say that, didn't you?
 3   A.  Yes, sir.
 4   Q.  Let me ask you.  Did you and your fellow plaintiffs get
 5   together and discuss what you were going to testify to in court
 6   before this trial started?
 7   A.  No.
 8   Q.  You've never discussed with them, with any of them, the
 9   facts of this case?
10   A.  No.
11   Q.  When you were working at Al Horno, there were about 24
12   delivery people who worked with the store, correct?  Does that
13   sound about right to you, sir?
14   A.  Almost half of them worked each shift.
15   Q.  Were there about 24 delivery people in total?
16   A.  I don't know.
17   Q.  Do you have an understanding about approximately how many
18   delivery people worked at Al Horno during the period of time
19   that you worked there?
20   A.  No.
21   Q.  Were there more than 20?
22   A.  I never counted.
23   Q.  Can you give me your best estimate of how many different
24   delivery people you saw working at the store during the time
25   that you were there?
```

1    A.  Well, when I had just the morning shift, I didn't know how

2    many people worked in the afternoon when I left.

3    Q.  During the afternoon, how many delivery people were on

4    duty?  Approximately 12 people?

5    A.  Yes, from eight to ten, almost.

6    Q.  How many were on duty in the morning?

7    A.  Eight or nine.

8    Q.  Does that compute -- if you add those groups up, is that

9    about 20 people, sir?

10   A.  Not quite.

11   Q.  How many do you think it is, sir?

12   A.  Like 18.

13   Q.  It was a six-day operation, right?

14        MR. HOFFMANN:  I'll withdraw the question.

15   Q.  If there's 18 people and they're all doing three of these

16   mega orders per week, that's about 50 big orders per week; is

17   that your understanding of how many big orders the store was

18   doing per week?

19   A.  Well, when I worked in the morning, various -- many orders

20   would go out in the morning.  Several orders would go out in

21   the morning.

22   Q.  I'm talking about big catering orders where the tip was

23   between -- which were approximately $200 tips.  You did three a

24   week, he did three a week and he did three a week.  And if

25   everybody did three a week, that would be about 50 a week,

I1nWado1                        Adonias Pacheco - Cross

1   right?

2   A.  Well, I believe so.

3   Q.  Now, if the tip was $200, that would mean the bill had to

4   be about $2,000 to generate a $200 tip, right?

5   A.  Well, I only gave an example.  It wasn't always exactly

6   $200.

7   Q.  Well, give me the range on these big catering orders that

8   you think you were shorted on for the tip.  What was the

9   average size of the tip that you claim you weren't given?  You

10  said earlier this morning between 150- and $250 tip.

11  A.  Yes.  That's what I saw with my orders, but I don't know

12  what my coworkers' orders were and what they got.

13  Q.  You saw approximately three orders per week where the tip

14  was approximately $200?

15  A.  Yes.

16  Q.  Now let me ask you something, sir.  Describe how big an

17  order would be to generate a $200 tip.  How much stuff would

18  have to go out of the store?

19  A.  Where there would be trays as big as this that would go

20  into the cart.  There would be four or five of those.

21  Q.  Four or five carts?

22  A.  No.  Four or five of those large containers.

23          THE COURT:  You had indicated a size of the tray or

24  container.  Would you make the gesture again, please.

25          THE WITNESS:  They were about this size.

I1nWado1                    Adonias Pacheco - Cross

1          THE COURT:  That's a tray or a deep container?

2          THE WITNESS:  Well, in each order, sometimes they'd

3   have these round containers and other containers that were long

4   like this.

5   BY MR. HOFFMANN:

6   Q.  Were you able to take out --

7          THE COURT:  Well --

8   Q.  Would you agree that for an order to generate a $200 tip,

9   that the order would have to be more than $1,500 worth of food

10  for someone to give you a $200 tip?

11  A.  Well, depends on the customers who order.

12  Q.  But sir, you had the ticket for these orders.  You could

13  see how much the order was and how much the tip was, and I'm

14  asking you, what kind of orders, how big do they have to be, to

15  generate a $200 tip?

16  A.  I didn't know -- well, I didn't know the percentage of how

17  much a customer had to spend to generate such a tip.

18  Q.  You had no idea what the cost of the orders were -- it was

19  right there in front of you on the ticket -- to generate these

20  big tips?

21  A.  No.

22  Q.  Sir, it is not true that you did three of these orders a

23  week, is it?

24  A.  Yes, it's true.

25  Q.  How big is the store?  If I told you it was 900 square

I1nWado1                    Adonias Pacheco - Cross

1   feet, does that sound about right to you?

2   A.  Well, I don't have the exact size of the restaurant.

3   Q.  Let me ask you.  If you look at this courtroom from the

4   front table to the back, is that about the size of the store,

5   or is it bigger or smaller than that?

6           MR. MULHOLLAND:  Objection.  I'm not clear what

7   dimensions you're offering.

8           MR. HOFFMANN:  I'm talking about from here across this

9   courtroom and to the end of the courtroom.

10          THE COURT:  You mean the window behind the witness as

11  opposed to the door of the courtroom?

12          MR. HOFFMANN:  No.  From here, this way.

13          I withdraw the question.

14  Q.  If I told you that the square footage for the store

15  according to the lease is 900 square feet, would you dispute

16  that?

17  A.  I don't know.

18  Q.  You have no idea?

19  A.  No.  (in English).

20  Q.  Sir, if I told you that that store is lucky to have one

21  order a month that's more than $1,000, would you dispute that?

22          MR. MULHOLLAND:  Objection.  Calls for --

23          THE COURT:  Speak to Mr. Hoffmann.

24          MR. HOFFMANN:  Sure.

25  Q.  If I told you that that store, on average, has an order

I1nWado1                    Adonias Pacheco – Cross

1    that large less than once a month, would you dispute that?

2    A.  Well, I don't know.

3    Q.  Sir, if I told you that that store, if every delivery

4    person in that store took out three orders that were more than

5    $1,000 a week, that Mr. Pizzimenti wouldn't be here; he'd be on

6    a beach someplace zipping a pina colada, would that surprise

7    you?

8             MR. MULHOLLAND:  Objection.

9             MR. HOFFMANN:  I withdraw the question.

10            THE COURT:  Thank you.

11   BY MR. HOFFMANN:

12   Q.  These huge catering orders that you did three a week, can

13   you tell me any customer that you made a delivery to during the

14   two years that you worked at Al Horno, where you delivered one

15   of these catering orders?

16            THE INTERPRETER:  I'm sorry.  If I'm interpreting, I

17   can't hear you.

18            THE COURT:  Yes.

19            MR. HOFFMANN:  Sorry.

20            THE COURT:  Rephrase and make it less compound.

21            MR. HOFFMANN:  Yes.

22   Q.  Can you tell us the name of any customer that you delivered

23   one of these big catering orders to during the time you worked

24   at Al Horno?

25   A.  Why are you asking me that?  I never knew the names of the

I1nWado1                    Adonias Pacheco - Cross

1    customers.

2    Q.  Fair enough.

3        Can you tell me the addresses where you delivered any of

4    these big catering orders to?

5    A.  I don't remember, sir, all the addresses any longer.

6    Q.  You can't remember a single one?

7    A.  One could be 1370 Sixth Avenue.

8            MR. HOFFMANN:  I'm sorry?

9            THE INTERPRETER:  1370 Sixth Avenue.

10   Q.  That's one could be; you're not sure, right?

11   A.  No, I don't remember much of the addresses where I would

12   go.

13   Q.  All right.  Now, during your employment at Al Horno, you

14   almost always started work at 11:00, right?

15           THE INTERPRETER:  During?

16           MR. HOFFMANN:  Almost always started work at 11 a.m.

17   A.  Yes.

18   Q.  Now, I heard your testimony about your duties and the work

19   that you did other than delivery, and I want to ask you again,

20   did you speak to the other plaintiffs about what you were going

21   to testify to on the stand today regarding that subject?

22   A.  Well, I think that this shouldn't be discussed with my

23   coworkers because that is what I did daily with them.

24   Q.  OK.  So you didn't discuss it?

25   A.  No.

I1nWado1                    Adonias Pacheco - Cross

1   Q.  Let's talk what happened on a daily basis.  You'd get to

2   work at 11, right?

3   A.  Yes.

4   Q.  And you said like two or three days a week, you spent 40

5   minutes putting away merchandise, correct?

6   A.  Or maybe more.

7   Q.  Or more than 40 minutes.

8   A.  No.  (in English).

9   Q.  Or more days per week?

10  A.  More days, more days per week.

11  Q.  Did you do it pretty much every day?

12  A.  Almost daily.

13  Q.  Good.  OK.

14      So that 40 minutes, then you spent 15 to 20 minutes doing

15  garbage, right?

16  A.  Yes.

17  Q.  Then pretty much every day you cleaned the sidewalk, which

18  took you 20 to 30 minutes, right?

19  A.  Yes.

20  Q.  Then you had to do, clean up the basement, right?

21  A.  Yes.

22  Q.  How long did that take?

23  A.  Around 20 minutes.

24  Q.  And then you had to do the sodas, right?

25  A.  Yes.

I1nWado1                      Adonias Pacheco - Cross

1    Q.  How long did the sodas take?

2    A.  Around 15 to 20 minutes.

3    Q.  And then you had to do windows?

4    A.  Yes.

5    Q.  And you had to mop?

6    A.  Yes.

7    Q.  And you had to change the garbage-can bags, right?

8    A.  Yes.

9    Q.  And you had to do this all before you started doing

10   deliveries, right?

11   A.  No.

12   Q.  Didn't you testify just a few minutes ago that these were

13   things you did when you first came in, before you started doing

14   deliveries?

15   A.  Well, actually, when we arrived, that's what -- those were

16   the main jobs that we had to do, but if there was a delivery,

17   they would send us to the delivery, and then we would come back

18   and continue.

19   Q.  All right.  So the morning shift was from 11 to 3, right?

20   A.  Yes.

21   Q.  So if you add up all the time that you said you did these

22   nondelivery functions, what percent of the time between 11 and

23   3 did you spend actually doing deliveries?

24   A.  Maybe 40 percent.  Perhaps.

25   Q.  Doing deliveries?

I1nWado1                    Adonias Pacheco - Cross

1   A.  No.

2   Q.  What percentage of the time did you spend doing things

3   other than deliveries?

4   A.  Around 40 percent, more or less.

5   Q.  So 40 percent of four hours, you were able --

6           MR. HOFFMANN:  That's -- what's the math?

7   Q.  So you were able to do all these things in an hour and 45

8   minutes, to put away the merchandise, the garbage, the

9   sidewalk, clean the basement, put the sodas away, do the

10  windows, mopping, change -- you were able to do that in that

11  time?  You're sure?

12  A.  You're asking me for an estimate.  You're not asking me for

13  the exact time that I would do all that.

14  Q.  What I'm trying to understand is, you told us all these

15  things that you did and how much time it took, and I'm

16  wondering how it didn't take at least half of your shift to do

17  all these things if you're, in fact, telling us the truth.

18  A.  I didn't understand what this is.

19  Q.  Let me ask you.  You said you spent about 40 percent of the

20  time doing nondelivery work.  Was that the same when you came

21  back to work from 5 to 11?

22  A.  I think it was.

23  Q.  Now, sir, I want you to think back.  Do you remember coming

24  to my office to be deposed, where you gave testimony under

25  oath?

I1nWado1                    Adonias Pacheco - Cross

1    A.  Yes.

2    Q.  Do you realize that you gave a completely different story

3    when you gave your testimony in my office under oath about what

4    your duties were when you worked at Al Horno?

5    A.  Well, I remember some of what I said, but I don't remember

6    everything I said.

7    Q.  Did you understand that you were under oath when you

8    testified at my office?

9    A.  Yes.

10   Q.  Did you take that oath seriously?

11   A.  Yes.

12   Q.  And did you tell the truth when you testified in my office

13   at your deposition?

14   A.  As far as I remember, I did.

15   Q.  Was your recollection of what your job duties were when you

16   worked at Al Horno better back at the time, the summer when you

17   were deposed at my office, or is it better today?

18   A.  I don't understand exactly.

19   Q.  I'll withdraw it.

20       Let's refresh your recollection.  Let's go through some of

21   your testimony at your deposition.  OK, sir?

22   A.  Yes.

23   Q.  I'm on page 56, line 12:

24   "Q.  Now, when you started work, when did you start making your

25   first deliveries?

1    "A.  Around 11:00.

2    "Q.  So you would show up for work, and when the first order

3    came out, you would make the delivery?

4    "A.  Yes.

5    "Q.  Did you keep making deliveries until the end of your

6    shift?

7    "A.  Yes."

8            MR. HOFFMANN:  Page 56.

9    Q.  Is that what you testified to in my office?

10   A.  Well, when we showed up, what we had to do, the most

11   important jobs we had to do were, were to organize the

12   merchandise deliveries; to clean; to mop, unless there was an

13   order, and then we had to stop and do the delivery, and then

14   when we would come back, continue with that job.

15   Q.  Sir, I asked you --

16           THE COURT:  Mr. Hoffmann, do you want to give me a

17   copy of this deposition?

18           MR. HOFFMANN:  Oh, I'm so sorry, your Honor.

19           THE COURT:  I tried to get your attention earlier.

20           MR. HOFFMANN:  I apologize.

21           THE COURT:  Thank you.

22           THE INTERPRETER:  Would we have an extra copy?

23           MR. HOFFMANN:  Page 56.

24           THE COURT:  And a copy for the interpreter too.

25           MR. HOFFMANN:  Your Honor, I apologize.

I1nWado1                    Adonias Pacheco - Cross

1    Q.  Page 56, lines 12 to 25, I asked you, sir; "did you keep

2    making deliveries until the end of your shift," and you

3    answered yes, right?

4    A.  Yes.

5    Q.  Now, I asked you at your deposition whether you did any

6    tasks other than delivery, and you only told me about two.

7    Actually, you only told me about one.  You only told me about

8    mopping.

9        Do you remember telling me that?  Do you remember that,

10   sir?

11   A.  But at that time, you were kind of aggressive asking me

12   questions, and you were not asking the questions the way you

13   are doing it today.  And frankly, you were looking for the

14   answers you wanted but not the ones we were saying.

15   Q.  I see.

16       Do you remember telling me that you only had to mop one or

17   two times during the entire time that you worked for Al Horno?

18   Do you remember saying that at your deposition?

19   A.  One or twice during two years?

20   Q.  Do you remember saying that?

21   A.  No, I don't remember.

22   Q.  All right.  Let's go to your testimony, sir.  I'm at the

23   bottom of page 57:

24   "Q.  Other than making deliveries, did you have any other

25   duties?"

I1nWado1                          Adonias Pacheco - Cross

1    A.  Yes.

2              THE COURT:  Are you going to read the questions and

3    answers?

4              MR. HOFFMANN:  I am.

5              THE COURT:  And ask if he recognizes --

6              MR. HOFFMANN:  Yes.  Let me move to question -- I'm at

7    now page 58, line 15:

8    "Q.  My question is how long when you worked at the restaurant

9    at the beginning of your shift were you asked to mop the

10   basement?

11   "A.  One or two times.

12   "Q.  During the entire time that you worked?

13   "A.  Yes.

14   "Q.  That was the only time you did it, right?

15   "A.  Yes."

16             THE COURT:  And would the interpreter read from --

17             THE INTERPRETER:  Yes.

18             MR. HOFFMANN:  Lines 9 through 24.

19             THE COURT:  That's not what you just read.

20             THE INTERPRETER:  No, he didn't.

21             MR. HOFFMANN:  I'm sorry.

22             THE INTERPRETER:  I think it was line 15.

23             MR. HOFFMANN:  Page 58.

24             THE COURT:  You started reading at line 15 just now.

25             MR. HOFFMANN:  Right, I did.

I1nWado1                    Adonias Pacheco - Cross

1          THE INTERPRETER:  Yes.

2          THE COURT:  Then you just asked her to read -- are you

3     going to start again on line 9?

4          MR. HOFFMANN:  No.  Line 15.  I had the wrong line.

5     Line 15.  Lines 15 to 24.

6          THE COURT:  Would the interpreter please read -- let

7     me explain.

8          The interpreter will now read lines 15 to 24, and

9     Mr. Hoffmann is asking whether you gave that testimony.

10         First the interpreter will read it, and so you'll

11    explain that to him?

12         THE INTERPRETER:  Yes.

13         THE COURT:  OK.

14         MR. HOFFMANN:  Thank you.

15         THE INTERPRETER:  OK.

16    BY MR. HOFFMANN:

17    Q.  Did you testify to that during your deposition?

18    A.  I maybe did it but didn't specify how many times a day or

19    how many times a year.

20    Q.  Well, you said you did it one or two times during the

21    entire time that you worked for Al Horno.  Isn't that what you

22    said?

23         MR. MULHOLLAND:  Objection.

24    BY MR. HOFFMANN:

25    Q.  During the entire time that you worked?  And that's the

I1nWado1                    Adonias Pacheco - Cross

1   question that you answered, correct?

2   A.  Yeah, I said that but didn't specify if it was in a week,

3   in a day, all the time I was working there.

4   Q.  All right.  Now, do you remember this question and answer,

5   page 63:  Question, this is at line 21:

6   "Q.  So is it true that other than what you told us about

7   mopping, the rest of the time that you were at work, your job

8   was to take out deliveries to customers?  Correct?"  And your

9   answer was yes.

10             THE COURT:  Then you have to ask whether he --

11  BY MR. HOFFMANN:

12  Q.  Is that what you testified to during your deposition, sir?

13  A.  Well, yes.  I -- I said what I felt at the deposition, but

14  as I was telling you, you were intimidating, and you didn't let

15  us answer what we were ready to answer.  You made us answer

16  what you wanted to hear.

17  Q.  I see.  Can you show me -- withdrawn.

18      So you felt that you didn't have a chance to give full

19  answers at your deposition?

20  A.  All the time that you were asking, you were in a real

21  hurry, so my mind -- in my mind, I didn't have time to really

22  think about what you were asking me, and I couldn't -- I didn't

23  have a chance to, for, to give you a full answer.

24  Q.  Were you taking any kind of medication at your deposition?

25  A.  Are you talking about this one or the other one?

I1nWado1                         Adonias Pacheco - Cross

1    Q.  During your deposition at my office, had you taken any

2    medication that may have affected the way that you answered the

3    questions?

4    A.  No.  The problem was because you were pressuring us to

5    answer.

6    Q.  So you felt that I was too impatient, and that's why you

7    gave these false answers to my questions?  That's your

8    testimony?

9                MR. MULHOLLAND:  Objection to form.

10               THE COURT:  You're objecting to the characterization

11   of the testimony?

12               MR. MULHOLLAND:  Yes.

13               THE COURT:  Overruled.  You may answer.

14   A.  Could you please repeat the question?

15   Q.  Sure.  I'll repeat it.

16       You felt that because I was too impatient, you gave false

17   testimony during your deposition?

18   A.  No, it was not -- I didn't give you false answers.  It

19   wasn't false.  The thing is that what you wanted to do is, at

20   your deposition, ask us the questions, and then when we would

21   be in front of the jury, we would contradict ourselves.

22   Q.  I see.  So I wanted to get you to say things that weren't

23   true so that we could make a case in front of a jury; that's

24   what you believe?  That somehow my questions were designed to

25   get you to give false testimony?

I1nWado1                    Adonias Pacheco - Cross

1   A.  Well, perhaps it wasn't false testimony that I said things

2   at the deposition, and now that I'm here, I'm making -- I'm

3   making an input of other things that I did also.

4   Q.  I see.  So when I asked you at your deposition, "Isn't it

5   true that other than what you told us about mopping, the rest

6   of the time you were at work, your job was to take out

7   deliveries to customers, correct"; when I asked you that

8   question, you just didn't remember about all these other duties

9   you told us about this morning?

10  A.  Yes.  On occasion, as I said before, I would arrive and

11  mainly clean everything.

12  Q.  But sir, I was asking you, in sum, the only job that you

13  did other than deliveries was mopping, and you agreed with

14  that, right?

15  A.  Yes.

16  Q.  Was that honest when you said it in my office, under oath?

17  A.  Yes.

18  Q.  Thank you.

19      Now, let's go back to the percentages.  Do you remember

20  being asked at your deposition what percentage of your time you

21  spent doing deliveries and what percentage of your time you

22  spent doing other things?

23  A.  I don't remember.

24  Q.  You don't remember one way or the other?

25  A.  I don't recall.  I don't remember.

I1nWado1                    Adonias Pacheco – Redirect

1   Q.  Let me refresh your recollection.  Page 66, line 2:

2   "Q.  Would you say that of the times that you were on the clock

3   at Al Horno, you spent about 99 percent of your time doing

4   deliveries?

5   "A.  Almost."

6       And then I asked:  "98 percent, would that be more

7   accurate?"  And your answer was, "80, 85 percent."

8       Do you remember giving that testimony at your deposition?

9   A.  I don't remember.

10  Q.  Is that true, that you spent 80 to 85 percent of your time

11  making deliveries when you worked at Al Horno?

12  A.  The percentage was less.

13          MR. HOFFMANN:  Thank you.

14  REDIRECT EXAMINATION

15  BY MR. MULHOLLAND:

16  Q.  Mr. Pacheco, what's your highest level of education?

17  A.  I started high school, but I didn't finish.

18  Q.  So how many years did you spend in school?

19  A.  Like eight, I believe.

20  Q.  I want to read to you a portion of your deposition.

21  Mr. Hoffmann stated that the only task apart from deliveries

22  that you told him about was mopping.  But that's not true; you,

23  in fact, told him about more, isn't that correct?

24  A.  Yes.

25          MR. MULHOLLAND:   I'd like to read a portion of his

I1nWado1                       Adonias Pacheco - Redirect

1   deposition, starting on page 57 and carrying over to 58, line

2   25, at the bottom of 57, and I'll read continuing over to 58

3   down to line 8:

4   "Q.  Other than making deliveries, did you have any other

5   duties?

6   "A.  At the beginning, they told us to go and do some mopping

7   and to go down to the basement, fix the deliveries and to wash

8   the street outside.  And when we closed the place, they told us

9   to mop the whole restaurant where the clients were."

10  Q.  Do you remember saying that?

11  A.  Yes, I think I do remember.

12  Q.  And do you remember telling Mr. Hoffmann at your deposition

13  about an address where you recall making a large delivery?

14  A.  I don't remember.

15  Q.  Let me refresh your memory.  On page 74, lines 9 through

16  11:

17  "Q.  What was the address that you took the order to?

18  "A.  1345 and Sixth Avenue."

19      Do you remember sharing that address with Mr. Hoffmann?

20  A.  Yes.

21           MR. MULHOLLAND:  No further questions.  Thanks.

22           MR. HOFFMANN:  No redirect.

23           THE COURT:  Thank you, Mr. Pacheco.  Your testimony is

24  concluded.  You may go back to your seat.

25           THE WITNESS:  Thank you, your Honor.

1        (Witness excused)

2        THE COURT:  We have about 15 minutes.  You can call

3   your next witness, Mr. Mulholland.

4        MR. MULHOLLAND:  Plaintiffs would like to call

5   Mr. Antonio Aranda to the stand.

6    ANTONIO ARANDA,

7        Plaintiff, called as a witness on his own behalf,

8        having been duly sworn, testified as follows:

9        THE COURT:  You may proceed.

10        MR. MULHOLLAND:  Thank you.

11   DIRECT EXAMINATION

12   BY MR. MULHOLLAND:

13   Q.  Mr. Aranda, could you tell the Court if you ever worked at

14   a restaurant called Al Horno?

15   A.  Yes.

16   Q.  When did you first start working at Al Horno?

17   A.  June 2014.

18   Q.  Who hired you?

19   A.  Jimmy.

20   Q.  Do you know his last name?

21   A.  No.  No.

22   Q.  How long did you work with Jimmy?

23   A.  I don't recall exactly.

24   Q.  Was it weeks, months, years, something else?

25   A.  That I recall, a month, maybe.

I1nWado1                    Aranda - Direct

1   Q.  OK.  Did there come a time when you left Al Horno?

2   A.  Yes.

3   Q.  When was that?

4   A.  September 2016.

5   Q.  Between June of 2014 and September of 2016, did you work at

6   Al Horno continuously?

7   A.  Yes.  Correct.

8   Q.  When you were first hired at Al Horno, what was your rate

9   of pay?

10  A.  $5.

11  Q.  How was that paid?

12  A.  They paid me in cash.

13  Q.  Did there come a time when your pay rate changed?

14  A.  Yes.

15  Q.  When and how?

16  A.  Then later on they paid us with personal checks.

17  Q.  OK.  When was that?

18  A.  Like July, July 2014.

19  Q.  OK.  So like one month after you were working, they started

20  paying you in personal check?

21  A.  No.  When I started, it was cash.

22  Q.  Yeah.  For how long did they pay you in cash?

23  A.  Like a month.

24  Q.  OK.  When they started paying you in personal check, did it

25  change -- when they started paying you in personal check, did

I1nWado1                         Aranda - Direct

1    they change your rate of pay?

2    A.   No.

3    Q.   All right.  Did there come a time when they did change your

4    rate of pay?

5    A.   That I know of, no.

6    Q.   OK.  So how much did you make per hour in 2015?

7    A.   They told us that 7.75, but they would deduct $2.

8    Q.   Was that in 2015, 2016, or something else?

9    A.   2015 to 2016.

10   Q.   I'm sorry.  What did you say your hourly rate was during

11   that time?

12   A.   7.75.  7.75.

13   Q.   OK.  If you worked more than 40 hours in a week, did they

14   pay you at a different rate?

15   A.   No.

16   Q.   OK.  When you first started working at Al Horno, what was

17   your schedule?

18   A.   When I started out, I went in at eight and left at three,

19   and then I would come back at six and would go out at ten.

20   Q.   Is that a schedule you had when you first started working

21   back in June of 2014?

22   A.   Yes.

23   Q.   OK.  How long did you have that schedule for?

24            MR. MULHOLLAND:  Actually, withdrawn, withdrawn.

25   Q.   When you had that schedule, how many days a week did you

I1nWado1                          Aranda - Direct

1   work?

2   A.  Six days.

3   Q.  OK.  And how long did you have that schedule for?

4   A.  2014 to 2015.

5   Q.  OK.  Did you have a different schedule if you worked on

6   Sundays?

7           MR. HOFFMANN:  I'm sorry.  I didn't hear the last

8   question.  Could you read it back, please.

9           THE COURT:  I will ask the reporter to read it back.

10          (Record read)

11  A.  No.

12  Q.  So you always worked two shifts?

13  A.  Yes.

14  Q.  And then what was your schedule in 2016?

15  A.  12 to 9.

16  Q.  How many days a week?

17  A.  Four and a half.

18  Q.  Four and a half days a week?

19  A.  Yes.

20  Q.  What do you mean?

21  A.  From Monday to Friday noon.

22  Q.  You worked starting at 12 noon to 9:00 p.m., or you worked

23  from 9 a.m. to 12?

24  A.  No.  I worked from noon until 9 p.m.

25  Q.  OK.  4.5, four and a half days a week?

I1nWado1                         Aranda - Direct

1    A.  Yes.

2    Q.  What were the days?  Sorry.  Withdrawn.

3        What was the half day?

4    A.  Fridays.

5    Q.  In what sense was it a half day?

6    A.  12 to 3.

7    Q.  OK.  All right.  When you were hired in June of 2014, what

8    was your position?

9    A.  Well, we would put away the merchandise that arrived.

10   Q.  No.  When you were first hired, what was the title, type of

11   job?

12   A.  Oh.  To make deliveries.

13            THE COURT:  We have five minutes until the break.

14            MR. MULHOLLAND:  OK.

15   Q.  After Jimmy Sanchez hired you -- withdrawn.

16       How many managers did you work under while you worked at Al

17   Horno?

18   A.  Three.

19   Q.  Could you name them?

20   A.  Jimmy, Ricardo and Samuel.

21   Q.  Did you ever work for a manager called Mr. Djibril Zakari,

22   otherwise known as Gabriel?

23   A.  No.

24   Q.  Did you recognize him in court earlier today and yesterday?

25   A.  Yes.

I1nWado2                          Aranda - Direct

1    Q.  Had you ever seen him at Al Horno before?

2    A.  Yes.

3    Q.  Do you remember when the first time you saw him was at Al

4    Horno?

5    A.  2015.

6    Q.  Do you remember when in 2015?

7    A.  Not correct -- not exactly.

8    Q.  Well, approximately, if you could give me a season.

9    A.  January 2015.

10   Q.  OK.  Did you ever have any discussions with him?

11   A.  No.

12   Q.  Did he ever give you documents to sign?

13   A.  That he gave me?

14   Q.  Yeah.

15   A.  No.

16   Q.  OK.

17          MR. MULHOLLAND:  Might it be logical to take a break

18   now before I go into other areas?

19          THE COURT:  Yes.  We will take our lunch break now and

20   resume at 1:45; that is, quarter to two.

21          (Luncheon recess)

22

23

24

25

                           AFTERNOON SESSION

                              1:45 p.m.

          THE COURT:  Good afternoon.

          Mr. Aranda, would you come back to the witness stand,
please.

          You may continue.

          MR. MULHOLLAND:  Thank you, your Honor.
Q.  Mr. Aranda, during your time at Al Horno, did you ever work
more than 40 hours in a week?
A.  Yes.
Q.  Did you ever get paid at a different rate when you worked
over 40 hours in a week?
A.  No.
Q.  Did you ever work over ten hours in a single day?
A.  Yes, on Sundays.
Q.  OK.  What about the days you worked two shifts?
A.  First I went in at eight to three, then from six to ten.
Q.  Did you ever get an extra hour pay when you worked those
split shifts?
A.  No.
Q.  When you said Sundays you worked over ten hours in a day,
how were Sundays different from the other days when you worked
a split shift?
A.  Excuse me?
Q.  How were Sundays different from the other days when you

I1nWado2                        Aranda - Direct

1   worked a split shift?

2   A.  I worked ten to ten.

3   Q.  Was that a split shift or something else?

4   A.  No.  It was just one complete shift.

5   Q.  The other days during the week, did you work split shifts?

6   The other days during the week, did you work split shifts?

7   A.  Yes.

8   Q.  OK.  Is it fair to say only Sundays is the day you would

9   work from ten to ten without taking a break?

10  A.  Correct.

11  Q.  During your time at Al Horno, did you earn tips?

12  A.  Yes.

13  Q.  OK.  How did you -- how were you paid your tips?

14  A.  At the end of the week, they would pay us.

15  Q.  How would you keep track of your tips on a daily basis?

16  A.  First, I would do my accounting, then the manager would do

17  his.

18  Q.  How would you do your accounting?

19  A.  With a calculator.

20  Q.  All right.  Where would you get the numbers to put in the

21  calculator?

22  A.  In Seamless it comes where you -- where they give you your

23  tips.

24  Q.  What are you referring to?

25  A.  The paper.

I1nWado2                      Aranda - Direct

1   Q.  Where would you get these papers?

2   A.  From Seamless, what they send.

3   Q.  Would you pick it up from the printer?

4   A.  No.  The one who packed it would put it in, on the bag.

5   Q.  With a staple on the bag?

6   A.  Yes.

7   Q.  Would you collect them as the day went on?

8   A.  Yes.

9   Q.  Was there any circumstance where the managers at Al Horno

10  would withhold some of your tips?

11  A.  Yes.

12  Q.  Could you tell the Court what those circumstances were?

13  A.  When we do large orders.

14  Q.  What's a large order?

15  A.  600-, $700.

16         MR. HOFFMANN:  I'm sorry?

17         THE INTERPRETER:  600-, $700.

18         THE COURT:  If you're going to ask something or

19  interrupt, stand up and speak out.  We don't want to have to

20  guess what you're doing.  Thank you.

21         You may go on.

22  BY MR. MULHOLLAND:

23  Q.  What would happen with these tips for these large orders?

24  A.  Two times it happened with Jimmy, and the other time when

25  Samuel was there.

I1nWado2                          Aranda - Direct

1   Q.   What happened, though?

2   A.   The other time they didn't give me the complete, all the

3   tip.   They told him to give me only 30, the owners.

4   Q.   OK.   Who told you?

5   A.   The owner.

6   Q.   Is the owner sitting in this courtroom today?

7   A.   Yes.

8   Q.   Is it Mr. Pizzimenti?

9   A.   I don't know his last name, but I know his name is Chris.

10  Q.   Is it the younger gentleman in the suit at the back table?

11  A.   Yes.

12  Q.   OK.   And what did he tell you?

13  A.   They gave me a tip for 110, and the manager at that time,

14  who was Samuel, told me they couldn't give me that amount.

15  Q.   But what did Mr. Pizzimenti tell you, if anything?

16  A.   That they should give me only $30 out of that money.

17  Q.   Did this happen -- how do you know that the tip was over

18  $100?

19  A.   It was a credit card.

20  Q.   So how did you know?

21  A.   They signed it.

22  Q.   Who is they?

23  A.   The customer.

24  Q.   What did they sign?

25  A.   The amount, and they signed their signature.

I1nWado2                    Aranda - Direct

1   Q.   Onto what?

2   A.   There's two receipts, one that says tips, and the customer

3   signs underneath.

4   Q.   OK.   How many times were your tips withheld for catering

5   orders?

6   A.   How many times?

7   Q.   Yes.

8   A.   Well, it would be two, twice a week.

9   Q.   OK.   How many catering orders did you do in a week?

10  A.   Catering?   Like one a week.

11  Q.   So how did they withhold catering tips from you twice a

12  week if you only did one a week?

13  A.   OK.   It was when we took other, larger orders, but in bags.

14  Q.   OK.   So how many times did you do that in a week?

15  A.   Two, three times.

16  Q.   And how would you -- how big were these orders?

17  A.   Like $300?   The amount?

18  Q.   How big were they physically; how many bags, how many

19  boxes?

20  A.   Perhaps you took three or two.

21  Q.   OK.   Would you ever have to use a cart to convey these

22  orders?

23  A.   No.   Not in the bags, no, but when we had plates full, yes.

24  Q.   Could you give the Court a range of the amount of tips that

25  were withheld on a weekly basis?   Just for you.

I1nWado2                          Aranda - Direct

1   A.  Once I had a tip for 80 and they only gave me 20.

2   Q.  OK.  But what is a typical amount of money that they

3   withheld from you, from these large orders?

4   A.  Well, they would give me 20 and they kept the rest.

5   Q.  Yes, how much was the rest, typically?  Was the rest $60?

6   Was the rest $100?  Was the rest $10?  An average.

7   A.  Maybe 80.

8   Q.  You're saying 80 is the amount they withheld or 80 is the

9   amount of the full value of the tip?

10  A.  Yes.

11  Q.  OK.

12  A.  80 is what they kept.

13  Q.  How did you know that tips were being withheld?

14  A.  Because they would tell us.

15  Q.  Did you ever notice a discrepancy between your count and

16  the manager's count?

17  A.  Yes.

18  Q.  Did you ever make a complaint to any of the managers about

19  this?

20  A.  No.

21  Q.  Did you ever, apart from the -- aside from the discussion

22  you told us that you had with the owner, were there any other

23  discussions with Al Horno management about withholding tips?

24  A.  No.

25  Q.  What were your duties at Al Horno apart from deliveries?

1   A.  We had to put the merchandise away.

2   Q.  When would you do that -- during a typical day, when would

3   you do that?

4   A.  From eight to ten.

5   Q.  OK.  How long did it take?

6   A.  It would take us like, take 20 minutes.

7   Q.  What kind of tasks did it entail?

8   A.  To put away the merchandise, the delivery, and the sodas.

9   Q.  How big was the delivery?  Merchandise.

10  A.  Well, when two companies would arrive with stuff, it would

11  be, like, 50 boxes.

12  Q.  How often would merchandise arrive at Al Horno?

13  A.  Three times a week.

14  Q.  OK.  How many times would two trucks arrive?

15  A.  Mondays and Fridays.

16  Q.  Did you have any other tasks besides deliveries that you

17  did during the morning shift?

18  A.  Yes.

19  Q.  Like what?

20  A.  We made boxes for the quesadillas.  We had to break down

21  the boxes for the merchandise that we put away came in.

22  Q.  Anything else?

23  A.  We had to clean the windows.  And wash the courtyard.

24  Q.  What do you mean, courtyard?

25  A.  The front of the restaurant.

I1nWado2                          Aranda - Direct

1    Q.  During the winter, did you have to shovel?

2    A.  Sometimes.

3    Q.  Anything else?

4    A.  And at night we had to clean.

5    Q.  What kind of cleaning tasks did you guys do at night?

6    A.  We had to sweep, mop.  We have to take out the garbage.

7    Q.  Anything else?

8    A.  You have to bring the things up for the prep workers.

9    Q.  Would you do that in the morning, at night, or some other

10   time?

11   A.  In the morning you have to bring the things up.

12   Q.  So in the morning, how long would it take you to refill the

13   sodas?

14   A.  20 minutes.

15   Q.  What about breaking down the boxes?

16   A.  15, about.

17   Q.  What about assembling the boxes for the quesadillas?

18   A.  Ten minutes.

19   Q.  How often would you have to assemble the quesadilla boxes?

20   A.  Every day.

21   Q.  Did anyone other than delivery workers do that job?

22   A.  Yes, we all had to do that, because there were a lot of

23   deliveries going out.

24   Q.  OK.  How long did it take you to clean the windows?

25   A.  Another 20 minutes.

I1nWado2                        Aranda - Direct

1    Q.  All right.  How long did it take you to wash the sidewalk?

2    A.  The same, 20.

3    Q.  When you say 20 minutes, did that include both the window

4    and the sidewalk, or is it 20 minutes per each?

5    A.  20 each, the windows and 20 the --

6    Q.  Sidewalk?  OK.

7        How much time would you spend bringing things up and down

8    the stairs?

9    A.  25.

10   Q.  Was it all at one time or spread throughout the day?

11   A.  Every morning.

12   Q.  Yeah.  But when you say you were bringing things up and

13   down the stairs, was there one time where all you did was bring

14   things up and down the stairs, or was it a task you repeated

15   throughout your shift?

16   A.  Well, we had to do other things.

17   Q.  OK.  Who asked you to bring those up and down the stairs?

18   A.  First the owner would let us know that we had to help the

19   prep workers, because they were women, that we had to help them

20   take the stuff upstairs, carry the stuff.

21   Q.  Who was the owner that you were referring to?

22   A.  Chris.

23   Q.  When did he tell you that?

24   A.  No.  The manager told us.

25   Q.  All right.  Did the owner tell you to do that?

I1nWado2                      Aranda - Direct

1    A.  No.

2    Q.  All right.  What kind of things were you bringing up and

3    down the stairs?

4    A.  Two boxes of tomatoes, three boxes of avocados, two bags,

5    about, of onions.

6    Q.  OK.  How many stairs were there?

7    A.  Like eight or seven.

8    Q.  Was there a basement to Al Horno?

9    A.  Yes.

10   Q.  All right.  What was down in the basement?

11   A.  A refrigerator and the owner's office.

12   Q.  OK.  I want to direct your attention to the activities you

13   did at night, during your night shift.  How much time did you

14   spend sweeping at night?

15   A.  I had to do that about twice a week.

16   Q.  Yeah.  How much time did it take you to do the sweeping --

17   when you did do -- withdrawn.

18       When you did sweep, how long did it take you?

19   A.  Ten minutes.

20   Q.  And how many times would you have to do that within a

21   shift?

22   A.  Excuse me?

23   Q.  When you did perform sweeping, when you did sweep at the

24   restaurant, did you do it just one time during your shift or

25   multiple times in your shift?

I1nWado2                         Aranda - Direct

1    A.  Once.

2    Q.  Then how much time did you spend mopping?

3              MR. MULHOLLAND:  Mopping.

4              THE INTERPRETER:  Oh, mopping.

5    A.  Around 20 minutes.

6    Q.  How much time would you spend dealing with the garbage?

7    A.  Around 15 minutes.

8    Q.  Is that something you would do -- withdrawn.

9        Did you deal with the garbage every, every night shift that

10   you had?

11   A.  Yes, we would take the garbage out.

12   Q.  All right.  Did you mop every night shift that you had?

13   A.  We'd take turns sometimes.

14   Q.  OK.  So how many times during a week would you mop?

15   A.  Around two times a week.

16   Q.  Besides sweeping, besides mopping, besides dealing with the

17   trash, are there any other tasks that you had to do during your

18   night shift?

19   A.  We would place the sodas in the refrigerator, we would fill

20   it with sodas.

21   Q.  How many times would you do that during your night shift?

22   A.  Also around two times a week.

23   Q.  OK.  How long would it take you?

24   A.  Around 20 minutes.

25   Q.  Any other tasks you would do during the night shift?

I1nWado2                        Aranda - Direct

1   A.  No.  No.  Those only.

2   Q.  During your morning shift, can you tell the Court a range

3   for the amount of deliveries that you would perform, just

4   during your morning shift?

5   A.  When I started, it wasn't very busy, so I would do half a

6   shift with delivery -- with a deliverer.

7           THE INTERPRETER:  Sorry.

8   Q.  How many deliveries, could you give the Court a range, high

9   and a low, how many deliveries you would do during a night

10  shift?

11  A.  At night, when it's busy, around 15.

12          THE COURT:  Now, as to the question of the number of

13  deliveries in the morning shift, would you ask that question

14  again, because I think he may have said a number, and I don't

15  know that it was interpreted that way.

16          Would you ask the question again as to morning

17  deliveries.

18          MR. MULHOLLAND:  Sure.

19          THE COURT:  So that we'll have it clear.

20          MR. MULHOLLAND:  Sure.

21  Q.  Mr. Aranda, could you tell me again, could you give me a

22  range, high and low, of the amount of deliveries you would do

23  during your morning shifts?

24  A.  Minimum five, ten maximum.

25  Q.  Why did you do so few in the morning compared to the night?

1    A.  Because before it wasn't busy.

2    Q.  At what time during the day did most of the deliveries --

3    withdrawn.

4        At what time during the day did the delivery orders start

5    to come in for Al Horno?

6    A.  We started at eight, but maybe we would have one, two,

7    three deliveries.

8    Q.  OK.  What was the busy time for Al Horno?

9    A.  From 11 to 2 p.m.

10   Q.  OK.  How many deliveries would you carry with you on a trip

11   out of the restaurant?

12   A.  When it is busy, like four of them.

13   Q.  And when it's not busy?

14   A.  One, two.

15   Q.  Could you give the Court a range, a high and a low, of how

16   much time it took you to do a trip for your deliveries?

17   A.  If the trip is long, it was about 45 minutes.  If it is

18   short, about 25.

19   Q.  Did you ever do delivery -- ever have trips that lasted

20   less than 25 minutes?

21   A.  Yes.

22   Q.  So how often did you have trips that were less than 25

23   minutes?

24   A.  Could you repeat the question, please?

25   Q.  Yeah.  How often would your trips for deliveries be less

I1nWado2                      Aranda - Direct

1   than 45 minutes?

2   A.  You know, when the deliveries were together to the same

3   address, it would take me less time.

4   Q.  Yeah.  So what's the least amount of time that a trip would

5   take?

6   A.  Ten minutes.

7   Q.  Did you ever buy any equipment to do your job at Al Horno?

8   A.  Yes.

9   Q.  What did you buy and how much did you pay.

10  A.  I bought one bike.  Actually, I bought two, because one of

11  them was stolen from me.

12  Q.  How much did you pay for each bike?

13  A.  The first one I paid $700, and the second one I paid $800.

14  Q.  OK.  Did you buy anything else in order to do your job at

15  Al Horno?

16  A.  Yes.

17  Q.  Yeah.  What did you buy and how much?

18  A.  I bought two helmets and the lock and the vest.

19  Q.  OK.  So how much was the vest?

20  A.  Around $20 I paid.

21  Q.  How much did you pay for the helmets?

22  A.  One was $50 and the other one was $80.

23  Q.  And what about for the lock; how much did that cost?

24  A.  70.

25  Q.  Who told you to buy these things?

I1nWado2                    Aranda - Direct

1   A.  No one, because I needed them.

2   Q.  All right.  Did anybody offer to reimburse you from --

3   withdrawn.

4        Did any of the management at Al Horno offer to reimburse

5   you for these purchases?

6   A.  No.

7   Q.  I'm going to ask you to turn to Exhibit C, Defendants'

8   Exhibit C in the book in front of you.  Could you take a moment

9   to take a look at the pages there?

10           MR. MULHOLLAND:  Actually, withdrawn.

11  Q.  Just take a look at the first page.  Do you recognize that

12  document?

13  A.  Yes.

14  Q.  What is it?

15  A.  They made me sign it, but I have no idea what it is.

16  Q.  Is there a signature there?

17  A.  Yes.

18  Q.  Do you remember when you signed this?

19  A.  Not exactly.

20  Q.  What do you remember about the timing of when you signed

21  this?

22  A.  When I -- they made me sign, all this was not filled out.

23  Q.  OK.  We'll get to that in a second, but can you give an

24  estimate of when you remember signing this?

25  A.  Around end of 2014.

I1nWado2                          Aranda - Direct

1    Q.  Did they give you to sign -- did somebody ask you to sign

2    this in July of 2014?

3    A.  No.

4    Q.  Did Ricardo give you this to sign in July 2014?

5    A.  The month, no.

6    Q.  OK.  Who gave you this to sign?

7    A.  Ricardo.

8    Q.  Is that Ricardo's handwriting?  Is that Ricardo's

9    handwriting at the bottom on the right?

10   A.  No.

11   Q.  Take a look at page 2.

12            MR. MULHOLLAND:  Actually, withdrawn.

13   Q.  Go back to page 1, please.  I apologize.

14       What, what -- see how there's three columns on the page?

15   A.  Yes.

16   Q.  And which column do you recall seeing, do you recall being

17   blank when you signed it?

18   A.  His name and this.

19            THE COURT:  What is he pointing to?

20            He's pointing at the first column.

21            MR. MULHOLLAND:  OK.

22   A.  And the date.

23   Q.  And the date?  OK.

24       If you could take a look at the second page, do you

25   recognize your signature on this page?

I1nWado2                    Aranda - Direct

1   A.  Yes.

2   Q.  Do you know who gave you this to sign?

3   A.  Ricardo.

4   Q.  Do you recall when?

5   A.  No, not exactly.

6   Q.  OK.  Do you remember if any part was filled out or blank,

7   or something else, when you signed it?

8   A.  It was blank.  There was no date or name.

9   Q.  Was the rest of it filled out, then?

10  A.  No, either.  It wasn't.

11  Q.  Was it filled out or it wasn't filled out?

12  A.  No, it wasn't filled out.

13  Q.  Take a look at the page after that, page 3.  Do you recall

14  when you were given this document to sign?

15  A.  Yes.

16  Q.  When?

17  A.  The exact day I do not remember.

18  Q.  Do you remember an approximate time?

19  A.  Well, yes.  Like in 2015.

20  Q.  Could you take a look at the last page of this exhibit,

21  page 4?  Do you recall --

22          THE INTERPRETER:  Hang on a second.

23          MR. MULHOLLAND:  Oh, sorry.

24          THE COURT:  The last page is 08.

25          MR. MULHOLLAND:  04 of Defendants' Exhibit C.

I1nWado2                         Aranda - Direct

1    Q.  Is that your signature there?

2    A.  Yes.

3    Q.  Do you recall who gave you this document to sign?

4    A.  Ricardo.

5    Q.  Did Mr. Zakari ever give you this document to sign?

6    A.  No.  No.

7    Q.  Was it filled out when you signed it, or were parts blank?

8    A.  It was -- they were blank.

9    Q.  All of it?

10   A.  Yes.

11   Q.  Did Ricardo ever explain to you that your tips were being

12   used to compensate you for your minimum wage?

13   A.  I'm sorry?

14   Q.  Did anyone ever tell you -- did any -- did the management

15   at Al Horno ever explain to you how you were being paid minimum

16   wage?

17   A.  No.

18   Q.  Did anyone at Al Horno, any of the management, ever explain

19   to you that if your tips were too low on a certain day, that

20   they would have to pay you the minimum wage at that time?

21   A.  No.

22   Q.  Did Mr. Zakari, also known as Gabriel, did he ever explain

23   to you how your tips were being used to justify paying you less

24   than the minimum wage?

25   A.  No.  No.  He never told me anything.

I1nWado2                          Aranda - Direct

1   Q.  OK.  Could you turn to Exhibit K, page 1 of Exhibit K?

2   A.  There's no date here.

3   Q.  I understand.

4            THE INTERPRETER:  I'm sorry.  What?

5            MR. MULHOLLAND:  Exhibit K.  Page 1 of Exhibit K.

6   Q.  Do you recognize the document there?

7   A.  Yes.

8   Q.  Do you recognize your signature on the document?

9   A.  Yes.

10  Q.  What is this document?

11  A.  This is the personal check that we were given.

12  Q.  Is this a check, or is it something else?

13  A.  From what I remember, I think it's the personal check or

14  something like that.

15  Q.  OK.  Let me ask you to turn to page K-3, third page of

16  Exhibit K.  Do you recognize these documents?

17  A.  Yes.

18  Q.  What are they?

19  A.  These are some personal checks.

20  Q.  OK.  In what context were you provided with these documents

21  to sign?

22  A.  Because they include all tips and the hours.

23  Q.  Yeah.  But when would you be given this to sign?

24  A.  On the weekends when we were given the check.

25  Q.  OK.  Who gave it to you to sign?

I1nWado2                          Aranda - Direct

1   A.   Ricardo.

2   Q.   OK.   Would you be allowed to keep a copy after you signed

3   it?

4   A.   No.

5   Q.   For what period of time did the management at Al Horno

6   provide you with these checks to sign?

7   A.   On the weekends they would pay us.

8   Q.   OK.   But when you first started working at Al Horno, when

9   they paid you in cash, did they provide you with a document

10  like this to sign?

11  A.   No.

12  Q.   When did they start -- when did the management at Al Horno

13  start to ask -- when did they start asking you to sign these

14  receipts when you got your pay?

15  A.   In 2015.

16  Q.   OK.   Let me ask you to turn to page -- sorry.   Exhibit G,

17  do you recognize what this document is?

18  A.   Yes.

19  Q.   Could you tell the Court what it is?

20  A.   My schedule.

21  Q.   When you first started working at Al Horno, how did you

22  keep track of your time?

23  A.   I didn't punch before.

24  Q.   I understand.   So when you first started working at Al

25  Horno, how did you keep track of your time?

I1nWado2                         Aranda - Direct

1   A.  The manager kept the time, the hours.

2   Q.  Which manager?

3   A.  Jimmy.

4   Q.  Did there come a time when you started using a, some sort

5   of a time, time clock to keep track of your time?

6   A.  Yes.

7   Q.  When was that?

8   A.  In December 2014.

9   Q.  Do you know why you started punching in in December of

10  2014?

11  A.  In order to keep the schedule in order.

12  Q.  Which locations, which Al Horno locations did you work at?

13  A.  In 47 and 57.

14  Q.  Was there a punch-card machine at the 57th Street location?

15  A.  Yes, but I didn't punch there.

16  Q.  How come?

17  A.  Because the same manager who was in 47 would send us to 57.

18  Q.  OK.  So where would you punch in?

19  A.  In 47.

20  Q.  Every day that you worked?

21  A.  Yes.

22  Q.  Would you punch in at eight when you came in?

23  A.  When I worked at eight, no.

24  Q.  How come?

25  A.  I wasn't given the thing to punch.

I1nWado2                          Aranda - Direct

1   Q.  Did there come a time when you were given the thing to

2   punch?

3   A.  Yes.

4   Q.  When was that?

5   A.  In December 2014 -- yes, 2014.

6   Q.  Did your schedule change in December 2014?

7   A.  Yes.

8   Q.  What did it change to?

9   A.  Some hours were taken away from me.

10  Q.  So what hours did you work after December 2014?

11  A.  I had nine or ten.

12  Q.  And would you still work those two shifts?

13  A.  Yes.

14  Q.  And would you still work a longer shift, one long shift on

15  Sundays?

16  A.  Yes.

17  Q.  Did you ever get paid an extra hour when you worked more

18  than ten hours in a single day?

19  A.  No.

20  Q.  Did any of the management ever tell you that they were

21  taking a fee for credit card, 3 percent fee from your tips

22  because they were being paid by credit card?

23  A.  No.

24  Q.  Did there ever come a time that you learned that they were?

25  A.  Yes, towards the end Ricardo told me.

I1nWado2                    Aranda - Cross

1   Q.  OK.  Did you complain to anybody?

2   A.  No.

3   Q.  When you say the end, what time period did you view to be

4   the end?

5   A.  Like towards the end of 2015.

6           MR. MULHOLLAND:  That's all, your Honor.  Thank you.

7           THE COURT:  Thank you.

8   CROSS-EXAMINATION

9   BY MR. HOFFMANN:

10  Q.  Good afternoon, Mr. Aranda.

11  A.  Good afternoon.

12  Q.  I'd like to kind of clarify your dates of employment.  You

13  testified today that you started work in June of 2014, correct?

14  A.  Yes.

15  Q.  And you said that you stopped working in September of 2016,

16  right?

17  A.  Yes.

18  Q.  But do you remember being deposed in my office, this past

19  July?

20  A.  But I didn't have the evidence to remember everything.

21  Q.  Sir, my only question to you was, do you remember being

22  deposed?

23  A.  Oh, yes.

24  Q.  OK.  And when you were deposed under oath, you gave very

25  different dates of employment for when you worked at Al Horno,

I1nWado2                    Aranda - Cross

1   right?

2   A.  Because I didn't recall perfectly well what the --

3   Q.  You gave different dates, didn't you, sir?

4   A.  That I recall or not, I don't.

5   Q.  You don't recall if you gave different dates?

6   A.  No.

7   Q.  Didn't you tell me under oath that you started in June

8   2013?

9   A.  No, I don't recall.

10  Q.  Didn't you say under oath that you were -- that "I remember

11  very well that it's 2013," the year you started?

12  A.  That I don't recall, no.

13  Q.  Can you take a look at -- there's a transcript in front of

14  you, and if you look at page 10, I'll read it to you.  And the

15  question, at line 15:

16  "Q.  You started in June of what year?

17  "A.  2013.

18  "Q.  Do you know the store did not exist in June of 2013?  So

19  tell me, sir, how did you work there?

20  "A.  I remember very well that it's 2013."

21       Does that refresh your recollection about what you

22  testified to?

23  Q.  Is that what you --

24            THE INTERPRETER:  I'm sorry.  You'll have to tell me

25  the lines again.

1          MR. HOFFMANN:  The last line would be 20, and "I

2     remember very well that it's 2013."

3          MR. MULHOLLAND:  15.

4          THE INTERPRETER:  The first line was?  The first line

5     was?

6          MR. HOFFMANN:  15.

7          THE INTERPRETER:  And the last line was 20.

8          MR. HOFFMANN:  Yes.

9     Q.  Do you remember saying that, sir?

10    A.  No, I don't remember very well.

11    Q.  OK.  And do you remember telling me that you stopped

12    working in January of 2016?

13    A.  No.

14    Q.  OK.  I want to read from page 12 of your deposition, line

15    9:

16    "Q.  When did you stop working at Al Horno?

17    "A.  In January 2016.

18    "Q.  How is it that you remember it was January 2016?

19    "A.  That's the day I stopped working there."

20         Do you remember giving that testimony, sir?

21    A.  Yes, because you were yelling at me that day and I had to

22    give you an incorrect date.

23    Q.  You gave the incorrect date because I was yelling at you?

24    A.  Yes.

25    Q.  Why would that cause you to give an incorrect date?

I1nWado2                          Aranda - Cross

1    A.  I got nervous.

2    Q.  Now, just going back to your deposition, sir, isn't it true

3    that there was a translator there?

4    A.  Yes.

5    Q.  So the questions that I asked you were actually addressed

6    to you by the translator, not by me directly, right?

7    A.  I don't remember.

8    Q.  Were you intimidated by the translator?

9    A.  No, him, because he was yelling and hitting on the table.

10   Q.  Who is "he" in that sentence?

11   A.  The attorney.

12   Q.  The attorney.  Would it be fair to say that you don't

13   really have a good recollection about the dates of your

14   employment at Al Horno?

15   A.  The first -- at the beginning, no, because I didn't have

16   this document that refreshes my memory.

17   Q.  OK.  Isn't it true that you started work in July of 2014?

18   A.  No.  It was in June.

19   Q.  And isn't it true that after you were on-boarded --

20          MR. HOFFMANN:  Let me withdraw that term, because I'm

21   not sure how it translates.

22   Q.  Isn't it true that after you started work, for the first

23   couple of months, there was very little work for you and you

24   didn't start working regularly until December of 2014?

25   A.  No.

I1nWado2                          Aranda - Cross

1   Q.  Wasn't the store brand-new in July of 2014?

2   A.  Yes, but there was already work inside.

3   Q.  Was there a lot of deliveries?

4   A.  No.  Deliveries, no.

5   Q.  So, I want to go to your testimony about these large orders

6   that -- you said you had about two of them a week.  Is that

7   your testimony, sir?

8   A.  Yes.

9   Q.  And how big were these two orders that you described during

10  your direct examination?

11  A.  I remember the amount.  They were wraps and they put them

12  in large plates.

13  Q.  And you were able to carry these orders by yourself?

14  A.  Sometimes it would be two of us or just one person.

15  Q.  Now, you say that the average tip on these two large orders

16  that you did a week was $80?

17  A.  Yes.

18  Q.  Do you know how big, what the cost was for the total order?

19  For these orders?

20  A.  Like 800.

21  Q.  800, OK.  So did this start right away, in July of 2014

22  that you started taking out two $800 orders a week?

23  A.  No.  About a month in they gave them to me.

24  Q.  So by August you were taking out two $800 orders a week?

25  A.  Yeah.

1    Q.  You told us during direct examination about all these

2    different duties that you had in addition to taking out

3    deliveries in the morning.  Do you remember that?

4    A.  Yes.

5    Q.  When you started at eight, you and another worker were the

6    only two delivery people who were working in the store, right?

7    A.  Yes.

8    Q.  Can you tell me who, what other people were working in the

9    store during the breakfast rush from between 8 and 10:00 in the

10   morning?

11   A.  Are you talking about the kitchen workers or delivery

12   people?

13   Q.  You said there were two delivery people.  Were there any

14   cooks that were working during that time?

15   A.  Yes, two cooks and two prep people.

16   Q.  Two cooks, two prep people.  Was there a porter that was

17   working at that time?

18   A.  When I started out, no.

19   Q.  OK.  Do you remember Nico?

20   A.  Yes.

21   Q.  Was he a porter?

22   A.  Yes.

23   Q.  When did he start work?

24   A.  Like mid-2015.

25   Q.  OK.  Was there a porter before him?

I1nWado2                     Aranda - Cross

1    A.  No.

2    Q.  Was there another porter as well, Antonio?

3    A.  No.  Antonio was a prep worker.

4    Q.  OK.  So you mentioned that there were two cooks and two

5    prep people.  How about on the front end; were there people

6    working in the front of the store?

7    A.  Yes, a cashier.

8    Q.  How many cashiers were working between eight and ten in the

9    morning?

10   A.  There was one that was named Marlene, and then at ten, two

11   more would arrive.

12   Q.  So you're saying from eight to ten, there was only one

13   cashier working?

14   A.  Yes.

15   Q.  Was there a --

16   A.  It wasn't busy.

17   Q.  Was there a dishwasher working between eight and ten in the

18   morning?

19   A.  No.

20   Q.  There was just the two delivery people and five others,

21   right?

22   A.  Yes.

23   Q.  And do you recall -- how many deliveries would go out for

24   breakfast between 10 and 12 -- I'm sorry, between 8 and 10 in

25   the morning?

I1nWado2                          Aranda - Cross

1    A.  Like four deliveries.

2    Q.  For the whole breakfast period, from eight to ten, only

3    four deliveries went out the door every day?

4    A.  Yes.  When we started out, it was slow.

5    Q.  OK.  And how about in 2015; how many breakfast orders would

6    go out between eight and ten?

7    A.  Maybe ten.

8    Q.  Ten?  Did it ever get higher than that?

9    A.  No.  It would be like ten, eight.

10   Q.  Eight to ten, and that was it?

11   A.  Yes.

12   Q.  Do you know how many items were on the menu for the Al

13   Horno store on 47th Street for breakfast?

14   A.  Tell you the truth, no.

15   Q.  Did you ever look at the menu?

16   A.  No.

17   Q.  How long have you been in the United States, sir?

18   A.  Ten years.

19   Q.  And what kind of jobs did you have before you were hired by

20   Al Horno?

21   A.  I worked for a company called Energy Kitchen.

22            MR. MULHOLLAND:  Energy.

23            INTERPRETER NEBBIA:  Energy.

24   Q.  Did you sue Energy Kitchen?

25   A.  No.

1    Q.  Did you do deliveries for Energy Kitchen?

2    A.  I started out doing deliveries, and then they hired me for

3    the kitchen.

4    Q.  Did you use a bicycle to do deliveries?

5    A.  When I worked at Energy Kitchen?

6    Q.  Yes, sir.

7    A.  Yes.

8    Q.  Was it the same bicycle that you used when you worked at Al

9    Horno?

10   A.  No.

11   Q.  What happened to the bicycle that you had when you worked

12   at Energy Kitchen?

13   A.  They stole it from me.

14   Q.  Who stole it from you?

15   A.  I don't know.  On the street.

16   Q.  Now, you testified earlier that you bought two bicycles to

17   use to work at Al Horno.  Where did you buy these bicycles?

18   A.  One I bought in upper Manhattan, around there, in a bike

19   store.

20   Q.  Did you buy it new or used?

21   A.  Used.

22   Q.  It cost $700 for a used bicycle?

23   A.  Yes.

24   Q.  Was it a racing bicycle, or was it just kind of a three

25   seat -- three-speed bicycle that you see delivery people riding

I1nWado2                          Aranda - Cross

1   around in the city?

2   A.  No, it's not a speed bicycle.  It's a mountain bike, but

3   it's a brand name.

4   Q.  Do you still have the bicycle?

5   A.  No.

6   Q.  What happened to it?

7   A.  I sold it.

8   Q.  Do you do delivery now for your profession?

9   A.  Yes.

10  Q.  Do you use a bicycle?

11  A.  Yes.

12  Q.  Where did you get the bicycle?

13  A.  I bought it.

14  Q.  So you sold the bicycle that you bought for Al Horno and

15  bought a new bicycle?

16  A.  Yes.

17  Q.  Can you explain why you did that?

18  A.  Because I changed jobs.

19  Q.  The bicycle that you bought at Al Horno, did you also use

20  that to get around town yourself in your personal life?

21  A.  No.

22  Q.  Did you use any kind of bicycle to get around, if you

23  wanted to visit a friend or go to the store, or maybe for a

24  second job?

25  A.  No.

I1nWado2                        Aranda - Cross

1   Q.  Did you buy the bicycle before you started at Al Horno or

2   after you started?

3   A.  Before I started.

4   Q.  Before you were hired?

5   A.  Yes.

6   Q.  And you said you bought two bikes.  Was the first bike

7   stolen, or did you sell the first bike and decide to buy a new

8   one?

9   A.  My first one was stolen and then I bought the other one.  I

10  was still at Al Horno.

11  Q.  OK.  You said that you bought a vest to use while you

12  worked at Al Horno?

13  A.  Yes.

14  Q.  Isn't it true that there were 60 vests in the store that

15  Mr. Pizzimenti bought for delivery people to use for free?

16  A.  Yes, but those arrived later on.

17  Q.  When did they arrive?

18  A.  Like at the end of 2014.

19  Q.  Did you see all the vests that were in the store for

20  delivery people to use?

21  A.  No.

22  Q.  How did you know about them then?

23  A.  Ricardo mentioned it, but I didn't see them.

24  Q.  Did anyone at Al Horno management tell you that you had to

25  buy a helmet?

1   A.  No.

2   Q.  Do you still have the helmet that you bought when you

3   worked at Al Horno?

4   A.  Yes.

5   Q.  And do you use it in your new job?

6   A.  Yes.

7          MR. HOFFMANN:  Thank you, sir.  I have nothing

8   further.

9          THE COURT:  Mr. Mulholland, anything further?

10         MR. MULHOLLAND:  Yes, please.

11  REDIRECT EXAMINATION

12  BY MR. MULHOLLAND:

13  Q.  Mr. Aranda, what is your highest level of education?

14  A.  I just did elementary school.

15  Q.  How many years did you spend in elementary school?

16  A.  Like four years.

17  Q.  All right.  Where was that?

18  A.  In Mexico.

19  Q.  Where in Mexico?

20  A.  In Guerrero.

21  Q.  In a city, in a town?

22  A.  In a town.

23  Q.  How big was the town?

24  A.  I don't know how many, but it was a small town.

25  Q.  Have you done any education since coming to the United

I1nWado2                          Aranda - Redirect

1    States?

2    A.  Here, no.

3    Q.  The bicycles that you bought, did they have a motor on

4    them?

5    A.  No.

6    Q.  OK.  Neither?

7    A.  No.

8              MR. MULHOLLAND:  No further questions, your Honor.

9              THE COURT:  Anything further for this witness?

10             MR. HOFFMANN:  No, your Honor.

11             THE COURT:  Thank you, Mr. Aranda.  Your testimony is

12   concluded.  You may step down.

13             THE WITNESS:  Thank you very much.

14             (Witness excused)

15             THE COURT:  Call your next witness.

16             MR. MULHOLLAND:  Yes, it was the plaintiffs' intention

17   to call Mr. Pizzimenti as an adverse witness.

18             THE COURT:  Are you doing that now?

19             MR. MULHOLLAND:  Yes, please.

20             MR. HOFFMANN:  I would object.  I'm going to call him

21   on my direct case.  I think things would move a lot quicker if

22   he goes through direct and cross rather than cross and direct

23   and cross again.  It's going to be the same testimony.

24             THE COURT:  The objection's overruled.

25             Mr. Pizzimenti, would you please come to the witness

I1nWado2                    Pizzimenti - Direct

1   stand.

2            MR. HOFFMANN:  Could we take -- I just need to use the

3   rest room.  Could we take 30 seconds?

4            THE COURT:  Actually, it's just about 3:15 now, so

5   we'll take our ten-minute afternoon break now and we will

6   resume at 3:25.

7            MR. HOFFMANN:  Thank you.

8            MR. MULHOLLAND:  Thank you, your Honor.

9            (Recess)

10           THE COURT:  Good afternoon.  Please be seated.

11           Mr. Pizzimenti, would you please come to the witness

12   stand.

13    CHRISTOPHER PIZZIMENTI,

14       Defendant, called as a witness on his own behalf,

15       having been duly sworn, testified as follows:

16           THE COURT:  You may begin.

17           MR. MULHOLLAND:  Thank you, your Honor.

18   DIRECT EXAMINATION

19   BY MR. MULHOLLAND:

20   Q.  Mr. Pizzimenti, I'd like to direct your attention to

21   Defendants' Exhibit I --

22   A.  Yes.

23   Q.  -- binder in front of you.

24       Oh, within that binder, there's a tab I.

25   A.  OK.

I1nWado2                    Pizzimenti - Direct

1  Q.  Do you recognize what that document is?

2  A.  Yes.

3  Q.  These are the pay stubs that you would have my clients sign

4  to get their weekly pay in 2015, isn't that right?

5  A.  Yes.

6  Q.  Did you ever issue these statements to my clients?

7  A.  Personally, no.

8  Q.  Isn't it true that you never, your managers never left a

9  copy for my clients to take with them home?

10  A.  That's not true.  They made copies.

11  Q.  How do you know?

12  A.  Because it was part of our practice.

13  Q.  Were you ever personally there when they were issued a

14  copy?

15  A.  Yes.

16  Q.  How many times?

17  A.  On occasion.  If I happened to be down on payday, I would

18  see, see them being distributed.

19  Q.  You would see a copy of these pay stubs handed to my

20  clients so they could take home?

21  A.  Yes.

22  Q.  How many times did you see that in 2015?

23  A.  Several times.

24  Q.  When did your company start issuing these pay stubs?

25  A.  Around the time shortly after we opened.

I1nWado2                        Pizzimenti - Direct

1   Q.  Isn't it true that -- withdrawn.

2       Would it surprise you if I told you that the earliest pay

3   stubs in this entire binder start in October of 2014?

4   A.  If that's what it is, then I would say it's accurate.

5   Q.  OK.  You're aware, you're very familiar with the state's

6   wage-and-hour laws, is that correct?

7   A.  Yes.

8   Q.  Do you know what spread-of-hours pay is?

9   A.  Yes.

10  Q.  Why do these --

11          MR. HOFFMANN:  Your Honor, I'm just going to request

12  that -- if the translator could maybe move down a little bit,

13  because --

14          Your sound is making it hard for me to hear the

15  testimony on the stand.

16          THE INTERPRETER:  Yes, but we have one earphone that

17  isn't working, so I don't know what I'm going to do.

18          MR. HOFFMANN:  Your Honor, would it be possible if I

19  just moved up closer?

20          THE COURT:  You can sit in the jury box.

21          MR. HOFFMANN:  Thank you very much.

22          THE INTERPRETER:  We'll get one earphone in a second.

23          THE COURT:  Did you call down?

24          THE INTERPRETER:  No, no.  My colleague went down to

25  bring it up.

1               THE COURT:  OK.  Great.  Thank you.

2               MR. HOFFMANN:  Thank you, your Honor.

3    BY MR. MULHOLLAND:

4    Q.  Mr. Pizzimenti, you're familiar with spread-of-hours law?

5    A.  Yes.

6    Q.  You're aware that when someone works over ten hours in a

7    day or has a split shift that spans over ten hours, you have to

8    pay them an extra hour at the minimum wage?

9    A.  Yes.

10   Q.  On any of the pay stubs in front of you, do you see an

11   entry for spread-of-hour pay?

12   A.  Not on these.

13   Q.  And why is that?

14   A.  It would mean they weren't entitled to a spread pay, spread

15   hour.

16   Q.  I'd like to direct your attention to Exhibit -- sorry, page

17   10 of Exhibit I.

18   A.  Yes.

19   Q.  Do you see that there's a spread-of-hour entry on these pay

20   receipts?

21   A.  Yes.

22   Q.  I'd like to have you turn one page back, to page 9.

23   A.  OK.

24   Q.  Do you see a spread-of-hour entry on any of these receipts?

25   A.  No.

I1nWado2                          Pizzimenti - Direct

1   Q.  Would it surprise you if I told you that none of the pay

2   receipts issued by Al Horno included an entry for spread of

3   hours until mid-May of 2015?

4   A.  Well, I remember a time we found it easier to have it typed

5   in even though someone didn't qualify for it, instead of

6   having -- in some other cases, let's say, with employees that

7   did get them, they would manually write them in.

8   Q.  OK.  So how about Mr. -- let's take a look at Mr. Aranda.

9            MR. MULHOLLAND:  Actually, you know what?  Withdrawn.

10  Q.  Let's take a look at --

11           THE COURT:  Mr. Pizzimenti, can you move the

12  microphone a little more directly in front of you.  Just pull

13  it over a little bit.

14           THE WITNESS:  Yes.

15           THE COURT:  Thank you.

16           THE WITNESS:  You're welcome.

17  BY MR. MULHOLLAND:

18  Q.  Let's take a look at Exhibit G.  Do you recognize that

19  document?

20  A.  Yes.

21  Q.  What is it?

22  A.  A time record.

23  Q.  OK.  Could you turn to page -- for who?

24  A.  Antonio Aranda.

25  Q.  How were these, how was this document generated?

1   A.  From the time clock.

2   Q.  And what does it reflect?

3   A.  Time worked.

4   Q.  Are there any other, any other documents reflecting the

5   hours that my clients may have worked at Al Horno apart from

6   these time receipts?

7   A.  Well, this is a full report.  There would be an individual

8   report as well that they would sign at the end of the pay

9   period.

10  Q.  OK.  Could you turn to page 7 of this exhibit.

11  A.  OK.

12  Q.  Do you see an entry for 11/11/15?

13  A.  Yes.

14  Q.  OK.  So do you see two entries for 11/11/15?

15  A.  Yes.

16  Q.  Based on your understanding of how spread of hours works,

17  would this worker have been entitled to a spread of hour, hours

18  pay for -- would the worker reflected in this time record have

19  been entitled to spread-of-hours pay for this shift?

20  A.  I'd have to calculate the time quick.

21  Q.  I think it's there.

22  A.  I believe so.

23  Q.  OK.  So if I take a look at his pay receipt, will I see

24  spread of hours written in there?

25  A.  What page is that?

1                MR. MULHOLLAND:  Oh, actually, withdrawn.  Let me go

2       back in time.  I'm sorry.  Sorry.

3       Q.  Take a look at G-13.  See an entry for 4/22?

4       A.  Yes.

5       Q.  Would this worker have been entitled to spread of hours for

6       that time period?

7       A.  Yes.

8       Q.  So if we look at the corresponding pay receipt, will we see

9       spread of hours handwritten in to his pay receipt?

10      A.  Which receipt?

11      Q.  The pay receipt that he received at the end of the week.

12      A.  Which example?

13      Q.  The one corresponding to 4/22, 2015.

14      A.  I don't know the page of it.

15                MR. MULHOLLAND:  You know, let's make it a little

16      easier.

17      Q.  Take a look at G-14.  There's an entry for March 30, two

18      entries for March 30, 2015.  All right?  Would this worker have

19      been entitled for spread of hours for that split shift?

20      A.  I'm sorry.  Which date?

21      Q.  3/30.  March 15 -- sorry.  March 30.

22      A.  Yes.

23      Q.  Take a look at the entry right after it, March 31.  Would

24      he have been entitled to spread of hours for that day?

25      A.  Yes.

```
 1   Q.  And April 1?

 2   A.  Yes.

 3   Q.  OK.  And what worker is covered by this time record?

 4   A.  Excuse me?

 5   Q.  What worker is covered by this time record?  Whose time

 6   record is this?

 7   A.  Antonio Aranda.

 8   Q.  OK.  Could you take a look at Exhibit K, page K-09?  Take a

 9   look at the middle receipt for pay period 3/27 to 4/2, 2015.

10   A.  OK.

11   Q.  Is there any spread of hours, is there a spread-of-hours

12   entry anywhere on this receipt?

13   A.  I don't see it written on this receipt, but I would

14   calculate that, and also I'd like to take a look at the bottom

15   of the receipt.

16   Q.  Sure.  Take a look at the bottom receipt.

17        Is there any indication from these documents that

18   Mr. Aranda was paid spread of hours for this time period, this

19   week of 3/27 to April 2?

20             MR. HOFFMANN:  Your Honor, I think there was a

21   question pending, and he was going to look at the bottom of the

22   sheet.  May the witness be allowed to finish looking at it?

23             THE COURT:  Did the witness wish to say something

24   further about the receipt at the bottom?

25             THE WITNESS:  No.
```

 1           THE COURT:  All right.  We'll have the court reporter

 2   reread the preceding question.

 3           (Record read)

 4   A.  I don't see it written as spread with a, an amount in

 5   there.

 6   Q.  Is there anywhere I should look to find out where spread

 7   of -- Mr. Aranda's spread-of-hour pay is recorded for this time

 8   period?

 9   A.  I'd like to maybe add up his calculations, or -- because

10   it's our practice to pay spread of hours.

11   Q.  Isn't it true that Al Horno didn't start paying spread of

12   hours until the middle of May 2015?

13   A.  I wouldn't say it was true, because I --

14   Q.  Do you have any knowledge of whether it's true or not?

15   A.  Well, I instructed everyone to pay it from when we opened

16   the store.

17   Q.  Mr. Pizzimenti, you had a background in finance before you

18   moved into the restaurant industry?

19   A.  I worked at a bank.

20   Q.  You went -- you have a college degree?

21   A.  Yes.

22   Q.  You have a master's degree?

23   A.  No.

24   Q.  How many years did you work in, at a bank?

25   A.  Maybe three.

1   Q.  All right.  Fair to say you're an intelligent,

2   well-educated man?

3   A.  I would hope so.

4   Q.  All right.  And Al Horno wasn't your first restaurant?

5   A.  No.

6   Q.  How many restaurants had you opened before Al Horno?

7   A.  Two.

8   Q.  What were their names?

9   A.  Stamina and Fuel.

10  Q.  And when did you open this first Al Horno?  Isn't it true

11  you opened the first Al Horno on 47th Street in April of 2014?

12  A.  It was around April or May.  I know I was there in April

13  setting the store up.

14  Q.  OK.

15  A.  But the first sale, I believe, took place sometime in May.

16  Q.  You've testified in several lawsuits, isn't that true?

17  A.  A few.

18  Q.  A few.  More than three?

19  A.  Yes.

20  Q.  I have deposition transcripts here of more than three.

21  A.  I'm sorry.  Could I ask a question?

22  Q.  Yeah.

23  A.  Did you mean in relation to labor or in general?

24  Q.  Just in general.

25  A.  Yeah, I would say it's -- yeah, more than three.

I1nWado2                    Pizzimenti - Direct

1   Q.  OK.  And isn't it true that you've testified at least in a

2   couple of places that Al Horno was opened in April of 2014?

3   A.  I've always said it was April and May.

4   Q.  OK.  So if I showed you a deposition transcript where you

5   only said April 2014, would that refresh your memory?

6   A.  Yes.

7   Q.  OK.  We'll get back to that.

8       Who is Jimmy Sanchez?

9   A.  He was a managing partner.

10  Q.  Isn't it true that he owned a piece of Al Horno when it was

11  first opened?

12  A.  Yes.

13  Q.  All right.  And isn't it true that he was in charge of

14  opening Al Horno in April -- I'm sorry.

15      Isn't it true that Jimmy Sanchez was in charge of opening Al

16  Horno back in April of 2014?

17  A.  Along with myself.

18  Q.  All right.  Well, isn't it true that it was Jimmy Sanchez

19  who did all the hiring for the first generation of workers for

20  the 47th Street location of Al Horno?

21  A.  Yes.

22  Q.  And isn't it true that Jimmy Sanchez stopped working at Al

23  Horno around July of 2014?

24  A.  Yes.

25  Q.  Isn't it true that Jimmy Sanchez initiated a lawsuit

1   against you predicated on various theories?

2   A.  Yes.

3   Q.  And didn't some of those lawsuits pertain to your business

4   practice, your businesses of Fuel Express, Stamina and also Al

5   Horno?

6   A.  It was just Fuel and Al Horno, and then he dropped the

7   charges against me.

8   Q.  They weren't criminal charges, though, were they?

9   A.  No.  I guess they're claims, if you want to call them.

10  Q.  We will call them claims.

11  A.  OK.

12  Q.  Have you ever been convicted of a crime involving perjury

13  or forgery or fraud?

14  A.  No.

15  Q.  You didn't spend much time at the 47th Street location of

16  Al Horno?

17  A.  I was always in and out.

18  Q.  When you say in and out, isn't it true that you would come

19  in maybe once every two weeks for an hour?

20  A.  I couldn't tell you exactly.

21  Q.  Well, you remember testifying under oath at Mr. Hoffmann's

22  office during a deposition that I was conducting, right?

23  A.  I remember.

24          THE COURT:  Do you have a copy for me?

25          MR. MULHOLLAND:  I have a copy.

1             THE COURT:  Mr. Hoffmann, do you have your copy out?

2             MR. HOFFMANN:  Yes.

3             MR. MULHOLLAND:  Page 18.

4             THE COURT:  Looks like we can proceed.

5             MR. MULHOLLAND:  OK.  Thank you.  Page 18, line 22 --

6    sorry, line 21 to 25.

7    Q.  I'm going to read this to you, Mr. Pizzimenti.

8    A.  I'm sorry.  Can I see it, please, too?

9             MR. MULHOLLAND:  Yeah.  I don't think I have a copy

10   for the witness.

11            THE WITNESS:  Thank you.

12            MR. MULHOLLAND:  Thank you, your Honor.

13            Page 18, line 21 to 25:

14   "Q.  How often were you on site at 47?

15   "A.  I can't say for sure, but it would be once every couple of

16   weeks.

17   "Q.  When did you go once every couple of weeks --"

18            I'm sorry.

19   "Q.  When you did go every couple of weeks, how long would you

20   stay?"

21            Turning over to page 19, line 2:

22   "A.  About an hour."

23   Q.  Do you remember telling me that?

24   A.  No, but if it's here, then I said it.

25   Q.  Is it accurate?

I1nWado2                     Pizzimenti - Direct

1    A.  It could be, because I was, I was going to get -- I got

2    married in August 2014, so it would make sense.  Between other

3    work that I had going on and that, sounds about right.

4    Q.  All right.

5    A.  And like I said, I still maintain that I was in and out of

6    the store.

7    Q.  Isn't it fair to say that Jimmy Sanchez kept you in the

8    dark about a lot of his dealings with Al Horno early on,

9    between April and July of 2014?

10   A.  I know that we -- we met and I told him how things need to

11   be done, and when I saw how things were being done, I

12   definitely wasn't satisfied with it.

13   Q.  OK.  Isn't it fair to say that Al Horno probably was not,

14   was not honoring the proper New York Labor Law pay practices

15   until late 2015, if at all?

16   A.  I wouldn't say that, because the way he was doing things I

17   just thought needed much more improvement, just because of kind

18   of what I know in this space, and those were the things that I

19   confronted him on.

20   Q.  Isn't it fair to say you were a pretty much hands-off

21   manager of 47th Street and the 57th Street locations for the

22   bulk of 2015?

23   A.  It -- well, if you want to say like day-to-day operation,

24   then yes.

25   Q.  Yeah.

1    A.  I wasn't in the store, let's say, doing like the daily

2    tasks and stuff like that.

3    Q.  So then it's fair to say you don't have a lot of personal

4    knowledge of how my clients spent their time at Al Horno?

5    A.  I can say in general how the employees, how we instructed

6    management and upper management to handle and how to run the

7    store and the operation --

8    Q.  But that's --

9    A.  -- with certainty.

10   Q.  But that's not the same.  Having personal knowledge of the

11   instructions that you issued is certainly different from having

12   personal knowledge of how my clients actually spent their time,

13   isn't it?

14   A.  Well, we would -- spent regular, regular time, let's say,

15   if not face to face, on the phone about the way the store was

16   being run and needs to be run.

17   Q.  But you yourself didn't witness the day-to-day activities

18   of my clients?

19   A.  When I would be in the stores, I would see what was going

20   on, for sure.  I knew what was going on, and I have a camera

21   system on my phone --

22   Q.  When you did you install the --

23   A.  -- to actually monitor --

24   Q.  When did you install the camera system on your phone?

25   A.  That was when we opened.

I1nWado2                    Pizzimenti - Direct

1    Q.  What was that?

2    A.  From when we opened.

3    Q.  And how often would you have looked at that camera system?

4    A.  Looked at the cameras every day.

5    Q.  How often during the day?

6    A.  Multiple times in a day.

7    Q.  Well, not while driving.

8    A.  Not while driving.

9    Q.  OK.  I want to ask you about Mr. Zakari.  It's true that

10   Mr. Zakari's been an employee of at least one of your

11   restaurants for a long period of time?

12   A.  Yes.

13   Q.  All right.  And he has since risen to become a manager for

14   you?

15   A.  He did.

16   Q.  Yeah, but he didn't become a manager until the middle of

17   2015, isn't that true?

18   A.  No.

19   Q.  Isn't it true that you told me something different in our

20   deposition?

21   A.  I don't really remember talking about Djibril.

22   Q.  How long has Djibril been acting in his capacity as a

23   manager at Al Horno?

24   A.  Since May of 2014.

25   Q.  Since May of 2014?

I1nWado2                    Pizzimenti - Direct

1   A.   Yeah.   He was more of a -- we called him a supervisor, and

2   then we called him the head of operations, but not the actual

3   store manager.

4   Q.   So what was his role at Al Horno in May of 2014?

5   A.   He was like an extended role of myself, so that's why we

6   said he was the head of operations.

7   Q.   Did he have the power to hire -- withdrawn.

8        What location was he assigned to in May of 2014?

9   A.   At that time, 47th Street.

10  Q.   Isn't it, in fact, true that Djibril worked at a different

11  restaurant for you at that time, and his role was

12  front-of-the-house worker rather than someone with any kind of

13  managerial authority?

14  A.   He definitely split his time.

15  Q.   Between where?

16  A.   My Stamina store and 47th Street.

17  Q.   What did he do at Stamina in May of 2014?

18  A.   Same thing.   At that time, I needed an extended role of

19  myself.

20  Q.   OK.   So how much time --

21  A.   That's how I would describe it.

22       I'm sorry.

23  Q.   Sir, you did actually talk about Djibril in your

24  deposition.   I'd like to read you a section from it.

25  A.   Sure.

1   Q.  This is page 57, lines 16 through 25.

2           THE COURT:  Did you want to look at that again?

3           THE WITNESS:  Yeah, thanks.

4   A.  I'm sorry.  What page?

5   Q.  57.  Actually, let's start with lines 13 through 25.

6   A.  OK.

7           MR. MULHOLLAND:  All right.

8   "Q.  Are there any other managers besides whom we talked about

9   today and Djibril?

10  "No.

11  "Q.  How long did Djibril work for you?

12  "A.  I believe since we opened, but not in that capacity.  He

13  was a regular front-staff worker, packer, and then we had given

14  him more administrative duties.  He is the one who, who -- he

15  had hire-fire capabilities.  He reviews this stuff.  We talk

16  about it a lot, as far as labor law, keeping up on labor-law

17  changes every year.  He is, he has the same conversations

18  with --"

19          Turning over to page 58:

20  "-- managers, I've had it with managers."

21  Q.  What did you mean when you told me that he was with you

22  when, you believed since you opened, but not in that capacity?

23  What did you mean by that?

24  A.  Well, I think when we first opened, the idea to Jimmy of

25  having this person who, you know, was, well, let's say, split

1    responsibility with him, I don't think he was too crazy about

2    it, but you're talking, like, after the first week of being

3    there.  We -- you can see what I say right after that.  We

4    quickly, very quickly got him into the position I just

5    mentioned before.

6    Q.  You told me he was a regular front-staff worker and a

7    packer and that it was later that you'd give him more

8    administrative duties.  Was that period of time, did you mean

9    like one week?

10   A.  Yeah, it was quickly after that.

11   Q.  OK.  So when you told me, "I believe since we opened, but

12   not in that capacity, he was a regular front-staff worker," you

13   meant he was not in a managerial -- he didn't have a managerial

14   capacity for, like, one single week?

15   A.  Well, I remember it being an issue, so there was a store

16   manager, and then there was --

17   Q.  Mr. Pizzimenti, you're in federal court.

18            MR. HOFFMANN:  Objection.

19   A.  Yeah.

20            MR. HOFFMANN:  Let the witness finish his answer.

21   A.  I'm just --

22            THE WITNESS:  Yeah.

23            THE COURT:  Are you asking for yes-or-no answers, or

24   are you asking for narrative answers?

25            MR. MULHOLLAND:  I would like to withdraw and ask a

I1nWado2                          Pizzimenti - Direct

1    yes-or-no question, your Honor.

2                    THE COURT:  You may.

3    BY MR. MULHOLLAND:

4    Q.  Isn't it true that you did not give Mr. Zakari any

5    administrative duties until the middle of 2015 and that prior

6    to that time, he was a front-of-the-house worker?

7    A.  That's not true.

8    Q.  Do you have any document reflecting his promotion?

9    A.  Well, the fact, the fact that he was issuing the pay-rate

10   sheets from the very beginning.

11   Q.  Uh-huh.

12   A.  You know, like I said, you have to kind of go back in time

13   and understand the circumstances.  Jimmy --

14   Q.  Where was he --

15                   THE COURT:  No.

16   Q.  Where was he a front-staff worker?

17                   THE COURT:  Let him finish his sentence.

18                   MR. MULHOLLAND:  Sorry.

19                   THE COURT:  Had you finished that answer?

20                   THE WITNESS:  No.

21                   THE COURT:  You can finish your answer.

22   A.  So Jimmy was not only managing partner, he was an equity

23   owner in the company, and it -- I remember the topic being

24   sensitive.  And I remember shortly after we opened, there were

25   things that were red flags with Jimmy from the beginning, and

1   that's why, if you think about it, we opened, let's say, in

2   May, and he's out by mid-July.  Why would that happen?  And

3   then why would he bring claims against me that would later,

4   that he decided to drop?

5       So it was a very sticky situation around that time, and

6   there were a lot of things I can get into why it didn't make

7   sense for him to be there, and that's what transpired.  And

8   that's why Djibril had to step into a more extended role of

9   myself, because I had a hard time, you know, doing everything

10  by myself.  I'm one guy; it just wasn't possible.

11  Q.  When did Mr. Zakari step into his administrative role?

12  A.  In May of 2014.

13  Q.  When you opened?

14  A.  Shortly after that.  We opened early May, then he stepped

15  into that maybe mid-May.

16  Q.  OK.  Where was Mr. Zakari a front-staff worker?

17  A.  In Stamina and 47th Street.

18  Q.  For how long?

19  A.  Stamina, I would say maybe a year.

20  Q.  OK.  Where was he a packer?

21  A.  I'm sorry.  Even before Stamina, he worked with me at Fuel.

22  He, he started as a delivery person, and I just, you know, grew

23  to really like him, the way he works, and so I gradually, as we

24  grew pretty quickly, I -- he was constantly being promoted,

25  delivery, packer, supervisor.

1        I mean, if you -- when you talk to him, you'll see.  Now

2    he's the head of operations for all of our stores, next to me.

3    Q.  What were his duties in the summer of 2014 at the 47th

4    Street location?

5    A.  Well, he did all kinds of duties, I would say, when he was

6    there.  He's not the type to do nothing, so he would still be

7    doing those duties in addition to --

8    Q.  Yeah, but which?  Name a single duty in the summer of 2014

9    that he fulfilled at the 47th Street location of Al Horno.

10   A.  He would definitely pack, send out deliveries.  He would --

11   he was very involved in a lot of the labor stuff, these

12   pay-rate sheets, the pay stubs.  Everything that I worked on

13   for the operations for the stores, it would pass through him,

14   and then that's kind of how we ran -- that's how we ran the

15   business.

16   Q.  So in the summer of 2014, Mr. Zakari would be packing

17   orders, and then every now and then, he would hand out annual

18   wage notices; that's the extent of his duties in the summer of

19   2014 as a manager?

20   A.  Yeah.  I mean, you got to understand, it's a very small

21   store.  We're not like this big corporate store on Broadway.

22   We're a small, 900-square-foot store on a residential Street

23   between Ninth and Tenth Avenue, so he wouldn't be there -- and

24   that's the kind of guy he is and that's the kind of guy I am.

25   If I'm in the store, I'm packing orders.  So he wouldn't be in

1    this small store just doing nothing.  He would be giving a

2    helping hand and doing other responsibilities.  Most managers

3    do.

4    Q.  How much time would he spend at the 47th Street location on

5    a weekly basis during the summer of 2014?

6    A.  You know, I really couldn't tell you exactly how much time.

7    Q.  How much time did he spend at Stamina?  You said he had the

8    same role at Stamina, correct?

9    A.  Well, if he spent three to four hours at 47th Street, he

10   would do about the same at the other store.  He would split his

11   day, and he still does.  He still splits his days up,

12   locations.

13   Q.  OK.  Isn't it true he was front-of-the-house worker at

14   Stamina until the middle of 2015 and didn't come over to Al

15   Horno until early 2015 as a front-of-the-house worker?

16   A.  That's not true.  He worked between both places.  I really

17   needed someone to do that, and besides what I needed, he was

18   the right guy for it.

19   Q.  Did he hire anybody?

20   A.  And he was the right guy to do it.

21          THE COURT:  I'll have to ask both of you to slow it

22   down just a bit more.  Thank you.

23   BY MR. MULHOLLAND:

24   Q.  Did Mr. Zakari hire anybody in 2014 at the 47th Street

25   location?

1    A.  Yes.

2    Q.  Who?

3    A.  I couldn't tell you exactly who, but he had that ability,

4    to do that.

5    Q.  All right.  How many people did he hire in 2014?

6    A.  I can't tell you for sure.

7    Q.  Did he fire anybody in 2014?

8    A.  I don't know.

9    Q.  Did you take away 3 percent of any credit card tips from

10   the -- my clients here during the time at Al Horno?

11   A.  They were --

12          MR. HOFFMANN:  Objection as to form.

13          THE COURT:  You can speak with Mr. Mulholland.

14   BY MR. MULHOLLAND:

15   Q.  Was it the practice of the management at Al Horno to

16   discount 3 percent of the value of tips that were paid by

17   credit card to the delivery workers?

18   A.  I don't know if I would call it a discount, but we did take

19   3 percent off of tips, because we never received that 3 percent

20   of tips.

21   Q.  Could we take a look at defendants' K-9.  Should be page --

22   I believe where we left off, page 9.  Do you see the top

23   document there where it says deductions 3 percent?

24   A.  Yes.

25   Q.  Did you ever provide any of my clients these notices in

1     Spanish?

2     A.   The pay stubs?

3     Q.   Yeah.

4     A.   We present them the way you see them here.

5     Q.   OK.   How do I know that you never saw that 3 percent?

6                MR. HOFFMANN:   Objection.

7     A.   I'm aware of the 3 percent.

8                MR. HOFFMANN:   I'm sorry.   I object.

9     BY MR. MULHOLLAND:

10    Q.   How can I know from the documents that the defendants have

11    presented as evidence --

12               MR. HOFFMANN:   That's fair.

13    Q.   -- that Seamless or Grubhub charged, made a service charge

14    of 3 percent?

15    A.   We made them aware of it on the pay-rate sheet.

16    Q.   No, but how can I know, as an outside observer?   In all

17    these documents that you prepared to bring to court today, have

18    you attached a credit card agreement or an agreement with

19    Grubhub or Seamless to document the amount of the service

20    charge?

21    A.   For one, it ties back to the pay-rate sheet, and that's why

22    I emailed the labor department.   We can actually fill it in on

23    there, and they said, yes, we could document any of these

24    deductions on the pay-rate sheet to inform the employees of why

25    we're doing it.

I1nWado2                    Pizzimenti - Direct

1     And I did happen to bring the Grubhub agreement with us

2     along with an email from early on, when it -- since we've been

3     operating, that says our credit card processing fee that we

4     charge to the entire order -- food total, tax, tip -- is 3.04

5     percent.  And so -- for our credit card company, it's actually

6     3 percent as well.  So instead of charging 3.04 percent, we

7     said we'll put 3 percent instead, so we never charged the .04

8     percent.

9  Q.  But is that agreement in evidence?  Was it produced during

10 discovery?

11 A.  I don't -- I don't know what -- I definitely have it with

12 me today.

13 Q.  What services did Al Horno use to make orders besides

14 Grubhub?

15 A.  Seamless.

16 Q.  Any others?

17 A.  Delivery.com.

18 Q.  Any others?

19 A.  At that time Eat24.  That would mostly be it.

20 Q.  Do you have service agreements from all those companies?

21 A.  Well, I have them, not with me.  I have the Grubhub,

22 Seamless one, but you have to understand, too, that between

23 credit card sales and Seamless and Grubhub, it's 99.5 percent

24 of our business.  And I can tell you that on Eat24 and

25 Delivery.com, it's also a 3 percent processing fee, because

1    when -- I'll explain it.  Can I?

2    Q.  No.  I understand --

3    A.  OK.

4    Q.  -- what service fees come from, and I understand why you're

5    trying to apply it.  I'm just confused.  I mean, you

6    understand -- you're very familiar with the wage-and-hours

7    laws?

8    A.  Yes.

9    Q.  So you understand it's the employer's burden to prove their

10   right to take deductions and take a tip credit?

11   A.  Yes.

12   Q.  So I'm wondering where these service agreements are so that

13   I can verify that my clients are being deducted at the proper

14   rate for all the services to which they would be getting tips.

15   A.  Would you mind taking a look at the one that I brought?

16   Q.  Well, I would mind at this juncture, because we're at trial

17   and we have exhibits in evidence, and I relied on those to

18   prepare the case.

19   A.  OK.

20   Q.  Did you ever personally sit down with my clients and

21   explain to them how the tip-credit system works?

22   A.  I didn't personally.

23   Q.  Did the opening time for Al Horno on 47th Street ever

24   change from seven in the morning to eight in the morning?

25   A.  I believe it did.

1   Q.  Do you recall when?

2   A.  Had to be real early on, because we realized that opening

3   at seven just wasn't worth it.  We were doing not that many

4   orders.

5   Q.  Because -- OK.

6       Isn't it true there weren't many deliveries between 7:00

7   and 10:00 in the morning?

8   A.  I'd say about ten, and that wasn't worth it for us.

9   Q.  How long was Ricardo with you?

10  A.  Say about a year.

11  Q.  OK.  So when did he start working for you?  Withdrawn.

12      Isn't it true that Ricardo started working for you right

13  after Jimmy left, in July 2014?

14  A.  Yes.

15  Q.  And is it your testimony that Ricardo left in July, around

16  July of 2015?

17  A.  You know, I really can't say for sure when he left, because

18  he was a student and he definitely did work on and off,

19  especially towards the end.

20  Q.  Do you remember approximately when Ricardo left, a season,

21  a year?

22  A.  If I were to give you an answer, I'd be guessing.

23  Q.  OK.  Why did you change your pay practices in 2016 where

24  you moved from using personal checks to a Paychex system?  When

25  I say paychecks, I mean P-A-Y-C-H-E-X.

I1nWado2                     Pizzimenti - Direct

1    A.   Right.  It was just a much more efficient system, and that

2    was one of the main reasons why.

3    Q.   Isn't it true that you realized that Al Horno had not been

4    using proper pay practices between 2014 and 2015 and that you

5    moved to Paychex to protect yourself?

6    A.   Well, if you think about photocopying these stubs all the

7    time, it was very work intensive, and moving to Paychex just

8    made a lot more sense operationally for us.

9    Q.   So you're telling, you were telling us that my clients

10   received copies of these pay stubs every week, right?

11   A.   Yes.

12   Q.   Are you trying to say those copies were made by a photocopy

13   machine within the premises every week?

14   A.   Yes.

15   Q.   OK.  How much did -- were my clients paid in 2014, in May

16   of 2014; what was their hourly rate of pay?

17   A.   So the way we do it is we actually take the minimum wage,

18   and that's what we call the minimum wage, and then we apply the

19   tip credit, if it applies.

20   Q.   My clients told the Court that they were paid $5 an hour in

21   cash for the first few months of 2014 while Al Horno was open.

22   Do you have any knowledge about why that might not be true?

23   A.   I just think that -- let's say before our stubs, we

24   documented pay differently, so anyone could say, Hey, you know,

25   this was this and that was that.  And that's, that's what I

I1nWado2                     Pizzimenti - Direct

1   think.

2   Q.  Isn't it true that prior to October of 2014, pay was

3   documented on handwritten sheets of paper by whatever manager

4   happened to be around that day?

5   A.  Well, I know they were keeping a schedule and track of the

6   hours with the guys, and I know for sure that if there was ever

7   an issue with hours, or people feel like it wasn't tracked

8   properly while we were implementing our time clock, which is --

9   you're talking really early on, when we first opened, and I

10  kind of want -- I want you to understand, like, when we first

11  opened, the -- what it entails to open a store and to get all

12  the systems up and running.  And so that's what we're up

13  against, and we definitely did still track time.  If it was on

14  paper, through the guys, and we just didn't track it the way we

15  are now.  This is, you know, this was --

16  Q.  Not the --

17  A.  -- the best solution we came up with.

18  Q.  Would it be fair to say it's not the right way?

19  A.  I wouldn't say that.

20  Q.  All right.

21  A.  I can --

22  Q.  Do you have a copy --

23  A.  I can tell you that whatever hours they worked, we still

24  applied the labor law to the time that they worked.

25  Q.  I understand.

1           Do you have a copy of the second binder of defendants'

2     exhibits?  Is there a second binder up there?

3     A.  Oh, yeah.  In front.

4     Q.  That's my binder for my --

5           THE COURT:  There's something blue here on the other

6     side of the monitor.  Is that what you want him to look at?

7           MR. MULHOLLAND:  Oh, maybe.  Yeah.

8           THE INTERPRETER:  Excuse me, your Honor.  Could you

9     ask the witness or the attorney to move the monitor over a

10    little bit so the interpreter can see the mouth of the witness,

11    and face?  Thank you.

12          THE COURT:  Is that better?

13          THE INTERPRETER:  Yes.

14          THE COURT:  OK.  Good.

15    BY MR. MULHOLLAND:

16    Q.  Could you turn to Exhibit V?

17          THE COURT:  V as in Victor?

18          MR. MULHOLLAND:  V as in Victor, yes.  Actually, you

19    know what?  Scratch that.

20    Q.  Make that Exhibit U, Exhibit U as in --

21    A.  I think it's in this book.

22    Q.  The second one, yes.

23    A.  OK.

24    Q.  Isn't it true that this piece of paper here reflects the

25    manner in which Al Horno kept time-and-pay records between

I1nWado2                    Pizzimenti - Direct

1   April of 2014 and October 2014?

2   A.  I'm not sure if this is the actual sheet we used to track

3   it, but it definitely has on there hours and what seems to be

4   tip amounts as well.

5   Q.  Isn't it true that you don't know whether this is the

6   actual records that were being used at that time because you

7   were hardly ever at Al Horno during that period of time?

8   A.  Well, from this, I can just see that it's writing down

9   hours and tip amounts.

10  Q.  OK.

11  A.  But, you know what, we --

12  Q.  Did you --

13  A.  There's also a book.  We had a notebook that also kept

14  record of the hours worked and the tip amounts that employees

15  would also refer to, and that I'm sure of.

16  Q.  Which exhibit is that?

17  A.  I -- I don't know.  I have to go through all the exhibits.

18  Q.  I'm sure we'll get to it.

19  A.  And I know, I know Jimmy kept that book as well.

20  Q.  OK, but Jimmy left in July of 2014, correct?

21  A.  He did.

22  Q.  Did he take the book with him?

23  A.  Possibly, because we didn't leave on the best terms.

24  Q.  Who was taking care of -- who was keeping track of my

25  clients' hours between July of 2014 and October of 2014?

I1nWado2                    Pizzimenti - Direct

1   A.  Well, we had the time clock implemented by then.

2   Q.  OK.  Why is it that we don't see any of my clients enter

3   their times in the machine until August of 2016 -- August of

4   2014?

5   A.  You just said October.

6   Q.  Well, October 2014 is when Al Horno started to use these

7   pay receipts, but there were no time stamps until August of

8   2014.  Both Mr. Ceferino and Mr. Hermenegildo, they both

9   started using the time-clock machine around August 2014, when

10  it --

11  A.  That would only be a couple of weeks, I would say, into

12  when they started, because at first, we were using a card

13  system, and we had a lot of issues with it.  But that doesn't

14  suggest that we weren't paying according to their time.  We

15  just had a system -- we were a brand-new company -- that the

16  cards weren't working for us the best way, so we improved the

17  system.

18      You know, I wish I can tell you that everything's perfect

19  from day 1, but realistically, it's not, especially when you're

20  just, you know, a small company that's starting out, to get

21  everything right.  I can tell you even our food wasn't perfect

22  in the first month.  I can tell you a lot of things that

23  weren't perfect, but we were aware that the cards was not the

24  best system, and so we moved over to PINs.  And I think that's

25  why, you know, couple weeks into when they started, you can see

1   the time clock being punched, but I can assure you that we

2   still tracked their time before that, and we paid according to

3   the time they worked.  We don't have any reason not to.

4   Q.  OK.  When did Mr. Hermenegildo Mercenario start working at

5   Al Horno?

6   A.  I'm not sure.

7   Q.  When did German Mercenario begin working at Al Horno?

8   A.  I'm not sure, but I can tell you that we were taking on

9   delivery guys in July.

10  Q.  When did Ceferino Adonias start working at Al Horno?

11  A.  I'm not sure.

12  Q.  When did Mr. Aranda start working at Al Horno?

13  A.  Exact dates, I -- exact dates, I couldn't tell you.

14  Q.  Do you remember when my clients left your employ?

15  A.  But let me say this.  The sheets should reflect the dates

16  that they started.  That's why we have them, so we do it upon

17  hiring, any raises or any, any natural raises, any change in

18  pay and any -- any change in, in minimum wage, we would issue

19  these sheets.

20      Actually, this one in front of me says at hiring.

21  Q.  You wouldn't personally give anyone these sheets, though,

22  would you?

23  A.  I didn't, but I instructed the staff to do it, and like I

24  said, so I couldn't tell you off the top of my head when guys

25  were hired, but that is why we, we have the paperwork.  I

1    mean --

2                 THE COURT:  You're holding something in your hand and

3    referring to it.  Does it have an exhibit letter or number on

4    it?

5                 THE WITNESS:  Yeah, Defendants' Exhibit A.

6                 THE COURT:  Thank you.

7    BY MR. MULHOLLAND:

8    Q.  Let me ask you.  While we're talking about notices, why

9    don't we take a look at the notices for Mr. Aranda, which are

10   located at Exhibit C.

11   A.  OK.

12                THE COURT:  That's back in the first notebook?

13                MR. MULHOLLAND:  Yes, in the first notebook.

14   Q.  Take a look at No. 4, defendants' C-4.

15   A.  OK.

16                MR. MULHOLLAND:  I'm just pulling my phone out, your

17   Honor, to use the calculator.

18   Q.  When was this notice issued to my client, Mr. Aranda?

19   A.  So, there was a point in time when the minimum wage was

20   increased to $9, and the tip credit was 3.10, so that would

21   be -- that would be when this happened.

22   Q.  How much did you pay Mr. Aranda in 2016?

23   A.  I have to look at the exhibit.

24   Q.  Would it surprise you if I told you that your records

25   reflect that you were paying Mr. Aranda 7.50 an hour in 2016?

I1nWado2                    Pizzimenti - Direct

1  A.  It was a time when the tip credit changed from, from 3.10

2  to $1.50.

3  Q.  Do you have any notice in here from Mr. Aranda that

4  reflects a $9 minimum wage with a 1.50 tip credit?

5  A.  I don't see it in this exhibit, but we have them for every

6  other wage increase, so it was our practice that we would issue

7  it if there was another change in tip credit.

8  Q.  Did you ever pay Mr. Aranda 5.90 an hour?

9  A.  That would -- that would imply that the minimum wage was $9

10 with a 3.10 tip credit.

11 Q.  What is reflected here in Defendants' Exhibit C-4, if not

12 that?

13 A.  That implies a $9 wage with a 3.10 tip credit, so --

14 Q.  Did you ever pay Mr. Aranda at that rate?

15 A.  If that was the law at the time, then that's what we paid

16 him.

17 Q.  OK.  So would it surprise you to learn that your records

18 show you paid him 7.50 an hour during that time?

19 A.  So we paid him more.

20 Q.  OK.  Would you agree that this notice as written is a

21 little confusing regarding what his rate of pay was going to be

22 during this period of time?

23 A.  Well, I can tell you this.  Labor laws and wages have

24 changed a lot over the last few years, so sometimes it could be

25 very confusing.  And there's been times when we would issue

1   them, and then we would say, Hey, you know, that tip credit

2   is -- actually applies to hotel workers, and we need to

3   issue -- we got it wrong.  And there was times when we actually

4   got it wrong -- I don't know in your guys' case, but we got it

5   wrong, and -- we had the tip credit wrong, and we issued checks

6   to pay the few weeks that we were operating at it wrong.

7       So there's definitely times when if we got a pay-rate sheet

8   wrong, we would definitely reissue them, because you got to

9   understand, like, the nature of how I operate too.  I -- I'm on

10  top of this stuff.  So, you know, anyone could interpret it a

11  little wrong, and I think most people would admit that it's

12  changed a lot over the last few years, and it could be

13  confusing, but we get it right, and --

14  Q.  But not for this, not for this man?

15  A.  Well, you're saying we paid him 5.90, and then you're

16  saying that it reflects 7.50, so if we compare, if we look up

17  the law and see the wage with the proper tip credit, I would

18  guarantee that whatever he's being paid reflects the law at

19  that time period.  I would guarantee that.

20  Q.  So perhaps the records will speak for themselves?

21  A.  Yeah.

22  Q.  I'd like you to take a look, if you could, at Defendants'

23  Exhibit D.  These are the annual notices for Mr. Hermenegildo

24  Mercenario.

25      It's fair to say that the minimum wage in 2015 was 8.75 per

1    hour, is that correct?

2    A.  OK.

3    Q.  Is there a notice in this exhibit for Mr. Mercenario that

4    reflects an $8.75 minimum wage?

5    A.  Do you recall what the tip credit was?  When it was 8.75?

6    Q.  It would have been 2.35?

7    A.  No.

8    Q.  One second.  The chart --

9            MR. HOFFMANN:  Are you asking about 2015?

10           (Discussion off the record)

11   BY MR. MULHOLLAND:

12   Q.  So the tip credit in 2015 was -- for service employees was

13   3.10.

14   A.  OK.

15   Q.  So -- and the minimum wage, prevailing minimum wage was

16   8.75?

17   A.  Well --

18   Q.  Is there a notice here for Mr. Mercenario, Mr. Hermenegildo

19   Mercenario, that reflects those rates?

20   A.  I think I would argue with you on that.  I think if you had

21   a certain amount of employees, it was 8.75, but if you were

22   below the amount of employees, it would be 9.

23   Q.  In 2015?

24   A.  I believe so.

25   Q.  Isn't it true that that particular law came into play

1  toward the end of 2016?

2  A.  I have to go through the chart as well.

3  Q.  Well, you spoke with the New York State Department of Labor

4  on a regular basis, correct?

5  A.  I did.

6  Q.  All right.

7  A.  But --

8  Q.  So they provided you with the charts that they have --

9  A.  -- I have --

10  Q.  -- for prevailing minimum wage and tip credit rates for

11  every year going back to 2011?

12  A.  I'll be honest.  I can't memorize every year and every

13  change, but --

14  Q.  Well --

15  A.  -- if it was at that year and at that time, then we

16  followed that.  Or else we wouldn't be doing pay-rate sheets

17  and tip credit and spread hours of these stubs.  And I would go

18  through the stubs and the law, if you have a copy of it, and we

19  can compare the time periods, and that I can guarantee would be

20  accurate.

21  Q.  So can you guarantee that there's an annual notice for 2015

22  for my client, Mr. Hermenegildo Mercenario?

23  A.  I'd really have to go back to the law and the wage and the

24  tip credit and then tie it back to this.

25  Q.  So again, the documents will speak for themselves, is that

I1nWado2                         Pizzimenti - Direct

1    correct?

2    A.  Yeah.

3          THE COURT:  Mr. Mulholland, you have one hour and five

4    minutes left of your seven and a half hours.

5          MR. MULHOLLAND:  OK.  Thank you, your Honor.

6    A.  I mean, I -- OK.

7    Q.  OK.  Did you ever tell Mr. Aranda that you were going to be

8    withholding a part of a tip for a large catering order?

9    A.  Well, I thought -- since I've heard so much about it in

10   this testimony, I thought about it, and I definitely recall

11   situations where that popped up, that concern of the guys.  I

12   don't remember speaking to any of them myself, because of

13   language barrier, but I remember the situation on what it was

14   when it did happen.

15   Q.  Is it true that the employees would complain to you about

16   Samuel taking their tips on these orders?

17   A.  So the complaint that I recall, especially with, with the

18   guys here, was that when we sent an in-house person on a

19   delivery on a large order, that would require naturally more

20   than one person, we would definitely give a portion of the tip

21   to, let's say, a cashier, only because we felt that was in

22   compliance with tip law, because an employee is, is now

23   operating on a tip duty, let's say.  And the guys were not

24   happy about that.

25   Q.  How often would you instruct your staff to share tips with

I1nWado2                        Pizzimenti - Direct

1   cashiers?

2   A.   Whenever cashiers took deliveries with another delivery

3   person.  And if a cashier ever took a delivery without anybody

4   else, we would give them that tip.  That's our practice.

5   Q.   All right.  Isn't it true that sometimes you would instruct

6   your -- withdrawn.

7        Isn't it true that sometimes Samuel would share tips with

8   the cooks?

9   A.   No.

10  Q.   You never heard a complaint from any of the delivery people

11  that the tips were being shared with the cooks?

12  A.   If we were super-busy and a cook happened to take a

13  delivery, the cook would get a portion of the tip.

14  Q.   Was Samuel a manager?

15  A.   Yes.

16  Q.   How long was he manager at Al Horno for?

17  A.   He became manager around the time Ricardo was leaving, and

18  he's still the manager today.

19  Q.   OK.  What's his position -- what's his title today?

20  A.   Manager.

21  Q.   Is it his full-time job?

22  A.   He works about 40 hours a week.

23  Q.   Does he have any -- does he have a second job that you're

24  aware of?

25  A.   I don't think so.

I1nWado2                        Pizzimenti - Direct

1    Q.  Does he work at any of your other restaurants?

2    A.  No.

3    Q.  Does he have an ownership interest in Al Horno?

4    A.  No.

5    Q.  OK.

6    A.  And can I say one thing?

7    Q.  Sure.

8    A.  You got to understand, these are tips that are electronic.

9    They're on paper.  They're not cash, so I don't know how he

10   would even steal them.  He doesn't have access.  It's not

11   physical money.  It's printed on a piece of paper.

12   Q.  I understand.

13       One last question about Mr. Zakari.  You know Mr. Zakari

14   pretty well, right?

15   A.  Yes.

16   Q.  He's been a trusted confidant for some years now?

17   A.  And a good friend.

18   Q.  And a good friend.

19   A.  Yup.

20   Q.  And you recognize his handwriting?

21   A.  I do.

22   Q.  All right.  So why don't you -- I'm going to ask you to

23   take a look at Exhibit C, which are the notices for Mr. Aranda.

24   I'm going to ask you to take out C-1.  Take it out from the

25   three rings and hold it next to C-2 so that the signature lines

I1nWado2                    Pizzimenti - Direct

1   line up between the one for, supposedly for Mr. Gomez and the

2   one for Mr. Zakari.

3   A.  OK.

4   Q.  All right.  Do you recognize the handwriting of Mr. Zakari

5   on C-2?

6   A.  Yes.

7   Q.  And the handwriting used to write the name Ricardo Gomez,

8   does that look familiar to you?

9   A.  Yeah.

10  Q.  Does it look like Mr. Zakari's handwriting or someone

11  else's?

12  A.  It -- I'll tell you the truth, I'm not a handwriting

13  expert, but I -- glance, it looks like they're different

14  people.

15  Q.  OK.  Are you familiar with Mr. Gomez's handwriting?

16  A.  I can't tell you that I'm familiar with his handwriting.

17  Q.  OK.

18  A.  But it looks like he -- someone signed this one; I would

19  assume that was Ricardo.  And I would assume that this one was

20  Djibril.

21  Q.  Is there any reason why the only ones with Ricardo's name

22  are for Mr. Aranda?

23  A.  Well, I can tell you this.  As part of our practice,

24  Djibril spent time with all managers, and he would be present

25  too with Ricardo translating or Samuel or -- well, Samuel and

I1nWado2                      Pizzimenti - Direct

1   Ricardo, because he's not fluent in Spanish.

2   Q.  Who is that?

3   A.  Djibril is not fluent in Spanish.

4   Q.  OK.

5             MR. MULHOLLAND:  No further questions, your Honor.

6   Thank you.

7             Thanks, Mr. Pizzimenti.

8             THE WITNESS:  Thanks.

9             THE COURT:  Any questions at this stage, Mr. Hoffmann?

10            MR. HOFFMANN:  I'll wait until my case, your Honor, if

11  that's OK.

12            THE COURT:  All right.  That's fine.

13            Mr. Pizzimenti, you may step down from the witness

14  stand.  Thank you.

15            (Witness excused)

16            THE COURT:  Do the plaintiffs wish to offer any

17  further evidence?

18            MR. MULHOLLAND:  Not at this time, your Honor.

19  Plaintiffs rest.

20            THE COURT:  Plaintiffs having rested, is there any

21  motion practice?

22            MR. HOFFMANN:  No, your Honor.

23            THE COURT:  Thank you.  The defense may call the first

24  defense witness.

25            MR. HOFFMANN:  Thank you.

1        Chris.

2        Your Honor, could we -- I'm so sorry.  Could we take

3   another bathroom break, just two minutes?

4        THE COURT:  Sure.  That's fine.  We'll take a

5   five-minute break.

6        MR. HOFFMANN:  Thank you.

7        (Recess)

8        THE COURT:  Good afternoon again.  Please be seated.

9        Before we begin, I would like to state on the record

10  that I have been informed that Mr. Pizzimenti was observed

11  during the break summarizing his testimony to a person who was

12  in the witness room outside the courtroom.  Plaintiffs' counsel

13  will be given an opportunity to inquire of the witness

14  regarding this, and that can be either on cross -- well, I

15  guess either of the witnesses, if you want to recall

16  Mr. Pizzimenti, or ask the other witness, seems to me the most

17  fair and expedient way to deal with this, but I will hear

18  counsel if either of you wishes to say anything further.

19       MR. HOFFMANN:  I don't know anything about it, but I'm

20  happy to have Mr. Pizzimenti explain what happened.  Certainly

21  any suggestion of potential wrongdoing here, let's get it right

22  out.

23       MR. MULHOLLAND:  I would appreciate a brief recall for

24  the purposes of inquiring about that discussion.

25       THE COURT:  Mr. Pizzimenti, would you come back to the

1    stand, please.

2      CHRISTOPHER PIZZIMENTI, resumed.

3              THE COURT:  And you understand that you're still under

4    oath.

5              THE WITNESS:  Yes.

6              THE COURT:  Thank you.  Please be seated.

7    DIRECT EXAMINATION

8    BY MR. MULHOLLAND:

9    Q.  Who did you talk with in the witness room right now?

10   A.  Djibril's waiting outside, but I didn't -- I didn't

11   summarize the testimony.  I used the bathroom.  I said hello to

12   him.  He's waiting outside the whole trial.

13   Q.  OK.  What did you tell him?

14   A.  I just said I -- I just went and I got to use the bathroom.

15   Q.  Did you tell him anything about how you testified regarding

16   the date he started as a manager at Al Horno?

17   A.  No.

18   Q.  Did you tell him anything about what you had testified to

19   regarding his time at Stamina Grill?

20   A.  No.

21   Q.  Did you tell him anything about how you testified about how

22   I -- that Mr. Zakari's duties at Al Horno during the summer of

23   2014?

24   A.  No.  I seen him.  We kind of said, Hello, how you doing,

25   you're waiting outside.  And I used the restroom, and then I

 1   was back in here waiting for the judge to come back.

 2             THE COURT:  Are you certain that you did not say

 3   anything about what you had testified to in terms of

 4   Mr. Zakari's duties and when Jimmy left?

 5             THE WITNESS:  No.

 6             THE COURT:  And that is your testimony under oath?

 7             THE WITNESS:  Yeah.

 8   BY MR. MULHOLLAND:

 9   Q.  Did you have this conversation in the witness room or in

10   the lobby?

11   A.  I seen him in the lobby, and then I came back from the

12   restroom, and he was sitting in another room, and I said I'm

13   going back in.

14   Q.  How did you see him sitting in -- sorry.  Withdrawn.

15       Which other room did you see him sitting?

16   A.  I think it's called a witness room.

17   Q.  Was the door closed or open when you saw him?

18   A.  It was closed, but I opened it, because the -- our

19   paralegal's -- I was looking for her too.

20   Q.  Was anyone else in the room with you when you spoke with

21   Mr. Zakari within the witness room?

22   A.  In the witness room?

23   Q.  Well, you just told us that you opened the door and walked

24   into the witness room looking for paralegals, and instead you

25   found Mr. Zakari.  So when you found Mr. Zakari, was it just

1    him in the witness room, or were there other people in the

2    witness room as well?

3    A.  Paralegal was there.

4    Q.  All right.  Which paralegal?

5    A.  From Andy Hoffmann's office.

6    Q.  OK.  So when it was -- was there anyone else in the room

7    besides those two people?

8    A.  No.

9    Q.  Did you enter the room and close the door behind you?

10   A.  I don't think it even had time to close.

11   Q.  OK.  How long were you in the room for with those two?

12   A.  Less than a minute.  Seconds.

13   Q.  What did you say, if anything, to Mr. Zakari in that time?

14   A.  "I don't think you're going to be going today."

15   Q.  Anything else?

16   A.  No.

17       Did someone say I said something like that?

18   Q.  Apparently, yeah.  I don't know myself.

19       And then after you told him, You'll be going next, did he

20   say anything in return?

21   A.  No.

22   Q.  And then what did you do?

23   A.  I came back in here.

24   Q.  OK.  So --

25       MR. MULHOLLAND:  Your Honor, I would like a brief

1    moment to speak with --

2              Sorry.  I forget your paralegal's name.

3              MR. HOFFMANN:  Your Honor, I --

4              THE COURT:  What I will do is ask counsel, the court

5    reporter and the interpreter, Ms. Nebbia, to join me at the

6    sidebar.

7              (At sidebar)

8              THE COURT:  I'm now going to ask Ms. Nebbia to explain

9    to you what she conveyed to me.

10             INTERPRETER NEBBIA:  I went out into the hallway to

11   make a phone call.  At that time, the witness said, Where is

12   he?  He started going out.  He went straight into the witness

13   room, closed the door, and I overheard him say, Well, I told

14   them, what I told them was that in 2004 -- I think he said

15   something to the effect, In 2000 -- I'm saying 2014, but I

16   can't remember, you know, Jimmy was the manager and you were

17   the *jefe*.

18             THE COURT:  And if you want me to, I can put

19   Ms. Nebbia on the stand for you under oath.

20             MR. HOFFMANN:  May I inquire?

21             THE COURT:  Yes.

22             MR. HOFFMANN:  Have you been listening to the

23   plaintiffs have their discussions between them?

24             THE COURT:  But we're at the sidebar so that everyone

25   doesn't hear us.

1           MR. HOFFMANN:  OK.  Have you been listening to the

2     plaintiffs talk between each other during breaks?

3           INTERPRETER NEBBIA:  Yes, but --

4           MR. HOFFMANN:  Is there anything you reported to the

5     Court about that?

6           INTERPRETER NEBBIA:  This was a sequestered witness,

7     and I overheard this witness go up to him and say what I just

8     told you, which I thought this person didn't have to know.

9     It's my responsibility to do that.

10          THE COURT:  We have had Mr. Zakari excluded from the

11    courtroom during the testimony for a purpose, and so Ms. Nebbia

12    came to me and reported it.  It's not that she was following

13    Mr. Pizzimenti, but she felt it was her responsibility to tell

14    me that.

15          INTERPRETER NEBBIA:  And my companion is in Spain

16    right now, and I had to call her before she went to bed.  She

17    really wanted to know --

18          MR. HOFFMANN:  It's a very awkward position to be in a

19    credibility dispute between my client, who I know to be an

20    extremely honest person, and the translator.

21          THE COURT:  And so do you have an application for me?

22          MR. HOFFMANN:  Let me talk to my paralegal.  I mean, I

23    wasn't there.  This is --

24          THE COURT:  All right.  Let's take a break.  Do you

25    want five minutes?  Do you want ten minutes?

1            MR. HOFFMANN:  Five minutes is fine.

2            THE COURT:  OK.  We'll take another five-minute break.

3     Thank you.

4                 (In open court)

5            THE WITNESS:  May I say something?

6            THE COURT:  We're going to take a break.  You can

7     speak with your attorney.

8            THE WITNESS:  Is it OK if I say something?  Because I

9     do remember what happened.  I don't even want to make -- I just

10    say it.

11           THE COURT:  Counsel.

12           MR. MULHOLLAND:  I'm fine.

13           THE COURT:  Mr. Hoffmann, is that all right with you?

14           MR. HOFFMANN:  Yes.

15           THE COURT:  Right.  Mr. Pizzimenti --

16           THE WITNESS:  OK.

17           THE COURT:  -- now you may speak.

18           THE WITNESS:  So I was definitely walking out of the

19    courtroom, talking to my lawyer about what we just said, and

20    Djibril was sitting outside, and it happened to seem like he

21    was there, like he was part of that.  He wasn't, and I'm -- I

22    didn't know that I wasn't supposed to say anything once we left

23    the doors, but that's what happened.  I was talking to both

24    Andy about what just happened, what we just went, were talking

25    about, and my paralegal.

I1nWado2                     Pizzimenti - Direct

BY MR. MULHOLLAND:

Q.  So did you summarize your testimony within earshot of
Mr. Zakari?

A.  I wouldn't call it a summary.  I -- I just mentioned to my
lawyer about, like a couple of points that you were bringing up
that -- that I thought were not true.

Q.  Was Mr. Zakari nearby?

A.  So, as we're walking out the doors, once we got through
those doors, I started talking with Andy about it.  We were
both going to the restroom, and he was there, sitting on the
bench.  So while we were walking through, I was saying
something that I thought that you said wasn't true, and he was
there.  But then I directed him at that point and said, Hey,
you know, you're here, I don't think you're going to go today.

     We then went to the restroom.  We then came back.  I was
looking for the paralegal.  She was in the office with him.
That's what happened.

Q.  What was -- what were the points that you mentioned to your
attorney that you thought were not true?

A.  OK.  I remember it.  It was the point that you said that he
didn't -- he wasn't a supervisor in May, and I said to my
lawyer, I said, What happened with Jimmy in May is that he got
drunk, got into a fight, broke the glass door, and that's why
we -- I knew right away he wasn't going to last, and that's why
I knew Djibril had to take that role.

1          It was while we were walking out.  He was sitting there,

2     but that was -- you're talking about a few sentences as we

3     walked out.  I saw Djibril, said hello, told him I'm going to

4     the restroom, used the restroom.  Within -- this is within the

5     five-minute break, and then when I came back, he wasn't on the

6     bench anymore, but it was already -- the time was up.

7          That's exactly what happened, so I don't know why someone

8     would say I directly went to him and was saying that.

9     Q.  OK.  Did you have a discussion with him in the witness room

10    at some point?

11    A.  No.  I just said, We're going back in, and --

12    Q.  OK.

13          MR. HOFFMANN:  Your Honor, I'd like to testify about

14    it to corroborate.  That's exactly what Mr. Pizzimenti said to

15    me when we walked into the bathroom.  He told me the story

16    about the fight and the glass.

17          I didn't see Mr. Zakari sitting there, but I know that

18    he's been sitting out on that bench in front of where all the

19    chairs are.  I must have been on the other side of

20    Mr. Pizzimenti.

21          THE WITNESS:  So when --

22          MR. HOFFMANN:  I do want to say I think Mr. Pizzimenti

23    deserves an apology, and I do think it's very regretful that

24    someone would find, in a completely innocent conversation, and

25    especially somebody who's got a small business.  He's trying to

I1nWado2

1    defend his business.  He's about to take the stand.  I find it

2    abhorrent.

3          THE COURT:  Mr. Hoffmann, what I would suggest is that

4    you take your five-minute break, that you also speak with your

5    paralegal, whatever you want to do, and my offer stands to put

6    Ms. Nebbia on the stand under oath for any questions that

7    anyone wishes to ask, and I will hear any applications that

8    anyone has.

9          THE WITNESS:  It's --

10         THE COURT:  Mr. Pizzimenti.

11         THE WITNESS:  Yeah.  I'm sorry.

12         I -- I didn't know that I shouldn't have done that,

13   saying anything about what we just spoke about, because we

14   walked out into the hallway, and if I do, I want to -- but

15   there was no intention there.  You know, and that -- I was just

16   saying how he was wrong about Djibril being the supervisor in

17   May because of the fight Jimmy had in May where he got drunk

18   with other employees and broke a glass door, and so I was

19   telling Andy that, because I thought he would kind of

20   appreciate that story.

21         MR. HOFFMANN:  Let's take five minutes.

22         THE COURT:  Thank you.  We'll take our five-minute

23   break.

24         (Recess)

25         THE COURT:  Please be seated.

1          How would you like to proceed?

2          MR. HOFFMANN:  Your Honor, I have had a chance to

3   speak to Djibril and to Mr. Pizzimenti and to my paralegal.

4          Mr. Pizzimenti made a remark to myself and to my

5   paralegal that he remembered this incident with the glass.

6   Apparently Mr. Zakari was in earshot, but it's certainly not

7   his intention to impart that information to him.

8          And I'll also note that Mr. Zakari's not going to

9   testify today; I have an opportunity to prepare him.  There was

10  no tactical advantage to be gained by telling him.  It was

11  something that just came to his mind, and I don't really have

12  any more to say about it.

13          I think the court reporter -- the interpreter has done

14  a terrific job.  I'm not concerned about her impartiality.  I

15  understand that as an officer of the court, she felt she had a

16  duty to inform the Court.  I understand that, and I think it's

17  unfortunate.  I think the timing's unfortunate, because

18  Mr. Pizzimenti is fighting for his professional life here, and

19  to have to deal with something like this in the middle of his

20  testimony is tragic, but these things happen in life, and I

21  think we should proceed.

22          THE COURT:  Thank you.

23          Mr. Mulholland.

24          MR. MULHOLLAND:  I'm also prepared to proceed, your

25  Honor.  I don't think I need to inquire into what happened with

I1nWado2

1     the paralegal, and I'd be prepared to move forward.

2              THE COURT:  Very good.  Between the testimony and the

3     representations, I have a contextualization of all of this.

4              MR. HOFFMANN:  I know Chris feels absolutely horrible

5     about it.  Certainly there was no intention to do anything

6     untoward here.

7              THE COURT:  Thank you.

8              MR. HOFFMANN:  Thank you.

9              THE COURT:  And thank you also, Ms. Nebbia.

10             We will go forward.

11             Mr. Hoffmann, will you call your first witness.

12             MR. HOFFMANN:  Mr. Pizzimenti.

13             THE COURT:  I'm sorry.  Hold on a minute.

14             Ms. Nebbia, do you want to talk to me again?

15             INTERPRETER NEBBIA:  Yes.

16             THE COURT:  OK.

17             I've confirmed with Ms. Nebbia that I've heard what

18    everyone says, I've heard what the representations are, and

19    we're going forward.

20             MR. HOFFMANN:  Thank you, your Honor.

21             THE COURT:  Thank you.

22     CHRISTOPHER PIZZIMENTI, resumed.

23             THE COURT:  Please be seated.

24             You're aware that you're still under oath.

25             THE WITNESS:  Yeah.

```
 1              THE COURT:  Thank you.

 2   DIRECT EXAMINATION

 3   BY MR. HOFFMANN:

 4   Q.  Chris, take a deep breath and get the last 20 minutes out

 5   of your system.

 6   A.  Yeah.  Sorry.

 7   Q.  Tell me a little about your educational background.

 8   A.  I went to Hunter College.  I have a bachelor's degree in

 9   political science.

10   Q.  Are you married?

11   A.  Yes.

12   Q.  When were you married?

13   A.  In August of 2014.

14   Q.  Do you have kids?

15   A.  Yes.

16   Q.  How many?

17   A.  Two.

18   Q.  What's their age?

19   A.  Two and one.

20   Q.  Now, there's been some testimony before you started Al

21   Horno, you had two other -- interests in two other restaurants?

22   A.  Yes.

23   Q.  What were the names of those?

24   A.  Stamina and Fuel.

25   Q.  And there's also been some testimony that you have been
```

I1nWado2                    Pizzimenti - Direct

```
 1   involved in several other wage-and-hour actions?
 2   A.   Yes.
 3   Q.   So how many of them involved Stamina and Fuel?
 4   A.   Two of them.
 5   Q.   OK.  And when was the first one, approximately?
 6   A.   It was early 2014.
 7   Q.   And what ultimately happened with the case?
 8   A.   I settled it.
 9   Q.   And why did you decide to settle it?
10   A.   Well, I just felt that -- I realized at that time the
11   documentation could have been better, and to avoid, you know,
12   expensive trial and everything, I decided it was best to
13   settle.
14   Q.   And what was the law firm that represented the plaintiffs
15   in that case?
16   A.   Michael Faillace Associates.
17   Q.   And then there was a second lawsuit that was filed other
18   than the ones involving Al Horno.  What happened in that
19   lawsuit?
20   A.   In the Fuel -- in the Fuel lawsuit, I was found that I
21   didn't owe any of the plaintiffs money, or anything like that.
22   Q.   Did it go to trial?
23   A.   Yes.
24   Q.   In this courthouse?
25   A.   Yes.
```

I1nWado2                    Pizzimenti - Direct

1   Q.  And then there was a prior case involving Al Horno?

2   A.  Yes.

3   Q.  And what happened to that lawsuit?

4   A.  The claims against me were dropped.

5   Q.  Now, as a result of these lawsuits, when you decided to

6   open Al Horno, did you do anything to educate yourself about

7   wage-and-hour issues?

8   A.  Yes, I did.

9   Q.  And tell me what you did.

10  A.  I started getting really familiar with the federal labor

11  standards act and the hospitality wage order law.

12  Q.  Did you read them?

13  A.  I read them a lot.

14  Q.  And what other things did you do to educate yourself about

15  wage-and-hour law?

16  A.  I started looking on a website called Pacer monitor.

17  Q.  And what's that?

18  A.  It's a, a website where you can read cases.

19  Q.  And cases from this court?

20  A.  Yes.

21  Q.  And what kind of cases did you read?

22  A.  Well, I bought a lot of credits, and I was reading mostly

23  Michael Faillace's cases.

24  Q.  Did you learn anything from reading decisions involving

25  Mr. Faillace?

1  A.  I did.  I definitely noticed that an overwhelm -- first of

2  all, there was a lot of them, because you can sort by the

3  firm's name.

4  Q.  Right.

5  A.  And then I noticed that almost all the ones I was reading

6  through, using my credits that I kept having to re-up, that

7  they involved delivery workers and mostly the 80-20 rule.

8  Q.  Did you do anything else to kind of educate and become more

9  aware of how to comply with wage-and-hour laws?

10  A.  I started an open dialogue with the labor department.

11  Q.  What labor department is that?

12  A.  The U.S. labor department.

13  Q.  How about New York?

14  A.  Yeah.

15  Q.  And who did you dialogue with primarily?

16  A.  Carmine Umberto, Vincent Armand.

17  Q.  And what kinds of things did you dialogue with these

18  departments of labor about?

19  A.  Well, on a regular basis, I would ask them almost anything

20  that applies to labor law, the credit card processing fee.

21  Tools of the trade was a big one for us, because I noticed that

22  in all of Faillace's cases, it mentions the tools of the trade

23  and did you buy a bike and did you buy a helmet.  And I -- we,

24  I asked them about spread pay, and I asked them about 80-20 and

25  all the -- it's, it's dozens of emails.  It's almost on every

I1nWado2                          Pizzimenti - Direct

1  topic concerning the law in relation to my business, especially

2  in the delivery-tip space.

3  Q.  Why did you do that, sir?

4  A.  Well, I just felt as a small-business owner, kind of when I

5  started seeing the amount of cases that were being brought

6  against and also talking to other, fellow restaurant people in,

7  especially in Manhattan, I just -- at first it was like a

8  panic, and then this is the business I've committed my life to,

9  and this is a real thing that's happening, especially with that

10 firm, a lot, on a regular, very, almost seemed like cases

11 that -- it was so many cases.  I read through so many, I just

12 felt like I had, I had to get ahead of it, I had to learn it,

13 and I had to basically protect the business so that we could

14 set out to do what I set out to do in the beginning, which is

15 to introduce our concept, our healthy Mexican concept, and grow

16 it into something that people everywhere can appreciate.

17      So that was one of my main focuses.

18 Q.  OK.

19 A.  And then --

20 Q.  Go ahead.

21 A.  I'm sorry.

22 Q.  I'm sorry.

23 A.  There was the meetings I had with you on compliance and

24 your office and stuff and emails back and forth, and -- on

25 compliance, it was a big part of my life in the last three

1    years --

2    Q.  When --

3    A.  -- just ran.

4    Q.  When did you decide to start Al Horno?

5    A.  I got the idea to start Al Horno sometime in 2013.

6    Q.  And when did you begin to actually execute on the business

7    plan to start Al Horno?

8    A.  I would say late 2013.

9    Q.  And when did you acquire your first location for the

10   business?

11   A.  Sometime in early 2014.

12   Q.  And did you have to do work at the location to get ready

13   for your use?

14   A.  Yes.

15   Q.  And when did it actually open for business?

16   A.  In the -- the first sale was in May of 2014.

17   Q.  And when it first opened in May of 2014, did you have a

18   delivery operation, or was that installed sometime thereafter?

19   A.  It was installed after.

20   Q.  Approximately how long after you opened the doors?

21   A.  June of 2014.

22   Q.  OK.  Tell us a little bit about the concept of Al Horno.

23   A.  It's a healthy Mexican restaurant, so we do -- I like to

24   say traditional Mexican food with a healthy, new spin on it.

25   Q.  Give us a very brief encapsulation of the menu and the

I1nWado2                    Pizzimenti - Direct

1    prices for the goods that you sell.

2    A.  So, it's -- we have a juice bar.  It's low fat.  We don't

3    have caloric -- we don't have fatty cuts of meat.  We, you

4    know, for chorizo we use turkey.  We have tacos, quesadillas,

5    burritos, salads.  And so the prices would range from, anywhere

6    from $4 a taco to maybe $12 for a plate, and in between, we

7    have quesadillas and burritos that fall in between that.

8    Q.  47th Street was the first location, right?

9    A.  Yes.

10   Q.  Tell us a little bit about the physical layout of the

11   store.

12   A.  So, it's on, between Ninth and Tenth Avenue, a residential

13   street in a residential building.  You walk in -- I'm sorry.

14   We have about 14 feet of frontage.

15   Q.  That's the entirety of the sidewalk in front of the store?

16   A.  14 feet.

17      You walk into the store.  We have maybe a -- we have, we

18   have twelve seats.  We have six tables and a counter.  We --

19   it's about 150-square-foot dining space.  We have a small

20   refrigerator where we keep beverages.  You then go into the

21   back, which is the kitchen and packing area, and then behind

22   that, you have the dishwashing/porter area, mop sink.  And then

23   behind that you have the -- there's a small yard.

24   Q.  And do you know the total square footage of the store?

25   A.  About 900 square feet.

1   Q.   That's the size of a small apartment in Manhattan?

2   A.   Yeah, maybe.  Yeah.

3   Q.   So when you decided to open Al Horno and you were getting

4   the first store ready, did you do anything to make sure that

5   you would be in compliance with the wage-and-hour laws?

6   A.   Yes.

7   Q.   Tell us what you did.

8   A.   So, a big part of it was the dialogue I had with the labor

9   department.  I took all that.  I trained managers on, on that,

10  what to do and how to do it correctly.  And that, that was a

11  big part of what I did.

12  Q.   Did you introduce any procedures regarding paperwork?

13  A.   Yeah.  So, I -- I knew at that point, so then we needed a,

14  the time-clock system, because if we didn't have that, even if

15  we paid people according to the hours they worked, we didn't

16  have that record on the clock, that would make us an easy

17  target for a lawsuit like this, because I've been through one,

18  and that was one of the issues.

19       I knew that we needed to issue these pay-rate sheets.  I

20  knew we needed to give copies to the employees, that we needed

21  to document pay on a stub and make copies of that and give that

22  to the employees.  I knew we needed to post labor posters where

23  they can be visible.

24       I knew -- I knew a lot about 80-20 and how that works and

25  when you can apply a tip credit and when you can't, so --

1   here's an important one.  I advised all management that

2   delivery workers weren't going to do any duties at all, just

3   because --

4   Q.  You mean other than delivery?

5   A.  Right, only deliveries, because if they did anything else,

6   then I thought to myself, How can you prove that -- the time

7   frame on that?  It was almost not possible, even if it was --

8   even if it's less than 80 percent.

9   Q.  With respect to the 80-20 rule, did you make any kind of --

10  did you implement any kind of staffing arrangement that

11  addressed the 80-20 issue?

12  A.  Yeah.  So, I would meet with the managers.  I met with

13  Djibril, who, like I said, was the manager below me, and we

14  discussed everything.  We discussed all the labor rules, 80-20,

15  tip credit, how to apply it properly, you know, based on tips.

16      We spoke about if -- for instance, if a delivery worker

17  doesn't make the tip credit amount, let's say, in an hour, we

18  would make up for it so that they make the minimum wage.  And

19  that's why we never like to call that you're making 5 -- for

20  example, 5.90 an hour, because the way we always explained it

21  is, is you're making, let's say, the minimum wage, and if you

22  go above the, the tips, the tip credit, but this is before

23  there was a threshold, that we would withhold that amount.  And

24  it became a big part of my business, and for good reason

25  that -- I can get into why.

I1nWado2

1    Q.  What's the good reason that you made it part of your

2    business?

3    A.  So, we're like 90 percent delivery.  I mean, when we

4    started looking at the numbers -- you know, I wish we could

5    make, not apply the tip credit and avoid all of this, but we're

6    90 percent delivery, so we have to hire all these -- a lot of

7    guys.  In our case, it's over 20, and so using what's available

8    to us in the law with the tip credit makes sense, because we

9    could afford that pay.  And I said as long as we follow it

10   properly and we do this and we advised guys not to, you know,

11   do anything other than that, we should be OK.

12   Q.  Did you give these instructions to managers other than

13   Djibril?

14   A.  Yeah.  So, Jimmy was aware of it, Ricardo, Sam, and

15   managers in other stores.  Like, it's a big part of what we do.

16   We talk about it constantly.  It's ongoing conversation.

17       You know, whenever there is a change in law, like they know

18   about it, and those are the practices we follow.  That's why

19   you see the sheets, stubs, even though, you know, the way we

20   were doing it was we were writing it, we were doing it to the

21   best that we can as we were growing, and the time clock and all

22   these other things that we did.

23   Q.  How many --

24            THE COURT:  Mr. Hoffmann, you have a little under five

25   minutes left.

I1nWado2

1              MR. HOFFMANN:  Oh, for the day?

2              THE COURT:  Yes.

3              MR. HOFFMANN:  I think this might be a natural

4      breaking point.  I know that we kind of got delayed.  I'm happy

5      to go later.

6              THE COURT:  That's fine.  We'll resume at nine

7      tomorrow morning.

8              MR. HOFFMANN:  Do you know how late we can go

9      tomorrow?

10             THE COURT:  Ms. Beale will calculate how much time is

11     left.  I need this trial to finish as efficiently as possible

12     tomorrow because it was my hope that we would have finished

13     today.

14             MR. HOFFMANN:  I know.

15             THE COURT:  Mr. Mulholland.

16             MR. MULHOLLAND:  Your Honor I would like to ask, on

17     behalf of my clients, for an accommodation.

18             Mr. Hermenegildo Mercenario has to be at work tomorrow

19     at 4:00, and he's asking if he can leave early from the trial,

20     around 3:45, to make it to work.  And Mr. Aranda started a new

21     job; he's got to be at work at 11:00 tomorrow morning, and he's

22     asking if his presence at trial tomorrow could be excused.

23             THE COURT:  As to 3:45, I'm certainly hoping that none

24     of us will be here anywhere near 3:45 tomorrow.

25             As to 11:00, Mr. Hoffmann, were you planning to call

I1nWado2

1     Mr. Aranda?

2               MR. HOFFMANN:  No.  I would have no objection to him

3     leaving early if he needs to start a new job.  Totally

4     understood.

5               THE COURT:  Then that's fine.

6               MR. MULHOLLAND:  Thank you.

7               THE COURT:  All right.  We are adjourned, and I will

8     see you tomorrow morning at nine.

9               Thank you, all.

10              MR. HOFFMANN:  Your Honor, just for planning purposes,

11    I have about another 20 minutes with Mr. Pizzimenti.  I have

12    Mr. Zakari and I have, I believe, one rebuttal witness who was

13    mentioned by the plaintiffs, who I anticipate ten minutes, and

14    then I'm done.  And I'm happy to disclose who the rebuttal

15    witness is, just so there's no surprises.  I've already shared

16    that with my colleague here.

17              THE COURT:  All right.  I will leave it to you two to

18    decide whether there is an objection to the rebuttal witness,

19    and if so, whether you're going to call the rebuttal witness or

20    raise the objection with me.  Can we do all that tomorrow

21    morning?

22              MR. HOFFMANN:  Sure.

23              THE COURT:  OK.

24              MR. HOFFMANN:  Thank you, your Honor.

25              THE COURT:  Great.  Thank you.

I1nWado2

1              And I thank the interpreters and the court reporter.

2              Good evening, everyone.

3              (Adjourned to January 24, 2018, at 9:00 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2     Examination of:                                    Page

3     GERMAN MERCENARIO

4     Cross By Mr. Hoffmann . . . . . . . . . . . . 146

5     Redirect By Mr. Mulholland . . . . . . . . . 162

6     CEFERINO ADONIAS PACHECO

7     Direct By Mr. Mulholland . . . . . . . . . . 164

8     Cross By Mr. Hoffmann . . . . . . . . . . . 195

9     Redirect By Mr. Mulholland . . . . . . . . . 217

10    ANTONIO ARANDA

11    Direct By Mr. Mulholland . . . . . . . . . . 219

12    Cross By Mr. Hoffmann . . . . . . . . . . . 247

13    Redirect By Mr. Mulholland . . . . . . . . . 258

14    CHRISTOPHER PIZZIMENTI

15    Direct By Mr. Mulholland . . . . . . . . . . 260

16    CHRISTOPHER PIZZIMENTI

17    Direct By Mr. Mulholland . . . . . . . . . . 305

18    CHRISTOPHER PIZZIMENTI

19    Direct By Mr. Hoffmann . . . . . . . . . . . 316

20

21

22

23

24

25