I1oWadoT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CEFERINO ADONIAS, a/k/a
"Steven Diaz," et al.,

                Plaintiffs,

        v.                              16 Civ. 7266 (LTS)


AL HORNO LEAN MEXICAN 57,
INC., d/b/a "Al Horno Lean
Mexican Kitchen," et al.,
                                        Trial

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        January 24, 2018
                                        9:00 a.m.

Before:

                HON. LAURA TAYLOR SWAIN,

                                        District Judge


                        APPEARANCES

MICHAEL FAILLACE
        Attorney for Plaintiffs
BY:  COLIN MULHOLLAND

ANDREW S. HOFFMANN
        Attorney for Defendants


Also Present:  Selva Nebbia
               Matilde deFerrari
               Interpreters (Spanish)

               Kaylynn Wong, Paralegal

I1oWadoT

1          (Trial resumed)

2          THE COURT:  Good morning, everyone.  Please be seated.

3          We are here for the conclusion of the presentation of

4     the evidence in this case.  I understand that you've been

5     informed of the remaining time that's left.  Mr. Hoffmann made

6     some representations on the record last night about the limited

7     nature of his intended defense case.

8          I understand that there was a question that counsel

9     wanted to raise with the Court.

10         MR. HOFFMANN:  Yes, two, actually.  One is, I think we

11    raised this earlier, your Honor, there are some items in our

12    evidence notebook that has some personal information about the

13    plaintiffs, which I've agreed with counsel for the plaintiffs

14    to take out, just to protect their privacy.  Perhaps at the

15    next break or at an appropriate time, Mr. Mulholland and I can

16    just go through and do that.

17         THE COURT:  That's fine, or you could even take them

18    with you and send them back afterward.

19         MR. HOFFMANN:  OK.

20         THE COURT:  It had been my hope and expectation that

21    we would be able to complete before lunch and so perhaps not

22    even need a break.

23         MR. HOFFMANN:  Mine too.

24         THE COURT:  It's fine.  Whatever needs to be done with

25    that will be fine.

I1oWadoT

1            MR. HOFFMANN:  My other question is if either one of

2       us has some time left and wants to make a verbal, an oral

3       summation, albeit brief one, would that be OK?  Would that be

4       permitted?

5            THE COURT:  I think the format should be parallel.

6            MR. HOFFMANN:  Sure.

7            THE COURT:  I will entertain summation of up to 15

8       minutes on each side if both sides have at least 15 minutes

9       left.

10           What I had anticipated, given how long the testimony

11      was running, was that I would give you the opportunity to file

12      written summations along with updated proposed findings and

13      conclusions keyed to the record.  Under the scenario that I

14      have in mind, the defense submissions being the updated

15      proposed findings and conclusions and a written submission of

16      up to ten pages will be due two weeks from today, and the

17      plaintiffs' set of submissions would be due a week after that,

18      so three weeks from today.  Let's see how we go in terms of

19      timing today.

20           I think the written summations would probably be my

21      preference, but if you both have 15 minutes left, I'll hear you

22      orally.  But we do need to finish this before lunch.

23           MR. HOFFMANN:  Yes, your Honor.

24           THE COURT:  OK.  Thank you very much for

25      understanding.

I1oWadoT

1           We were on Mr. Pizzimenti's direct for the defense

2    case.

3           Mr. Pizzimenti, would you please come back to the

4    witness stand.

5     CHRISTOPHER PIZZIMENTI, resumed.

6           THE COURT:  Please be seated.

7    DIRECT EXAMINATION CONTINUED

8    I1oWadoT                    Pizzimenti - Direct

9    BY MR. HOFFMANN:

10   Q.  Good morning, Mr. Pizzimenti.

11   A.  Good morning.

12   Q.  I want to return to the question, we were talking when we

13   broke yesterday about your efforts to comply with the 80-20

14   rule, and I'm wondering what other steps you took to make sure

15   that Al Horno and the 47th Street store remained in compliance

16   with the New York 80-20 rule.

17   A.  Well -- we, I made sure from the very beginning that we had

18   the adequate staff to do all these tasks, that we wouldn't have

19   to rely on delivery workers to have to do these things, because

20   I know from experience that, you know, if we didn't have these

21   people in place and had to rely on delivery workers, you know,

22   that would just leave us at risk for the type of case like

23   this.

24   Q.  In reading cases and from your discussions with people in

25   the industry, did you learn what kinds of restaurants wound up

1    having 80-20 problems?

2    A.   Yeah, so they would be smaller restaurants that would, you

3    know, rely on workers to do, to wear different hats and to do

4    different tasks around the restaurant.  So I just made sure

5    that when we opened, we had prep people, we had dishwashers in

6    place, we had a porter, we had an up-front staff -- to do all

7    these duties.

8    Q.   Did you give any instructions about what the delivery

9    personnel should be doing when there were no deliveries to be

10   made?

11   A.   Just wait, waiting for the next delivery.

12   Q.   And physically, where did they spend that time if, in fact,

13   it happened?

14   A.   So they would either be in the dining room, or some guys

15   preferred to wait outside in front of the store.

16   Q.   All right.  Did you familiarize yourself with the laws and

17   regulations concerning the tools of the trade?

18   A.   Yes, I did.

19   Q.   And what steps did you take to make sure that Al Horno

20   complied with that as well?

21   A.   The biggest thing that I emailed the labor department and

22   asked if we were required to provide bicycles, and the response

23   was no, that we weren't required to provide bikes.  So we

24   never -- we never -- and then the other, the follow-up question

25   to that was, are we required to pay for the repairs on

1    bicycles, and they said -- well, the response from the labor

2    department was, if it's not, if it's their bike, then no.

3    Q.   Did you supply any kind of equipment to the delivery

4    people?

5    A.   So, we had the vests available, helmets to use and the

6    lights that were required to be on delivery guys' bikes.

7    Q.   OK.  So let's talk about the vests.  What did you do to

8    supply vests to the delivery people in the store?

9    A.   So when we opened, I purchased vests.

10   Q.   How many did you purchase?

11   A.   It was five dozen, 60 vests, and I had them in the office

12   to give out to the delivery workers.

13   Q.   And were delivery people free to come and take the vests

14   for use when they were out on the bicycle?

15   A.   Yes.

16   Q.   Now, were there helmets that were supplied by the store

17   that delivery personnel could use?

18   A.   Yeah.  So, part of having a new account with Grubhub and

19   Seamless is they would give you a lot of promotional items:

20   raincoats, helmets, sidewalk signs.  And so we had a solution

21   for helmets.  We got them from, from Grubhub, and they were --

22   Q.   And how many helmets were supplied to the store by Grubhub?

23   A.   We had about 15.

24   Q.   What color were they?

25   A.   Red.

I1oWadoT

1    Q.  And did they display the insignia of Grubhub?

2    A.  It has the Grubhub logo on it.

3    Q.  Where were those helmets kept?

4    A.  We had them available in the office, and we have them in

5    the section of the dining room where we keep delivery supplies,

6    in cabinets.

7    Q.  And did delivery people utilize those helmets when they

8    made deliveries?

9    A.  Yeah.  So, the guys who chose to wear that helmet would

10   wear that helmet.

11   Q.  Did other people choose not to wear the helmet?

12   A.  Yeah.  So, some guys didn't like the style or fit of the

13   helmet, so they would wear their own helmet.  It's -- the

14   Grubhub helmet, if you know about helmets, there's different

15   styles of helmets.  And this helmet is a very round-looking

16   helmet, and some guys prefer a more, kind of cyclist-looking

17   helmet.  I would say this looks more like a motorcycle helmet,

18   but they're still, they still are helmets, and they do the job.

19   Some guys, maybe for style reasons, or whatever the case may

20   be, fit, they didn't prefer to wear it.

21   Q.  Did you implement any kind of record-keeping practices at

22   the 47th Street store to ensure compliance with the

23   wage-and-hour laws?

24   A.  Yeah.  So, from the beginning, we made sure that people

25   were, were -- we tracked their time.

I1oWadoT

1   Q.   Did you install a timekeeping system in the store?

2   A.   Yes.

3   Q.   And when did you do that?

4   A.   We had it since we opened.  And we were entering in the

5   data and training people on how to use it and using it

6   properly.

7   Q.   Do you know when it actually started to become effective

8   and used by store personnel?

9   A.   So, we got it working where there were less issues about

10  two to three weeks into opening the store.  At first, and this

11  is like communicating with our IT person that was outsourced,

12  we tried using a card, and there seemed to be issues with it.

13  But after that, when we knew it -- it needed to be fixed, we

14  did everything we can to, to get it up where we have it now,

15  where you would use a PIN; it seemed to be more effective.

16  Q.   The records here reflect that the plaintiffs started

17  punching in in August of 2014.  How was time kept between when

18  they started and August of 2014?

19  A.   So, the manager would record their time, when they came in

20  and left, and at that time there were no -- no one made any

21  complaints that their time was inaccurate or that we weren't

22  keeping it properly.  And we would actually go to the employee

23  to verify the times, so it's not like we were saying what time

24  it was.  They -- it was verified with the employees.

25  Q.   And how were they paid based on the records, the time

1   records that were kept by the managers?

2   A.   Excuse me?

3   Q.   How were they paid?  How was their weekly pay calculated?

4   A.   So, we would calculate it based on the wage at that time,

5   and if they made a tip credit or not, we would apply it, if

6   they made tips above that amount; and if not, we always assured

7   that they got, at the very minimum, minimum wage.  But in our

8   case, that wasn't the case, even before, when -- by the time we

9   started delivery, we were lucky enough to have a good delivery

10  business, so --

11  Q.   You have gone through all the records in this case?

12  A.   Yes.

13  Q.   Was there a single shift where a delivery employee did not

14  earn at least the minimum wage when you take into effect their

15  hourly rate and the tips that they make?

16  A.   No, and you can go through every record that we have here,

17  and you'll see that there's never a case where an employee got

18  paid, if you calculate their pay, less than the minimum wage

19  based on hourly and tip credit.

20  Q.   All right.  Now, back to that initial period -- by the way,

21  when did the delivery people start to work?  I may have asked

22  you that yesterday.

23  A.   We didn't have delivery right away, so we -- we started

24  offering delivery a few weeks after we opened.

25  Q.   And do you know when the bulk of the delivery people were

1   hired, at least the first generation, to coin Mr. Mulholland's

2   phrase?

3   A.  It would be in July of 2014.

4   Q.  If people worked more than 40 hours during that initial

5   period, were they paid at a premium rate for their overtime

6   hours?

7   A.  Yes.

8   Q.  And were they paid spread of hour?

9   A.  Yes.

10  Q.  Now, you mentioned that the 47th Street store is on a side

11  street?

12  A.  Yes.

13  Q.  I think you may have told us yesterday, what's the width of

14  the sidewalk in front of the store?

15  A.  It's 14 feet, similar to -- it's the same as our frontage.

16  Q.  And it's in a residential building?

17  A.  Yes.

18  Q.  What percentage of the business in the store comes from

19  delivery?

20  A.  90 percent.

21  Q.  And why is that?

22  A.  So, when we first got started, and even until today, we

23  had -- we -- I'm doing this -- you know, this is a self-funded

24  business, and so I had to find the cheapest available rent.  So

25  I -- I found the space on a residential street between Ninth

1   and Tenth Avenue on 47th Street.

2       My initial intention was that we would service the

3   neighborhood in Hell's Kitchen, and people would come into our

4   store, and I hoped that the business would make it based on

5   that.  But when we opened, no one was coming in the store, and

6   so we did hear from people.  They would, you know, rather us

7   deliver the food to them.  And so, we were like, Let's start

8   delivery, we're not making it like this.

9   Q.  How did you advertise for delivery?

10  A.  Well, I would personally go out, and I had fliers and I

11  would visit buildings and doormen.  And I would go to gyms and

12  I would bring our menu and let people know that --

13  Q.  What's the delivery -- I think you testified yesterday, but

14  where did most of your deliveries arise from?

15  A.  You mean as far as the deliveries --

16  Q.  Location of the customers.

17  A.  So, we -- we delivered -- it was a 15-block radius.  So if

18  we're on 47th, we went from 32nd to 62nd, and we would go down

19  to Third Avenue and as far west as the piers, so that's Twelfth

20  Avenue.

21  Q.  Now, how many orders a day, how many delivery orders a day

22  are generated from that store?

23  A.  Over 300.

24  Q.  And was that true in 2014?

25  A.  Yes.

1    Q.  And is that true today; it's about the same?

2    A.  Yes.

3    Q.  And there's been some testimony about breakfast between

4    eight and ten.  You bring in a whole staff to work during the

5    breakfast period, do you not?

6    A.  Yes, we have --

7    Q.  And how many breakfast orders are generated on a daily

8    basis?

9    A.  From 8 to 10 a.m., we have between 25 and 30 breakfast

10   orders.

11   Q.  There's been some testimony by the plaintiffs that there

12   were only a handful of breakfast orders that went out between 8

13   and 10:00.  Is that true?

14   A.  It's not true, and it doesn't make any sense, because we

15   have two cooks in the morning, not just one.  We have two prep

16   people.  We have two to three front staff to package these

17   orders, and so 90 percent of our business is delivery.  It

18   doesn't make sense that there's only four orders before 10 a.m.

19   Q.  All right.

20   A.  And I'd like to make the point that we have eight items on

21   our breakfast menu, so that would mean if we're only doing four

22   a day, at least four of those items aren't selling.  And so it

23   wouldn't make any kind of business sense to open at 8 a.m. if

24   we weren't doing any business at that time.

25   Q.  There's been testimony about Mr. Zakari.  When did he start

1   working in the store?

2   A.  In May 2014.

3   Q.  And do you know someone by the name of Sam, or Samuel

4   Solis?

5   A.  Yes.

6   Q.  And who is he?

7   A.  Now he's a manager of the store.

8   Q.  And was he working in the store when it first opened?

9   A.  No.

10  Q.  Where did he work -- how do you know Sam?

11  A.  I know him from my previous restaurant, where he worked as

12  a cook.

13  Q.  When did he start working at Al Horno on 47th Street?

14  A.  I believe it was late 2014, as a cook.

15  Q.  And did there come a time that he became a manager?

16  A.  Yes.  That would be in the later part of 2015.

17  Q.  And is he still a manager in the store?

18  A.  Yes.

19  Q.  Let's talk about -- has the staffing model in the store

20  been pretty much the same since it's opened?

21  A.  Yes.

22  Q.  And you basically have two shifts, right, a morning shift

23  and a p.m. shift?

24  A.  Yes.

25  Q.  And when is the morning shift, for staffing purposes?

I1oWadoT

1   A.  So, we receive a delivery from our supplier around 6 a.m.,

2   so we have the first person come in at 6 a.m.

3   Q.  And who's that?

4   A.  It would be the dishwasher and the prep people, actually

5   arrive.

6   Q.  Tell me, lay out the entire staffing you have for the

7   morning shift.

8   A.  So at 6 a.m., we have people that arrive to take the order

9   in, to check the order, make sure that everything we ordered is

10  there.

11  Q.  Right.

12  A.  And then at that point --

13  Q.  And who are they?  You have a dishwasher and two prep

14  people?

15  A.  Yes.

16  Q.  And then are other people added to the shift?

17  A.  Yes.  Then we have a cook that comes in.

18  Q.  What time does the cook come in?

19  A.  The first cook comes at 7:30.

20  Q.  And the second one?

21  A.  8:00.

22  Q.  And who else works during the morning?

23  A.  We have two to three cashiers.

24  Q.  Anyone else?

25  A.  Delivery workers.

1    Q.  And how many delivery people work in the morning?

2    A.  Two.

3    Q.  Is there anybody else who's there?  Do you have a porter?

4    A.  And a porter.

5    Q.  What time does the porter come in?

6    A.  About -- between 7 and 8:00.

7    Q.  Let's talk about the prep people.  The cooks cook, right?

8    A.  Yes.

9    Q.  What do the prep people do?

10   A.  They prep the -- mostly the meat and vegetables that arrive

11   that day.

12   Q.  When you use the word "prep" as a verb, can you just

13   explain to the Court what that means?

14   A.  So, they will take, let's say, the vegetables that come and

15   prepare them for our menu.  So they would cut tomatoes.  They

16   would cut onions.  They would cut meat, clean meat, clean

17   salad, make sauces and dressings.

18   Q.  And what does the dishwasher do?

19   A.  So, he cleans the dishes, and so there's -- so he starts

20   with that, but he helps the prep people with their packages,

21   and he puts the order away, and he also cleans the store with

22   the porter.  It's almost an interchangeable job.  It's not a

23   big store, so they're -- they're the guys who are doing these

24   duties.

25   Q.  And what do the cashiers do?

1    A.  So, in our front of the house, they work the cashier.  They

2    package delivery orders, and they maintain the front of the

3    house.  So they'll fill up the soda machine.  They'll maintain

4    the dining room area.  They clean the tables and make sure the

5    front of the, in the dining room is clean.

6    Q.  Now, there was some testimony about different activities

7    which take place in the morning, and the first one I want to

8    ask you about is, when your deliveries come at 6:30, who opens

9    the packages, puts everything away, folds the boxes up?  Who

10   does that work?

11   A.  So, it's mostly the dishwasher that does that, with the

12   porter.  But also, the front of the house has a lot of supplies

13   too that they use, so these orders that come in are not only

14   meat and vegetables, but it's a lot of supplies that the front

15   of the house uses, like cups.

16       We have a juice bar too, so they make juices.  So let's say

17   paper products, cups and --

18   Q.  Who unpackages those boxes?

19   A.  So, the front of the house unpackages that to stock it in

20   their station.

21   Q.  All right.  There was some testimony about when the bags of

22   carrots and onions and other kinds of produce come in, who

23   carries them from the basement upstairs.  Who does that kind of

24   work?

25   A.  So, it's the prep, dishwasher and porter that does that

1  work.

2  Q.  There was some testimony that the plaintiffs were asked,

3  because the prep people are women, to carry these heavy bags up

4  the stairs because the women couldn't do it.  Is that true?

5  A.  No, it's not true.

6  Q.  Tell me a little bit about your prep people.

7  A.  Uh, well, if we kind of go through the timeline, first of

8  all, the -- the women that work for us, prep at that time, are

9  very capable of carrying these, let's say, case of vegetables

10  or meat.  They're -- I like to say they're, you know, strong

11  women.  They are even bigger than me.  They can, they can

12  handle that, that weight and --

13  Q.  By the way, how much does a container of onions or a

14  container of carrots weigh that is sent to you by your

15  supplier?

16  A.  Well, the packages would range from, you know, 5 to 25

17  pounds.

18  Q.  Is there ever a time that the delivery people are involved

19  in unpacking your deliveries and putting the products away?

20  A.  No.

21  Q.  What do they do in the morning, your delivery people?

22  A.  For us, the fact that we are so delivery intensive, when

23  they come in, their delivery's ready to go, so mainly -- all

24  they do is delivery.  Let's say in between waiting for delivery

25  to be packaged, they're just waiting to receive the delivery.

1  That's delivery that's going to customers.

2  Q.  There's been some testimony about cleaning and mopping in

3  the basement and kitchen area.  Who does that work in the

4  morning?

5  A.  It would be the dishwasher and the porter.

6  Q.  Do the delivery people ever do that?

7  A.  No.

8  Q.  There's been some testimony about cleaning the sidewalk out

9  in front of the building.  What kind of building is it again?

10  A.  It's a residential building.

11  Q.  Does the building have its own building service staff?

12  A.  The building has a super.

13  Q.  And does the super clean the sidewalk in front of the

14  building?

15  A.  Yes.

16  Q.  Do your personnel need to clean the 14 feet of sidewalk in

17  front of the building?

18  A.  No, because the building is maintaining that for all the

19  residents that live in that building.

20  Q.  And by the way, 14 feet of sidewalk, would it take anybody

21  a half hour to clean 14 feet of sidewalk in New York City?

22  A.  No, and I just don't know why even -- some things that

23  didn't make sense, that every delivery guy would be doing that.

24  That would only imply that we must be cleaning that sidewalk

25  every half hour.

1   Q.  There's been some testimony about shoveling snow.  Who

2   shovels the snow in front of the store if and when it snows?

3   A.  The super does that.

4   Q.  Does he have a snow blower?

5   A.  No, because it's not a lot of sidewalk.

6   Q.  There's been some testimony about filling up the soda

7   refrigerator.  How big is the soda refrigerator, and where is

8   it located?

9            MR. HOFFMANN:  I'm sorry.  That's a compound question.

10  Q.  Where is the soda refrigerator located?

11  A.  So, it's in the dining room.

12      We're a quick-service restaurant.  We don't have waiter and

13  waitress services.  We have a small dining room.  It's about

14  200 square feet.  So when someone places an order, they do it

15  at our counter, and next to the counter, which is only about

16  two feet from there, we have a small beverage merchandiser.

17  Q.  Can you just indicate the dimensions of the actual

18  refrigerator?

19  A.  It's about three to four feet wide.  It's a little taller

20  than me, so it would be about six feet high, and the bottom two

21  feet of this merchandiser is actually a compressor.  So the

22  actual area that houses the beverages is only about four feet

23  by three to four feet wide.

24  Q.  Do you know how often it's refilled with soda?

25  A.  Once a day, because it -- you know, think about it like

1    this: we're not selling all of those beverages in a day's time,

2    so if we ever need to refill it, you're talking about two to

3    three dozen beverages have to be put back in there, single --

4    single size.  And what we keep in there are cans of soda,

5    bottles of water.

6    Q.  Who does that work?  Who refills the soda?

7    A.  So, that's the job of the front staff, to refill the fridge

8    merchandiser.

9    Q.  Let's go to your p.m. staffing.  What is the layout in

10   terms of the staff for the afternoon shift that starts three in

11   the afternoon?

12   A.  Well, we have a lot more staff -- before we get into that,

13   we have a lot more staff that shows up at -- between 10 and

14   11:00, because we do a very busy lunchtime.  And so we have, in

15   the kitchen, five cooks.  We have five cashiers by 11 a.m.  We

16   have 10 to 12 delivery workers by 11 a.m., and so the lunch

17   rush --

18   Q.  How many prep people do you have?

19   A.  It's two to three.

20   Q.  And do you have a dishwasher?

21   A.  Yes.  The dishwasher stays from the morning until the end

22   of lunch.

23   Q.  And do you have a dishwasher that comes in later in the day

24   as well?

25   A.  Yes.  Then we have another dishwasher that comes.

1    Q.  And do you have another porter that comes?

2    A.  Yes.

3    Q.  And there was some testimony about some activities that the

4    plaintiffs claim that they did that happens in the afternoon.

5    Who takes out the garbage?

6    A.  Well, we don't take out garbage until 5:00, because if you

7    put garbage out onto the street before five, you'll get

8    ticketed by the city.

9    Q.  Who puts it out there?

10   A.  So, that's the dishwasher and the porter.

11   Q.  Is that part of their assigned duties every day?

12   A.  Yeah.

13   Q.  Who takes the trash that's generated and moves it to the

14   area where you store it before you put it out on the street?

15   A.  The dishwasher and the porter, and at the end of the night,

16   they also do that.  We only generate between five and ten bags

17   of garbage a day.

18   Q.  There was some testimony about the end of the day doing

19   some mopping and some sweeping of the dining room.  Who does

20   that work?

21   A.  For the dining room, it's the front staff, and like I said,

22   it's 200 square feet, so --

23   Q.  Do you know how many deliveries each of the delivery people

24   do on a shift?

25   A.  Yeah.  So, if it's a short shift, which is four hours,

1    they're, they're doing over a dozen deliveries.  And a long --

2    and that's per, per busy time, so that would be for the lunch,

3    and then also we have an evening rush.

4    Q.  Are the delivery people busy during their entire shift

5    making deliveries?

6    A.  Yes.

7    Q.  There's been some testimony about a 3 percent deduction

8    that you made from the delivery people's tips.  Why did you do

9    that?

10   A.  Well, looking -- reading through the labor law, it says

11   that as an operator, if we don't collect -- if there's a credit

12   card processing fee related to a tip and we don't collect that,

13   then we can pass that on to delivery workers because.  In

14   theory, if we collect a dollar tip on behalf of the delivery

15   worker, we never receive the entire dollar.

16   Q.  And were you charged any of these processing fees?

17   A.  Yes.  On --

18   Q.  For example, do you have a contract with Grubhub?

19   A.  Yes.

20   Q.  And does your contract with Grubhub charge you a processing

21   fee?

22   A.  Yes, and so do all of the other delivery platforms and

23   any -- any order that takes place on a, let's say, by credit

24   card.  So if a customer calls in and uses a credit card,

25   there's a processing fee on that order as well.  It's standard

1    in, in any kind of electronic form of payment.

2    Q.  And is this something that is absolute throughout the

3    industry?  Is every restaurant paying that same processing fee

4    that uses Grubhub or any of the other delivery services?

5    A.  Yeah, because, if you think about it, when -- when a

6    customer orders on Grubhub, they pay with their credit card, so

7    it's a passalong.  So Grubhub never not charges that processing

8    fee, because they incur the fee as well.

9    Q.  OK.  There's been some testimony here about large orders,

10   in excess of $1,000, that would generate a tip of $80-plus.

11   How often does the store receive an order of that size?

12   A.  That would be once every month or two, and when they come

13   in, it's a big deal, because to make an order like that --

14   first of all, it, it -- they're not common to get a size order

15   like that, and so when they come, you know, it's -- it's good

16   to see that we have a large order like that, so --

17   Q.  Do you know about it when that happens?

18   A.  Yeah.  So, we would know in advance because we need time to

19   prepare for that order.  You can't, you can't make a

20   thousand-dollar order on such a short notice.  It can't, it

21   can't come in and then, you know, we make a thousand-dollar

22   order and send it out.  When you think about the amount of food

23   that makes up for $1,000, you need time to prepare for that.

24   Q.  There's been testimony by each of the plaintiffs that they

25   themselves delivered orders of that size three times a week.

1  Is that remotely possible?

2  A.  It can't even be possible, because, because if you take

3  into consideration all the other delivery guys we have, let's

4  say it's 10, between 10 and 12, and they're all taking three

5  orders of that size, it's just not -- it's just not possible.

6  We -- yeah, it's not even possible.

7  Q.  Were employees -- tell me about your policy regarding

8  employee breaks.

9  A.  So, from day 1 we, we implement -- according to the labor

10  law, if you work six hours or more, you get a half-hour break.

11  For us, anyone who's working a longer shift than nine hours,

12  you get at least an hour break.  That's how we did it.

13  Q.  And what about people that work less than six hours?

14  A.  We would allow a 15-minute break, but if someone worked

15  four hours, they were so busy -- if you want to take, for

16  example, delivery guys -- doing deliveries that some of them

17  didn't take a break if they worked a four-hour shift.

18  Q.  Can you turn to the first book and just go to Exhibit C,

19  and I just want to direct your attention to the first three --

20  the first four pages, which are the New York State wage forms.

21  A.  OK.

22  Q.  Do you recognize those?

23  A.  Yes.

24  Q.  There's been some testimony by each of the plaintiffs here

25  that while they admit that it was their signature, they

1    indicate that portions of the form were not actually filled out

2    when they signed it.  Do you have any personal knowledge about

3    whether that's true or not?

4    A.  No.  And what I can say is we would have no reason to give

5    an incomplete form.  If you tie back what's stated on these

6    forms to the pay stubs, it's paid according to the numbers that

7    are on this form.

8    Q.  Who did you assign in your business to be responsible for

9    having these forms filled out and given to employees?

10   A.  So, it would be Djibril and the managers at the locations.

11   Q.  Do you know whether Mr. Zakari actually personally sat down

12   with employees and had them fill out these forms?

13   A.  He did, and it would be with also a translator, because --

14   Q.  Did you actually see him doing that with employees?

15   A.  Yeah.

16   Q.  Do you have any reason to think that Mr. Djibril signed his

17   name to these forms even though he was not the one that gave it

18   to employees?

19   A.  He would have no reason to do that.

20   Q.  How many delivery people do you have working for you now?

21   A.  Storewide, it's about 80 delivery workers.

22   Q.  Approximately how many with turnover have come through your

23   business since you opened?

24   A.  We've employed over 150 delivery workers.

25   Q.  And do you utilize the same forms in the same format for

1  all of your delivery people?

2  A.  We use the same form for every employee.

3  Q.  OK.  And they're all filled out the same way, using the

4  same procedure?

5  A.  Yeah.  In a case of like, let's say, nondelivery worker, it

6  wouldn't have tip credit.

7  Q.  All right.  Do you know whether employees are given a copy

8  of the form after they sign it?

9  A.  Yeah.  So, the same homework I did to make sure we have

10  these pay notices, it says in the same law that you're required

11  to give a copy of it.

12  Q.  And were copies given to employees?

13  A.  Yes.

14  Q.  Did you know any of the individual plaintiffs when they

15  worked for you?

16  A.  Personally?

17  Q.  Yeah.

18  A.  I knew who they were.

19  Q.  Did you see them around?

20  A.  Yes.

21  Q.  Did you notice anything different about them than some of

22  the other delivery people that worked for you?

23  A.  I did.

24  Q.  Tell me what you observed.

25  A.  Well, the guys here in general, you know, if I were to come

1  and greet them, I wouldn't get a greeting back.  A couple in

2  particular were very -- what's the word I'm looking for?

3  Didn't want to sign for certain things and refused and --

4  Q.  Did you hear anything about them from any of your managers?

5  A.  Yeah, that they were --

6          MR. MULHOLLAND:  Objection.  Calls for hearsay.

7          THE COURT:  Please consult.

8          MR. HOFFMANN:  I'll withdraw the question.

9          THE COURT:  Thank you.

10  BY MR. HOFFMANN:

11  Q.  I want to direct you to Mr. Aranda.  Do you know when he

12  actually started at the store?

13  A.  I believe he first came in when we were on-boarding

14  delivery workers; he was interested in working there.

15  Q.  Do you know when he actually started to work?

16  A.  So, he didn't come on board after that for a few months,

17  until after his initial, I guess, interview at the store.

18  Q.  Do you know why he delayed his becoming a regular employee?

19  A.  From what I understand, he, I think, was in between a

20  different job.

21  Q.  And is that why he doesn't show up on the punch records

22  until December as far as you know?

23  A.  Yes.

24  Q.  Did you institute any policies regarding the recording of

25  tips?

1    A.   Yes.

2    Q.   And what was the policy?

3    A.   So, we had a, a tip sheet where we would record each

4    delivery worker's tips, and the way it worked was that for our

5    system, delivery workers would get the original slip from a

6    Grubhub or Seamless order; a receipt you can call it.  And they

7    would hold onto these receipts until the end of their shift.

8    We encouraged delivery workers to calculate their own tips, and

9    then a staff member of ours would recount their tips to make

10   sure the two numbers were accurate.  And so then we would

11   record it on a sheet and ask them to sign that the amount is

12   correct, and that there was no discrepancies.

13   Q.   Are the tip sheets for the store in question reflected in

14   Defendants' Exhibits U, V and W -- the other book -- broken

15   down by year?

16   A.   Yes.  And as you can see, they evolved over time.

17   Q.   Why did you have people record their tips?

18   A.   Well, it -- first of all, so they can reference the amount

19   of tips they made in that day, because what we do is by the end

20   of the pay period, we calculate the total, and then it goes

21   onto their paycheck.  So if there's a discrepancy, we can refer

22   back to the sheet and correct if there's a discrepancy.  And so

23   that's why we keep a record of it.

24   Q.   How did you finance the opening of this business, of Al

25   Horno?

I1oWadoT

```
 1   A.  Well, I started the first business with my own personal

 2   money that I saved, and it was -- I started the business with

 3   $24,000 and set out to, you know, build a chain of restaurants

 4   that I believed in.

 5   Q.  Did you -- tell me a little bit about your initial, your

 6   original family background and your financial condition growing

 7   up, as a person.

 8            MR. MULHOLLAND:  Objection.

 9            THE COURT:  Consult.

10            MR. MULHOLLAND:  Your Honor, I'm objecting to this

11   line of questioning on the grounds of relevance.

12            THE COURT:  I will give a little leeway for this.

13            MR. HOFFMANN:  One question.

14            THE COURT:  Not extensive questioning.

15            MR. HOFFMANN:  Thank you.

16   A.  So -- I'm sorry.  It's tough to grow up, single mom,

17   that --

18   Q.  How did your family support itself?

19        Do you need a tissue?

20   A.  I'll be all right.

21   Q.  Just take a minute, please.

22   A.  So, we were on public assistance.

23   Q.  Why do you do Al Horno?  What's your goal there?

24   A.  I just wanted to build something successful, and I --

25   Q.  How many people do you currently employ?
```

I1oWadoT

1    A.  200.

2    Q.  Is that important to you?

3    A.  Yes, very important.

4    Q.  How many stores do you have?

5    A.  I have five Al Hornos.

6    Q.  Are you looking to expand at the moment?

7    A.  Not right now.

8    Q.  Why not?

9    A.  We're a very delivery-intensive business, just like a lot

10   of places in Manhattan, and I guess, being in the business I

11   learned that there's just so much exposure, claims to be made,

12   almost, how do you -- how do you protect the business against

13   all these possible claims that someone could make, and --

14   Q.  How much effort have you made to comply with the

15   wage-and-hour laws?

16   A.  Uh, from my first lawsuit, it just became my life.  It's --

17   I kind of took a -- I just put a lot of my time and energy into

18   making sure that we complied, because I didn't set out to, to

19   open a restaurant and run one restaurant.  I set out to build a

20   brand, to be the biggest, to be -- to be a brand that people

21   love.

22       I really believe in what we do.  It's very niche.  It's an

23   idea that I just had from a long time ago, and I know that we

24   can't build this company by not complying with labor.  That's

25   not my intention.  My intention is not to, you know, do all

1   these tricks to try to not pay people properly.  It's my --

2   Q.  Are you getting rich from Al Horno?

3   A.  No.

4   Q.  How much do you take out of the business for yourself?

5          MR. MULHOLLAND:  Objection.

6          THE COURT:  Overruled.  One question.

7   A.  I -- I pay my bills through, through the business.  So if

8   we open a store, it's a big sacrifice.  You know, most

9   restaurants don't even last for the first year, so I invest

10  into a new restaurant, and by doing that, I'm able to get by

11  paying my bills, my personal --

12  Q.  Are you a one income or two-income family?

13  A.  Two incomes.  My wife's a New York City schoolteacher.

14  Q.  Last question.  Are you satisfied as a human being that you

15  have done everything you possibly can to comply with the

16  wage-and-hour laws for your employees?

17  A.  Yes.

18          THE COURT:  Thank you.

19          Mr. Mulholland.

20          MR. MULHOLLAND:  Yes.  Thank you, your Honor.

21  CROSS-EXAMINATION

22  BY MR. MULHOLLAND:

23  Q.  Mr. Pizzimenti, I believe you testified earlier that Mr.

24  Aranda was some sort of part-time employee until December of

25  2014.  Is that correct?

1    A.  Yes.

2    Q.  All right.  Could you turn to page defendants' U-23.

3    A.  I can't find it.

4    Q.  Defendants' U-23.

5              MR. HOFFMANN:  Does it have a date?

6              MR. MULHOLLAND:  It's a handwritten record.  The dates

7    at the top are 8/23, 8/24, 8/25.

8    A.  OK.

9    Q.  If you take a look at that chart there, do you see an entry

10   for Antonio A.?

11   A.  Yes.

12   Q.  I mean, it looks to me, sir, like Antonio A. was working

13   six days during that week in August of what purports to be

14   2014.

15   A.  OK.

16   Q.  Is that a part-time employee, six days a week?

17   A.  Uh, I couldn't tell you if that is actually him.  If you

18   notice, if you go through these records, there's a lot of same

19   names, and I know from -- from that time that he was not a

20   permanent employee.

21   Q.  Well, why don't you take a look at defendants' U-14.

22   A.  OK.

23   Q.  Do you see an entry there for Aranda?

24   A.  Yes.

25   Q.  How many calendar entries are there for Aranda on that

I1oWadoT                        Pizzimenti - Cross

1   day -- on that week?

2   A.  Uh --

3   Q.  There's six, aren't there?

4   A.  Yes.

5   Q.  How many Arandas did you employ at this time?

6   A.  Uh, I don't know, but there was a --

7   Q.  Why don't we take a look at defendants' U-11.

8   A.  OK.

9   Q.  Do you see this handwritten list, the name Aranda again

10  near 68.94 and 10 hours for Thursday, the 31st, of 2014?

11  A.  I don't see it.

12  Q.  If you look in the middle of the column there, it says

13  Aranda next to the number $68.94, 10 hours, defendants' U-11.

14  A.  I think it's a little cut off on mine.

15  Q.  OK.

16  A.  I see --

17  Q.  That's fine.

18      How many locations are there for Al Horno presently?

19  A.  Five.

20  Q.  And how many other restaurant locations do you own?

21  A.  One more.

22  Q.  What about Fuel?

23  A.  I don't own it.

24  Q.  So it's just Stamina?

25  A.  Yeah.

1   Q.  So you own -- you have an ownership interest in a total of

2   six restaurant locations in Manhattan?

3   A.  Yes.

4   Q.  What did you declare on your taxes last year for your

5   income?

6   A.  I'd have to refer back to it.

7   Q.  OK.

8   A.  But it's -- it's not a lot.  It's not what you'd think it

9   was, you know.

10  Q.  If you brought the -- I believe you testified earlier that

11  if you put the garbage out early, ECB would give you a ticket?

12  A.  Right.  Correct.

13  Q.  Did they give a ticket to you or to the building?

14  A.  That would go to us.

15  Q.  OK.  So if the sidewalk -- if an ECB agent found debris to

16  be on the sidewalk in front of Al Horno, would they ticket you,

17  or would they ticket the building?

18  A.  If it's our garbage, they would ticket us.

19  Q.  Did the ECB take time to discern whose garbage it was?

20  A.  Yeah, because our garbage is, is kept to the right side.

21  Q.  Well, isn't it true that if an ECB agent examined the

22  frontage of Al Horno and found any sort of debris on the

23  sidewalk, be it cigarette butts, old wrappers, they would

24  ticket Al Horno as the commercial tenant on the first floor and

25  they would not ticket the building?  Isn't that true?

1    A.  Not always.

2    Q.  And isn't it true that in the terms of your lease, you're

3    required to maintain that frontage as part of your commercial

4    lease with your building?

5    A.  No.

6        So, back to your point before, I'm seeing Aranda in the

7    earlier pages, and then I -- there's an Antonio that comes

8    later, so there was a break in employment at sometime, and if

9    you'll go through this, you'll see that.

10   Q.  But you don't have any personal knowledge about the staff

11   at that time, because you didn't spend much time at Al Horno,

12   isn't that correct?

13   A.  Well, I still know what was going on, and like I said, if

14   you go through it, it's -- you'll see that.  So, we would have

15   no reason, too, an important point, for some guys to be on a

16   time-entry system and some not.  I don't see why some guys

17   would be according -- paid according to our policies and some

18   guys would not.

19   Q.  I understand.

20             MR. MULHOLLAND:  No further questions.

21             THE WITNESS:  OK.

22             THE COURT:  Mr. Hoffmann, anything?

23             MR. HOFFMANN:  No redirect, your Honor.

24             THE COURT:  Thank you, Mr. Pizzimenti.  You may step

25   down.  Your testimony is concluded.

1              (Witness excused)

2              THE COURT:  The defense may call its next witness.

3              MR. HOFFMANN:  I need to leave the courtroom to get

4      him, if that's OK.

5              THE COURT:  Very well.

6              MR. MULHOLLAND:  Your Honor, I'm just asking my

7      paralegal --

8              THE COURT:  Yes.  Good morning.

9              Good morning, Mr. Zakari.  Please come to the witness

10     stand.

11      DJIBRIL ZAKARI,

12          called as a witness by the Defendants,

13          having been duly sworn, testified as follows:

14     DIRECT EXAMINATION

15     BY MR. HOFFMANN:

16     Q.  Good morning, Mr. --

17             MR. HOFFMANN:  Your Honor, would it be OK to just give

18     him his water?

19             THE COURT:  Yes.

20             MR. HOFFMANN:  Thank you.

21             THE COURT:  We don't have a pitcher there?

22             MR. HOFFMANN:  No, but I know he's been drinking it

23     all week.

24     Q.  Good morning, Mr. Zakari.

25     A.  Good morning.

```
1    Q.  Can you tell me a little bit about your educational

2    background?

3    A.  I have a bachelor in business and management.

4    Q.  I'm going to need you to move the microphone a little

5    closer.

6    A.  Oh.

7    Q.  And keep your voice up so everyone can hear.

8    A.  Sorry.

9    Q.  Thanks.

10   A.  I have a bachelor in business management.

11   Q.  From where?

12   A.  From Niger, West Africa.

13   Q.  How long have you known Chris Pizzimenti?

14   A.  I've known Chris about seven, eight years now.

15   Q.  OK.  And how did you come to meet him?

16   A.  I was just working in a restaurant.  At that time it was

17   Fuel, and he hired me as a delivery guy, actually.  And then a

18   month later, he asked me to work in, at the juice bar because

19   he told me that my English was good and that I can do something

20   better inside.

21   Q.  Right.

22   A.  Yes.

23   Q.  Did there come a time that you started working at Al Horno?

24   A.  Yes.

25   Q.  And when was that?
```

1   A.  That was in May of 2014.

2   Q.  OK.

3   A.  Yes.

4   Q.  There's been a lot of testimony during this trial about how

5   often you were in the 47th Street store from, let's say, July

6   of 2014 until 2015.  Tell me what your professional job was

7   during that period.

8   A.  Oh, I was coming in every day in the morning about four, or

9   in the evening for four to five hours, because I was in Stamina

10  also that time.

11  Q.  Right.

12  A.  Just come, check everything is fine, the operation is

13  running perfectly.  And then I would leave after that.

14  Q.  All right.  So you were working at Stamina and 47th Street?

15  A.  Correct.

16  Q.  Did you have any other kind of job during that period?

17  A.  No.

18  Q.  And do you speak Spanish?

19  A.  Not fluently.  Few words.

20  Q.  OK.

21  A.  Here and there.

22  Q.  Did you ever have conversations with Mr. Pizzimenti about

23  making sure that the store complied with all the laws regarding

24  how employees are paid?

25  A.  Every day, every single day, all the time.  If there was a

1  change, whatever it is, Mr. Pizzimenti told me --

2  Q.  You can call him Chris here.

3  A.  Chris.

4        MR. HOFFMANN:  If that's OK with you, your Honor.

5        THE COURT:  Fine.

6        MR. HOFFMANN:  It's just a long name and might just

7  flow easier.

8  A.  Yeah, he would always make sure that, you know, I have to

9  pay the employees, you know, to make sure that they're paid the

10  minimum wage and stuff like that.  There was a lot of times

11  that he told me, Make sure that employees must be paid

12  correctly.

13  Q.  Did you ever have any discussion with him about the tip

14  credit in New York?

15  A.  Yes.

16  Q.  And tell me what kinds of things you would talk about.

17  A.  Yeah, he would tell me as a delivery person, when he makes

18  the minimum wage, then we'll be able to apply the tip credit on

19  that.  Yes.

20  Q.  Did he ever have any discussion with you about the 80-20

21  rule?

22  A.  Yes.

23  Q.  And tell me what he instructed you to do.

24  A.  He instructed me to just let the delivery guys do nothing

25  except deliveries.

1  Q.  Can you turn to -- there's a book in front of you, and why

2  don't you turn to Exhibit B.

3  A.  B, yes.

4  Q.  Do you know what the New York State wage form is?

5  A.  Yes.

6  Q.  What is it?

7  A.  The pay rate --

8  Q.  What --

9  A.  The pay-rate sheet.

10  Q.  When the store opened and when you got involved, did you

11  guys have a practice regarding having employees sign the

12  pay-rate sheet?

13  A.  Yes, sir.

14  Q.  And what was your practice?

15  A.  My practice was to instruct, what you call, the manager to

16  make sure to explain that, because we have documents either in

17  English and Spanish, and then he would write the company name,

18  how much the wage was at that time, the rate, if I can call it;

19  the tip credit; receive the credit card fee.  And then the

20  employee will write his name, attest that, you know, he agree

21  on that, and sign.  And then I will sign at the bottom.

22  Q.  Do you recognize any of the three gentlemen at the table?

23  A.  Yes, sir.

24  Q.  Who do you recognize them to be?

25  A.  Delivery -- delivery drivers.

1   Q.  Did you have any role in having them fill out and sign --

2   having them sign their pay-rate sheet?

3   A.  Yes, sir.

4   Q.  There's been some testimony here by each of the plaintiffs

5   that while they acknowledge that they signed the payroll sheet,

6   they testified that there were portions of it that weren't

7   actually filled out at the time that they signed it.

8   A.  No, that's not --

9   Q.  Are you aware of that ever happening with any employee at

10  the store?

11  A.  No.  I would make sure that everything is filled out,

12  explained to them.  Again, because my level of Spanish wasn't

13  that good, I would always have a manager, because our location

14  always had a manager besides -- I was operation manager -- that

15  would help explain to them, OK, that's what you're getting, and

16  that's what the tip credit is, and stuff like that.

17  Q.  Do you know who German Mercenario is?

18  A.  Yes.

19  Q.  Can you identify him?

20  A.  Yes.  That's the one in the middle.

21  Q.  The gentleman with the pony tail?

22  A.  German, yeah.

23  Q.  OK.  Now, let's look at Exhibit B.  Do you see the first

24  page there?

25  A.  Yes.

1   Q.  Who filled out that form?

2   A.  I filled it out.

3   Q.  And do you see your signature?

4   A.  Yes, sir.

5   Q.  What does that signature -- when you signed it, what did

6   that mean to you?

7   A.  That means that we are just paying, you know, the right

8   thing, according to the law.

9   Q.  Were you present when Mr. Mercenario signed it?

10  A.  Correct.

11  Q.  And did you sit with him and explain all the information on

12  the form?

13  A.  I would explain it to Ricardo, and then he will make sure

14  that he explained to him in Spanish.

15  Q.  Were you present when that was done?

16  A.  Yes, sir.

17  Q.  Did you watch him sign it?

18  A.  Yes.

19  Q.  Can you look at the four pages there?  Would that be -- I'm

20  sorry.  The three pages there, would that be the same for all

21  of them?

22  A.  Yes.

23  Q.  You understand you're under oath?

24  A.  Yes, sir.

25  Q.  This is a very important issue in this case, and the

I1oWadoT                     Zakari - Direct

1    testimony is very disparate between what you're saying and

2    these plaintiffs are saying.

3    A.  OK.

4    Q.  So just to be clear, did you ever sign your name to a form

5    where you did not personally participate in explaining the form

6    to employees?

7    A.  No.

8    Q.  Were employees given a copy of the form?

9    A.  Yes, sir.

10   Q.  And how did you make the copy?

11   A.  The printer in the office.

12   Q.  Can you take a look at Exhibit A and look at those forms as

13   well, starting with the second page, and we see your signature.

14   Were you present when Mr. Adonias signed those forms as well?

15   A.  Yes, sir.

16   Q.  Can you go to C, Mr. Aranda.  Not the first one, but the

17   second and the fourth one --

18   A.  Yes.

19   Q.  -- where it's your signature?

20   A.  Yes.

21   Q.  You were present when that form was signed by Mr. Aranda?

22   A.  Correct.

23   Q.  And the information was explained to him?

24   A.  Yes.

25   Q.  By another person?

1   A.  It was always explained.

2   Q.  And if you go to D, the first three pages, would that be

3   the same for that as well?

4   A.  Yes, sir.

5   Q.  Let me ask you a question, sir.  In 2014 and early 2015,

6   how many delivery people worked at the 47th Street store?

7   A.  On a shift about 10 to 12, the morning and the night.

8   Q.  In total; how many was the total complement of employees?

9   A.  About 40 to 50 employees.

10  Q.  No.  I'm sorry.

11  A.  Just deliveries?

12  Q.  Just the delivery employees.

13  A.  Yeah, more than 20.  About 25 to 30 deliveries.

14  Q.  Did you notice anything different about the four plaintiffs

15  in this case compared to the other delivery people that worked

16  there?  In terms of their attitude and their personality.

17  A.  Attitude and personality.  I mean, they would just come and

18  do what they got to do, and that's about it.  That's fine.

19  Q.  Do you remember if they -- how did they react when they

20  were asked to sign papers and forms?

21  A.  They would be kind of rebellious, but you know, I was going

22  to be, like, explaining -- then I would be explaining them in

23  my way, which sometimes the communication doesn't go through,

24  and that's why I have Ricardo or someone to jump in and then

25  explain to them really what is it about.

1   Q.   Did any of them express any kind of reluctance to sign the

2   form, if you can recall?

3   A.   No, not that I can recall.

4   Q.   There's been testimony here about the duties that the

5   delivery people performed at 47th Street, and each of the

6   plaintiffs has testified that in the morning, when all of the

7   produce --

8            MR. MULHOLLAND:  Objection.

9            MR. HOFFMANN:  That's fine.  That's fine.

10  Q.   What time did the store get its deliveries of paper

11  products and food in the morning?

12  A.   About 6 a.m. in the morning.

13  Q.   And where was it delivered?

14  A.   Delivered to 417 West 47th, in the basement.

15  Q.   And somebody from the store had to unpack everything and

16  put all the food and the meat and the paper products away?

17  A.   Yes, we have --

18  Q.   Who did that?

19  A.   There was a dishwasher and then a prep, porter that helps

20  him to do it, because we get daily, like, 50, 60, sometimes up

21  to 80 boxes a day.

22  Q.   Did the delivery people ever participate in unpacking the

23  boxes and putting the products away?

24  A.   No, because by the time they come in at eight, already

25  everything has been stocked up.

1   Q.  There's been some testimony about people who clean the

2   windows in the front of the store.

3            MR. MULHOLLAND:  Objection.

4            MR. HOFFMANN:  I'm happy to rephrase the question.

5   Q.  Did employees of the store ever clean the windows in front

6   of the store?

7   A.  No.

8   Q.  Who cleaned the windows?

9   A.  We have a porter.  Sometimes --

10  Q.  No.  Did any employee of the store clean the windows?

11  A.  Yes.

12  Q.  And who would do that?

13  A.  The porter and sometimes the front of the house.

14  Q.  Did the delivery people ever do that?

15  A.  No.

16  Q.  Who took out the trash?

17  A.  The dishwasher.

18  Q.  Did the delivery people ever do that?

19  A.  No.

20  Q.  Are people from the store responsible for cleaning the

21  sidewalk in the front of the store?

22  A.  No.  The -- the management, actually, because it's a

23  residential building --

24  Q.  Right.

25  A.  -- they do have a super that takes care, takes care of

1    that.  I would call him personally sometimes to tell him that,

2    What happened, the garbage's not cleaned, and stuff like that.

3    Q.  If it snowed, do you know who cleaned the snow in front of

4    the store?

5    A.  Yeah, they have a super for that building.

6    Q.  There's been some testimony about the refrigerator in the

7    front of the store that has beverages in it.  Does it have to

8    be restocked from time to time?

9    A.  Yeah, once a day.

10   Q.  And who stocks the refrigerator?

11   A.  Front of the house.

12   Q.  Did the delivery people ever do that?

13   A.  No.

14   Q.  What about mopping and sweeping and cleaning the floors;

15   who does that work in the restaurant?

16   A.  That's in the front of the house for the front, and the

17   back of the house for the dishwasher and the cooks, whatever it

18   is.

19   Q.  When the delivery people come in, how do they spend their

20   day?  What do they do all day?

21   A.  They just sit and wait for deliveries.

22   Q.  Do you know how many deliveries the store does per day?

23   A.  Over 400 deliveries.

24   Q.  Now, let's talk about the breakfast period, and we'll go

25   back in time to 2014 and 2015.  Between eight and ten, did the

```
 1  store offer breakfasts to its customers?

 2  A.  Yes.

 3  Q.  And were most of those orders deliveries?

 4  A.  Say that again.

 5  Q.  Were most of those orders deliveries?

 6  A.  Yes.

 7  Q.  And how many deliveries would typically go out during the

 8  breakfast period per day?

 9  A.  About 20 to 25.

10  Q.  Was there ever a time where you only had one or two or

11  three deliveries go out in the morning?

12  A.  No.

13  Q.  What would delivery people do if they were on duty and

14  there were no deliveries to go out?

15  A.  They would be sitting in the front or outside.

16  Q.  Are you aware of any time ever at that store that delivery

17  people were asked to do cleaning or prep work or cleaning

18  windows or any kind of side duties other than delivery?

19  A.  No.

20  Q.  With 400 deliveries to do, are they pretty busy during the

21  day?

22  A.  Oh, yeah.  A lot.

23  Q.  Do you know how long it takes, approximately, for a

24  delivery to be done?

25  A.  About 15 to 20 minutes for one delivery.
```

I1oWadoT                           Zakari - Direct

1   Q.  OK.

2   A.  Let's say they go seven, eight minutes per block, added

3   three or four minutes to go to the building, you know, because

4   they still have to go upstairs, so it's a process.

5   Q.  And if people took out two or three deliveries, how long

6   were they -- if a delivery person took out two or three

7   deliveries at the same time, how long were they usually gone

8   from the store until they came back?

9   A.  About 35 to 45 minutes or so.

10  Q.  And what was the range that was covered by the store, your

11  delivery area that you would deliver to customers for?

12  A.  They would go a few miles' radius, actually.  You know,

13  that might take some time for them.

14  Q.  How far east would you make deliveries?

15  A.  At the beginning, I think they go up to Third Avenue, when

16  we, you know, had that first store.  But as we're growing, we

17  had to cut the range, so they were going -- I think as for now,

18  they go up to Madison, I believe, or Fifth Avenue.

19  Q.  What's the average ticket for a delivery going out of that

20  store?

21  A.  Ticket?

22  Q.  Yeah, the price of the order going out.

23  A.  Oh, you mean the tips?

24  Q.  No.  The average order amount.

25  A.  Oh, like 20 -- 20-, $25, including tips and everything.

I1oWadoT                          Zakari - Direct

1    Q.   OK.

2    A.   Yes.

3    Q.   And what's the average tip?

4    A.   10 percent, 3-, $4, 2-something.

5    Q.   Does the store ever get catering orders?

6    A.   Yeah, once in two months, once in a month, something like

7    that.

8    Q.   And what's the size -- I mean, do you ever get orders that

9    are $1,000 or more?

10   A.   Yeah.  Like I said, once in, like, a month or two months.

11   Q.   Not more frequently?

12   A.   No.

13   Q.   All right.  There's been some testimony here that --

14            MR. MULHOLLAND:  Objection.

15            MR. HOFFMANN:  There's no other way to ask the

16   question.

17   Q.   Is it possible that the store had 10 to 12 orders in excess

18   of $1,000 per day?

19   A.   No.

20   Q.   Would the store possibly be able to handle that?

21   A.   No.

22   Q.   How big is the store?

23   A.   900 square feet.

24   Q.   Did you ever hear from the managers of the store about any

25   of the delivery people complaining that their tips were stolen?

 1              MR. MULHOLLAND:  Objection.

 2              MR. HOFFMANN:  I'm not offering it for the truth of

 3     the matter asserted.

 4              MR. MULHOLLAND:  I'm objecting on the basis that it

 5     calls for hearsay.

 6              THE COURT:  You can answer whether you have been told

 7     that there were complaints.

 8     A.  No.

 9     Q.  Do you know who Samuel is?

10     A.  Yes.  He was a manager of the store.

11     Q.  Do you know when he became a manager?

12     A.  That was in September, I believe.  September 2015.

13     Q.  And what was his job at the store before that?

14     A.  He was a cook, a line cook.

15     Q.  Did it ever come to your attention that any of the delivery

16     people had complained that he was stealing their tips?

17     A.  No.

18     Q.  Do you know if there was ever a situation where a big

19     catering order had to go out and cashiers were asked to help

20     deliver it because there weren't enough delivery people on

21     location at that moment?

22     A.  Yeah, that might happen once within a blue moon.  Yes.

23     Q.  And let's say if a delivery person and a couple of cashiers

24     together took out a big order --

25     A.  Right.

1   Q.   -- what would the store do with the tip?

2   A.   They would split it among -- if it's $300, three persons

3   receive -- if an example is $300, just going to split it among

4   them, if it's three persons, it's $100 each.

5   Q.   So it would go to the people who made the delivery?

6   A.   Right.

7   Q.   Even if they weren't a delivery person?

8   A.   Uh-huh.

9   Q.   Were you ever aware of a situation like that actually

10  happening?

11  A.   Once in a blue moon that they will help them, but they

12  will, you know, split the -- the tips.

13  Q.   OK.  Did the store have a time clock?

14  A.   Yes.

15  Q.   And do you know when it became operational?

16  A.   Somewhere in, I believe -- I can't recall the exact date,

17  but it was in 20 -- end of 2015, something like that.

18  Q.    2015 or 2014?

19  A.   20 -- 2014.  I believe beginning of 2015.  I'm sorry.

20  Q.   Do you know when the clock was first purchased?

21  A.   Yeah.  I recall it was in August of 2014, the clock, and

22  then we went to the POS system, meaning by the computer.

23  Q.   Did all the employees punch the clock?

24  A.   Yes, sir.

25  Q.   Now, when an employee punches in their time, does the

1    machine kind of generate any kind of receipt that the employee

2    can keep?

3    A.   Yes.

4    Q.   And is the receipt on paper?

5    A.   Yes, the receipt's on paper.

6    Q.   So if an employee wants to take their receipt and keep it,

7    they can, right?

8    A.   Right, they can.

9    Q.   And if during the week an employee wants to check on their

10   hours, are they able to do so?

11   A.   Yeah, if they ask the manager, he can print it out and then

12   show the receipt, the times, actually.

13   Q.   Do you know how the time, how employee work time was

14   recorded in the store before the time clock became operational

15   in August of 2014?

16   A.   Yes.  So let's say he works from eight to two or eight to

17   four, whatever it is, then we know how many hours he's working

18   that shift, and then he will write it on a piece of paper at

19   the end of the week, we would put the total hours, and then

20   that would be his.

21   Q.   Would you check it with the employee to make sure it was

22   accurate?

23   A.   Yes, because they always sign it.

24   Q.   Now, during that first period of time before the clock

25   became operational, if an employee worked in excess of 40

I1oWadoT                           Zakari – Direct

1   hours, how would you pay them for those overtime hours?

2   A.  Time and a half.

3   Q.  Do you know what spread of hour is?

4   A.  Yes, sir.

5   Q.  What is spread of hours?

6   A.  Spread of hours is a person works more than ten hours and

7   he's entitled to get spread of hours at the minimum wage.

8       You know, I can give you an example of those because

9   Mr. Chris did really show me, because I seen him a lot of times

10  that he's been, you know, getting a lot of information about

11  that with the labor department, because they say a person works

12  one hour and then get like nine-hour break, come back, work

13  another hour, for instance, so that would even be like spread

14  of hours.

15      To be honest, I was reading on top of that, he had to make

16  sure to, you know, to teach me really how to pay those

17  employees honestly.

18  Q.  Did Chris give you any instruction about what you should do

19  when people worked in excess of ten hours?

20  A.  Yes.

21  Q.  What was his instruction?

22  A.  That was the spread of pay.

23  Q.  And was that done from day 1?

24  A.  Yes, sir.

25  Q.  Some of the initial timekeeping -- some of the initial

1   payroll slips that were given to people does not reflect spread

2   of hours for the first couple of months the store's open.  Do

3   you know why that is?

4   A.  They didn't have -- I can't really recall it, but I'm

5   pretty sure that at that time they were still getting paid for

6   the spread of hours.

7   Q.  Were employees required to record their tips?

8   A.  Yes.

9   Q.  And how was that done?

10  A.  At the end of the shift, they would come, we'd count the

11  amount of deliveries they did, the total of tips, make sure

12  they agree with it, and they would sign, daily.  And they would

13  get the weekly total too.  So at the end of the week, they

14  already have an idea of how much they're getting for tips.

15  Q.  Are you aware of any employees who ever complained that

16  they did not receive all the tips that they actually earned?

17  A.  No, I don't recall that.

18  Q.  Is the store charged a fee by SeamlessWeb and Grubhub and

19  credit card companies on delivery orders?

20  A.  Yes, sir.

21  Q.  And do you know what the fee is?

22  A.  3 percent.

23  Q.  And do you know what that represents?

24  A.  Yes.  That's the credit card-fee deduction that they

25  charge.

1   Q.  And is that something that is passed on to the delivery

2   people?

3   A.  Yes, sir.  I explained that to them, and they -- a lot of

4   them did admit that it was right; they know about it because

5   they have other location that they work like the same way too,

6   so it was OK with them.

7   Q.  OK.

8   A.  Yes.

9   Q.  And when you would sit with people and explain to them

10  about how they were going to be paid at the time they signed

11  their New York State pay-rate sheet, is that one of the things

12  you discussed with them?

13  A.  Yes, sir.

14  Q.  And what did you tell people during the discussion?

15  A.  Yes.  Let's say the person gets the $100, then he would

16  get -- he will be paid the $97, because the 3 percent,

17  that's -- we pay for that also.

18  Q.  And that's money the store, actually, never receives --

19  A.  Never receives, exactly.

20  Q.  What is your current job with Al Horno?

21  A.  I'm operation manager.

22  Q.  And how many stores are you responsible for?

23  A.  Six stores.

24  Q.  So you are the person directly under Chris in the company?

25  A.  Yes, sir.

I1oWadoT                    Zakari - Cross

1   Q.  And is Chris a friend of yours?

2   A.  Yes, he's a friend.

3   Q.  Would you lie for Chris?

4   A.  No, never.  Why would I?

5          MR. HOFFMANN:  All right.  I have nothing further.

6   Thank you very much.

7          THE COURT:  Thank you.

8          Mr. Mulholland.

9          MR. MULHOLLAND:  Yes.  Thank you, your Honor.

10  CROSS-EXAMINATION

11  BY MR. MULHOLLAND:

12  Q.  Mr. Zakari, I believe you testified that you started

13  working at Al Horno in May of 2014?

14  A.  Yes, sir.

15  Q.  OK.  And what was your role?  What was your title in May of

16  2014?

17  A.  I was the operation manager.

18  Q.  How long have you been an operations manager for with

19  Mr. Pizzimenti's restaurants?

20  A.  Since he opened Al Horno in May 2014.

21  Q.  Isn't it true that you were working at Stamina at the same

22  time in 2014?

23  A.  Yeah, I was working at Stamina.

24  Q.  And what was your role at Stamina during that time?

25  A.  I was a juice bar/manager at that time.

I1oWadoT                    Zakari - Cross

1   Q.  What were your hours at Stamina in 2014?

2   A.  I would work from 11 to 12.  And then I would go to 47th,

3   let's say, from 1 to 5.  If -- I mean, I didn't have an exact

4   schedule.  I was going between Stamina and 47th and split the

5   day, actually.  That's how I was working.

6   Q.  Would it be fair to say that you spent your mornings at

7   Stamina and your afternoons at Al Horno in 2014?

8   A.  I was -- I was just saying that I have sometimes the

9   mornings Stamina or the mornings 47th.  I was splitting my days

10  in both stores.

11  Q.  How many -- during a week in 2014, how many mornings would

12  you spend at Stamina?

13  A.  Three, four times, or two times.  I can't recall it, but I

14  definitely split my day every day actually in both stores.

15  Q.  OK.  Isn't it true, Mr. Zakari, that you were a

16  front-of-the-house staff worker at Al Horno until the middle of

17  2015 and not an operations manager?

18  A.  No.  When I say front of the house, I mean, I was working

19  in the store.  Deliveries, I would help them pack, you know.  I

20  would make juices.  I just like to work all the time, so you

21  might see me not as a manager, but I was a manager, operation

22  manager.

23  Q.  Did Mr. Pizzimenti give you any documentation to

24  memorialize your promotion to operations manager in 2014?

25  A.  Yes.

1   Q.  What did he give you?

2   A.  Excuse me.  Like you said a paper or something like that?

3   Q.  Yeah.

4   A.  Yeah.  I mean, he just tell me that now that you've been

5   with me for certain time now, that, you know, there's trust

6   between us, I would like you to be taking care of both stores.

7   Q.  How long did Mr. Sanchez work at Al Horno?

8   A.  Mr. Sanchez?

9   Q.  Yeah.

10  A.  If I recall it, like a month and a half or a month.  No

11  more than two months, I believe.

12  Q.  OK.

13  A.  Yes.

14  Q.  Who hired -- withdrawn.

15      Did you hire anybody in 2014 for the 47th Street location?

16  A.  Yes.

17  Q.  Who did you hire?

18  A.  Amadou.  I have Amadou, Miri.  Yeah, these are most likely

19  the two that I can recall.

20  Q.  Did you hire any of the plaintiffs here?

21  A.  Yes.

22  Q.  Which one did you hire?

23  A.  All of them.

24  Q.  You hired each and every one of these men?

25  A.  Yes.

1   Q.  OK.  When you hired them, was Jimmy Sanchez present?

2   A.  Jimmy Sanchez -- either Jimmy Sanchez -- and Ricardo, jimmy

3   Sanchez was present first, and Ricardo came afterwards.

4   Q.  No.  The moment they were hired.

5   A.  Right.

6   Q.  Was --

7   A.  Yes, they were present.  Yes, Jimmy Sanchez was present.

8   Q.  Including Ricardo?

9   A.  Afterwards.

10  Q.  So Ricardo was not present when these men were hired?

11  A.  Some of them, yes.

12  Q.  Which ones?

13  A.  I believe -- German, I believe.  Either German or the other

14  one.  What's his other name?  Steven.

15  Q.  Is it your testimony that Ricardo starting working in --

16  what month of 2014?

17  A.  I can't really recall the exact date, but that was months,

18  a little month after Jimmy, actually.

19  Q.  OK.

20  A.  Uh-huh.

21  Q.  Did you have a conversation with Mr. Pizzimenti yesterday?

22  A.  No.

23  Q.  After, after Mr. Pizzimenti testified?

24  A.  No.

25  Q.  Did you hear Mr. Pizzimenti discuss his testimony with his

1    attorney in the lobby --

2    A.  No.

3    Q.  -- yesterday?

4    A.  No.

5    Q.  Were you nearby Mr. Pizzimenti as he came out of the

6    courtroom the other day before he put on his direct testimony?

7    A.  No.

8    Q.  Did you have any interactions with Mr. Pizzimenti in the

9    witness room here --

10   A.  No.

11   Q.  -- yesterday?

12   A.  No.

13   Q.  Did Mr. Pizzimenti come and enter the witness room and tell

14   you that it was about to be your time to take the stand soon?

15   A.  No.

16   Q.  Were you ever in the witness room, in this hallway, last

17   night?

18   A.  No, I wasn't.

19   Q.  When you didn't come to Al Horno in 2014, did you spend

20   much time interacting with the delivery people?

21   A.  Most of the time, yes, just in case there's a new pay-rate

22   sheet or, you know, payment information, but that's about it.

23   Excuse me.

24   Q.  Would you interact with them on a daily basis?

25   A.  Daily basis, yeah, you know:  Hey, how you doing?  It's

1    your turn to take delivery.  That sort of thing.

2    Q.  Who was in charge of distributing the tips at Al Horno in

3    2014?

4    A.  Ricardo.

5    Q.  Did Samuel have any role in that?  Did Samuel role have any

6    role in distributing the tips in 2014?

7    A.  Yeah -- no, not in 2014.  That was actually --

8    Q.  In 2000 --

9    A.  -- '15.  2015, yes.

10   Q.  I'd like you to take a look at Exhibit C.  Do you see the

11   signature -- page C-1, do see the signature for Ricardo Gomez?

12   A.  Yes.

13   Q.  Is that your handwriting?

14   A.  No.

15   Q.  How about on C-3?

16   A.  C-03, right?

17   Q.  C-03, yeah, where it says Ricardo Gomez.  Is that your

18   handwriting?

19   A.  No.

20   Q.  Is there any reason why the only annual, the only two

21   annual notices signed by Ricardo are for Mr. Aranda?

22   A.  I mean, sometimes he would sign because I had actually

23   already told him how it works, so I believe he did sign it.

24   Q.  OK.  Could you --

25   A.  He was a manager.  You understand?  So sometimes if I

I1oWadoT                    Zakari - Cross

1   happened to have a pay-rate sheet, he would explain it to them

2   in my presence, and then they would sign it.

3   Q.  OK.  Now, could you take a look at C4?

4   A.  C-04, OK.

5   Q.  Is there any reason why there's no date on this annual

6   notice?

7   A.  No, I don't recall it.  Probably forgot to write it.

8   Q.  Did you ever --

9   A.  Uh-huh.  Go ahead.

10  Q.  Sorry.  Did you have more to say?

11  A.  No.

12  Q.  Oh.

13      Did you ever pay Mr. Aranda 5.90 an hour?

14  A.  5.90 an hour, meaning per hour, or with -- that was the tip

15  credit?

16  Q.  5.90 after a tip credit was applied.

17  A.  After the tip credit, I can't recall it.  I would have to

18  go back and see, but if that's what the minimum wage was, then,

19  you know, probably did.

20  Q.  OK.

21  A.  Only thing is, like, I'm completely sure he was getting the

22  minimum wage minus the tip credit.

23  Q.  Was the tip credit -- withdrawn.

24      What year was this notice given to Mr. Aranda?

25  A.  The nine -- I think that would be 2015, if I believe.

I1oWadoT                      Zakari - Cross

1    According to law -- well, I have to check, but I believe that

2    would be 2015.

3    Q.  Wasn't the minimum wage $9 an hour in 2016?

4    A.  Oh, yeah.  So that would be 2016, like I said.

5    Q.  But didn't you pay Mr. Aranda 7.50 an hour in 2016?

6    A.  7.15?

7    Q.  7.50.  Sorry.

8    A.  7.50.  I don't recall it.  Like I said, $9 --

9    Q.  Was there any annual wage notice that was given to Mr.

10   Aranda for 2016 that reflects an hourly wage of 7.50 an hour

11   after the application of the tip credit?

12   A.  Sure.  Yes, can be.

13   Q.  Is it in this exhibit?

14   A.  Not that I see, but like I said, there's -- the minimum

15   wage and the tip credit that I've been giving to them was the

16   right thing that I've been doing.

17   Q.  OK.

18   A.  Uh-huh.

19   Q.  If I could ask you to take a look at defendants' D.

20   A.  OK.

21   Q.  These are wage notices for Mr. Hermenegildo Mercenario?

22   A.  Correct.

23   Q.  Can you show me the 2015 notice for Mr. Mercenario in this

24   exhibit?

25   A.  The 2015, you said?

1    Q.   Yeah.

2    A.   That would be -- you said D?

3    Q.   Yeah, D.   There's three pages there.   I'm just confused

4    about which one covers the year 2015.

5    A.   Right.   If I -- I can't really recall it, but I think that

6    it was 1.50 or 1.15 and then after the 3.

7    Q.   All right.

8    A.   But I know it changes, so we have to update it.

9    Q.   Would it be fair to say that there's no annual notice in

10   this exhibit for Mr. Hermenegildo Mercenario --

11   A.   No.   There was.

12   Q.   -- for the year 2015?

13   A.   There was.

14   Q.   Sure, but which one?

15   A.   The tip credit I paid in 2015, it changed.

16   Q.   Sure, but is it --

17   A.   Yes.

18   Q.   Wasn't the minimum wage in 2015 8.75 an hour?

19   A.   8.75 an hour.   I believe it was 9, if I recall it.   I

20   believe it was 9, 9 per hour, in 2015, if I remember.

21   Q.   OK.

22   A.   8.75 --

23   Q.   So why are there -- there are two tip credits here.   Sorry.

24   Withdrawn.

25       Why are there two notices here for $9 an hour each with

1   different tip credit rates?

2   A.  I believe the tip credit -- the tip credit have changed, I

3   believe.

4   Q.  So if it turned out that the minimum wage in 2015 was, in

5   fact, 8.75, would you agree with me that these notices, these

6   two notices would be incorrect and inadequate?

7   A.  I'm not sure.  I believe it changed, because like I said --

8           MR. HOFFMANN:  Sorry.  I object.  There's no

9   testimony.

10          THE COURT:  If you're going to speak, you stand.  If

11  you want to talk to him, you go over to him.  And if you want

12  me to hear you, you have to speak clearly.

13          MR. HOFFMANN:  OK.  I withdraw it.

14  A.  Well, I'm not really sure, because like I said, I was 100

15  percent sure that in 2014 -- '15 -- '16, there was no way

16  that -- none of those delivery guys was paid below the minimum

17  wage.  100 percent.

18  Q.  Isn't it true, Mr. Zakari, that it wasn't until the middle

19  of --

20  A.  Zakari, please.

21  Q.  Oh, sorry.  Zakari?

22  A.  Zakari.

23  Q.  Zakari.  I apologize.

24  A.  No problem.

25  Q.  Isn't it true that Mr. Pizzimenti didn't ask you to come

I1oWadoT                         Zakari - Cross

1   and take a look at the operations of Al Horno until the middle

2   of 2015 in order to make up for numerous compliance problems

3   that he had seen there?

4   A.   No.   In 2014, already I was in between Al Horno, 417 47th

5   and Stamina.   Somewhere in October, I was already in the Second

6   Avenue location.   So that makes it three already.

7   Q.   So in October of 2014, when you were working at the second

8   location for Al Horno, how much time did you spend at the 47th

9   Street location?

10  A.   Three, four hours.   I was -- now I was moving more between

11  Stamina, 47th and Second Avenue, so I was running more staff

12  and then on a daily basis.

13  Q.   What time -- after October 2014, what time during the day

14  would you visit the 47th Street location?

15  A.   The morning.

16  Q.   Was it always in the morning?

17  A.   Most, most of the time, yes.   Now.

18  Q.   How many times a week would you go visit the 47th Street

19  location after October 2014?

20  A.   Like twice, twice a week.

21  Q.   OK.

22  A.   And sometimes in the afternoon too.   It all depends, but I

23  was running all the stores at that time already.

24  Q.   OK.   I'd like to direct your attention to Defendants'

25  Exhibit I.   Do you recognize these documents?

1  A.  That's a pay stub.  I, right?

2  Q.  I, yes.

3  A.  Yes.  For Marco Steven Diaz?

4  Q.  Sure.

5  A.  Yes.

6  Q.  These are receipts that you asked my clients to sign before

7  they received their pay, correct?

8  A.  Yes.

9  Q.  And isn't it true that Al Horno didn't start issuing these

10  documents until October of 2014?

11  A.  October, no.

12  Q.  All right.  Well, would it surprise you if I stated that

13  there's not a single one of these pay receipts that predates

14  October 3 of 2014?

15  A.  OK.  Then I can't recall that date.

16  Q.  OK.  See in the receipts here, there's an entry for tips?

17  A.  Tips, yes.

18  Q.  Does that include cash tips?

19  A.  No.  The cash tips, they keep it for themselves.  We don't

20  even know how much they get for that.

21  Q.  All right.  So is it fair to say there's no accounting for

22  the amount of cash tips that were received?

23  A.  The cash tips go in their pocket.

24  Q.  So it's fair to say that there's no document reflecting the

25  amount of cash tips my clients received?

I1oWadoT                          Zakari - Cross

1   A.  Yeah, we can, but we don't know how much amount would be,

2   but that would be, like, delivery.  But we don't know how many,

3   how much tips they get.

4   Q.  Yeah.  So there's no documents that the management at Al

5   Horno maintained that recorded --

6   A.  No.

7   Q.  -- the amount of cash tips my clients received?

8   A.  No.

9   Q.  All right.  Was the 3 percent fee deducted also from cash

10  tips?

11  A.  No.  Only for the credit cards.

12  Q.  Now, if you'll notice, in those pay receipts from, on that

13  first page there, there's no entry for spread of hours, isn't

14  that correct?

15  A.  Spread of hours.  I mean, it was added to that, actually.

16  Q.  OK.  So if I did the math correctly, I would find that

17  there was a spread of hours, spread of hours, spread-of-hours

18  hour placed into the final number?

19  A.  OK.  It was credit in a way that, the way that -- that time

20  already we had a total paid and see that they were making,

21  like, nine -- you know, $800 and what you call the regular

22  overtime, then I believe the spread pay was added to that also.

23  Q.  Could you take a look at Defendants' Exhibit I-10.  All

24  right.  Do you see on these pay receipts there is indeed a

25  spread-of-hour entry?

I1oWadoT                           Zakari - Cross

1   A.  Yes.

2   Q.  Isn't it true, sir, that Al Horno was not paying spread of

3   hours to its delivery workers until the middle of May 2015?

4   A.  No.

5   Q.  Would it surprise you if I told you that there's no pay

6   receipts reflecting spread-of-hours pay until May of 2015?

7   A.  No.  I mean, they were paid the spread of hours at the

8   beginning.

9   Q.  OK.  So I suppose the records will speak for themselves in

10  regards to whether or not my clients were paid spread of hours

11  prior to May 2015?

12  A.  Yes, sir.

13  Q.  Were my clients ever issued a copy of these pay receipts

14  after they signed them?

15  A.  Yes.

16  Q.  By whom?

17  A.  By the manager.  He would just photocopy and give it to

18  them.

19          THE COURT:  You said by the manager, he would

20  photocopy --

21          THE WITNESS:  By the manager, yes, ma'am.

22  BY MR. MULHOLLAND:

23  Q.  But you were hardly ever present for that interaction,

24  isn't that true?

25  A.  I was there a few times.

I1oWadoT                          Zakari - Cross

1   Q.  When you say a few times, you mean a very few times, isn't

2   that correct?

3   A.  No.  A lot of times, actually.  For the payments I was

4   making sure to be there all the time.

5   Q.  For every single one of the delivery workers who worked at

6   Al Horno?

7   A.  Yes, I would be sure to check.  And if everything was

8   right, I would say to Ricardo or Sam, whoever was the manager

9   at that time, Make sure to give them a copy of the stubs.

10  Q.  Even after October of 2014?

11  A.  Yes, sir.

12  Q.  OK.  And were you present also at the other locations to

13  make sure that the workers at the other locations received

14  copies of their pay stubs?

15  A.  Yes, sir.

16  Q.  How long have you worked for Mr. Pizzimenti?

17  A.  About seven, eight years now.

18  Q.  Do you have any other jobs?

19  A.  No.

20  Q.  Do you have any ownership interest in any of the

21  restaurants that Mr. Pizzimenti controls?

22  A.  Not now.  Maybe in the future.  Who knows?

23  Q.  Is it fair to say that Mr. Pizzimenti's been a very -- a

24  very generous employer?

25  A.  Yes, 100 percent, because if I can state in one to three,

1    starting from a delivery person, moving from the juice bar, and

2    then being one manager, then being over six stores, then, you

3    know, I believe that he's really generous.

4    Q.  Did you ever have any discussions with Mr. Pizzimenti about

5    the facts of this case?

6    A.  No.

7    Q.  All right.

8    A.  No.

9    Q.  So is it fair to say today is the first time you've been

10   asked any questions about the facts involved in this case?

11   A.  Yes --

12         MR. HOFFMANN:  Objection.  I just want to make sure

13   the witness understands he's not to reveal conversations

14   between he and I that would be attorney-client protected.

15         MR. MULHOLLAND:  Oh, I'll withdraw it.

16         THE COURT:  Are you withdrawing or do you want to

17   rephrase?

18         MR. MULHOLLAND:  I'll rephrase.  Thank you, your

19   Honor.

20   Q.  Is it fair to say apart from discussions with Mr. Hoffmann

21   about this case --

22   A.  Right.

23   Q.  -- you haven't had any independent discussions about the

24   facts of this case with either Mr. Pizzimenti or anyone at Al

25   Horno?

```
1    A.  No.  I mean, I spoke with Ms. Wong, maybe.

2    Q.  But nobody else?

3    A.  Yes.

4    Q.  Do you intend to keep working for Mr. Pizzimenti?

5    A.  Yes.

6    Q.  Do you enjoy your job with Mr. Pizzimenti currently?

7    A.  Yes, I do like it.

8    Q.  Do you look forward to many more years of employment with

9    him?

10   A.  Yes, sir.

11   Q.  Has he ever lent you any money?

12   A.  Say that again.

13   Q.  Has he ever lent you any money?

14   A.  He's my friend.  Apart from the business, we have our own

15   thing on the side too.

16   Q.  What is that?

17   A.  He's a good friend, you know.  We go out, we go have

18   dinner.  He's a good friend of mine, actually.

19   Q.  Has he ever lent you more than $1,000 for any reason?

20   A.  No.

21   Q.  Has he ever paid for tuition for school?

22   A.  No.

23   Q.  Has he sponsored any applications on your behalf?

24   A.  No.

25           MR. MULHOLLAND:  No further questions, your Honor.
```

I1oWadoT

1          THE COURT:  Thank you.  Anything further?

2          MR. HOFFMANN:  Nothing further, your Honor.

3          THE COURT:  Thank you, Mr. Zakari.  Your testimony is

4   completed.  You may step down.

5          (Witness excused)

6          MR. HOFFMANN:  Your Honor, I have one more witness.

7   I've already spoken with my colleague.  He doesn't object.

8   He's a short rebuttal witness, and I'd like to go out and get

9   him.

10         MR. MULHOLLAND:  It's my understanding, your Honor,

11  that Mr. Hoffmann is offering this witness solely for the

12  limited purpose of discussing conversations between him and my

13  clients regarding tip deductions, and for no other purpose; not

14  notices, not any discussion of the duties he may have observed

15  or the hours my clients worked or the pay they received.

16         THE COURT:  Is that your understanding?

17         MR. HOFFMANN:  I might say it's to rebut the testimony

18  about the tip theft that the plaintiffs made on the big orders.

19  That was their testimony, that Sam was the one that told them

20  they were only getting $10 when it was a $100 tip.  That's the

21  subject matter of his proposed testimony, your Honor.

22         THE COURT:  The subject of the testimony is the

23  division or distribution of tips for large orders only.

24         MR. HOFFMANN:  Yes, your Honor.

25         THE COURT:  Not going to the credit card 3 percent --

1          MR. HOFFMANN:  No.

2          THE COURT:  -- or any of the other issues.

3          MR. HOFFMANN:  No.

4          THE COURT:  All right.  You may.

5          MR. HOFFMANN:  Thank you.

6    SAMUEL SOLIS,

7         called as a witness by the Defendants,

8         having been duly sworn, testified as follows:

9          THE COURT:  Please be seated, and when you speak,

10   please be sure to speak into the microphone so that we can all

11   hear you.

12          Before we begin, just as an update, Mr. Mulholland,

13   you have 24 minutes left of your allocation.

14          MR. MULHOLLAND:  Thank you, your Honor.

15          THE COURT:  You may begin.

16   DIRECT EXAMINATION

17   BY MR. HOFFMANN:

18   Q.  Good morning, Mr. Solis.

19   A.  Good morning.

20   Q.  Where are you employed?

21   A.  I'm employed at Al Horno, Hell's Kitchen.

22   Q.  And what location?

23   A.  417 west 47th.

24          THE COURT:  Please move a little closer to the mike.

25          MR. HOFFMANN:  Yeah, you have to speak kind of into

I1oWadoT                          Solis - Direct

1    the mike.

2                THE WITNESS:  Sorry.

3    BY MR. HOFFMANN:

4    Q.  How long have you worked at that store?

5    A.  I've been working there for almost three years, I believe.

6    Q.  Do you remember when you started?

7    A.  Started around September 2014.

8    Q.  And what was your job then?

9    A.  To begin, I was in the kitchen.  I was a cook.

10   Q.  And did you, did your job change at some point?

11   A.  Yes.  I moved to the counter on, like, August 2015.

12   Q.  And then did you become a manager at some point?

13   A.  Yeah, after that.  Later.

14   Q.  I'm sorry.  What was the date you became a manager?

15   A.  It was early 2016, when I was --

16   Q.  Do you recognize the three gentlemen who are seated at the

17   left side of this table here?

18   A.  Yes.

19   Q.  Who are they?

20   A.  One is German Macedonia, I believe -- I mean Herman

21   Mercenario, German, and the other guy is Steven Diaz or Marco

22   Diaz, I believe.

23   Q.  And do you know Mr. Aranda, Antonio Aranda?

24   A.  Yes, I know him.

25   Q.  When you were manager of the store, what was the average

1   size of an order that went out?

2   A.  The --

3   Q.  The average amount of an order.

4   A.  Like a --

5   Q.  The total ticket, the total amount that the customer was

6   charged.

7   A.  How many orders they take, or --

8   Q.  No, no.  The average order that went out for delivery, how

9   much -- what was the value of the order?  How much food did the

10  customer order?

11  A.  It depends.  Some of them, you know, $20, $30.

12  Q.  Were you ever aware of big catering orders where the cost,

13  the charge would be in excess of $1,000 that went out of 47th

14  Street?

15  A.  We have those orders like once in a while, like once every

16  month or once every two months.  That's all.

17  Q.  They're very, very rare?

18  A.  Yeah.

19  Q.  And when those -- and is that still the case today?

20  A.  What was that?

21  Q.  Is that still the case today, that they're very rare, to

22  have big orders like that?

23  A.  Yeah, up to now.  Over $1,000, not the usual.

24  Q.  How about over $500; are they also unusual?

25  A.  We have them, like, more often.

1  Q.  How often would you say?

2  A.  I don't know.  Like once every two weeks, once a week,

3  maybe.

4  Q.  When you had a big catering order in excess of a

5  thousand -- what would you say the average tip amount was as a

6  percentage of the total bill?

7  A.  I don't really remember about that because I wasn't the

8  manager at that time.  When I started, you know, being a

9  manager, tip credit was, I think, one --

10  Q.  I'm asking a different question.

11  A.  OK.

12  Q.  What percentage of tip did customers generally leave for

13  delivery, leave to delivery people on an order?  Was it 10

14  percent, 20 percent, 30 percent?

15  A.  It all depends about the order.  If the order's, like, $50,

16  you know, $4 tips, $5, $3.

17  Q.  Are you able to give an approximation about what you

18  believe the average tip percentage is on delivery going out of

19  that store?

20  A.  Like each delivery?

21  Q.  Like, is it 10 percent?

22  A.  It's like 10, around 10, 15 percent.

23  Q.  OK.  So when you had these -- when you were manager and you

24  had these big orders, $1,000 or more, how many delivery people

25  would have to deliver the order?

I1oWadoT                          Solis - Direct

1    A.   Usually two.

2    Q.   And what -- how did you distribute the tip --

3    A.   It's all --

4    Q.   -- that would be left on an order like that?

5    A.   It's all depends.  If it's only for one guy, you know, that

6    means the tips is for that person.  If they go two delivery

7    guys, split it in two.

8    Q.   Do you ever remember a situation where a big catering order

9    came in and there weren't delivery people around so that a

10   cashier had to help bring the delivery?

11   A.   I don't really remember that.  We always, like, have

12   delivery guys.

13   Q.   Did you ever on a big order tell any employee, any delivery

14   person at the store that you were not going to give the

15   delivery people 100 percent of the tip that was left?

16   A.   We always give them all the tips.

17   Q.   Did you ever tell any of the plaintiffs, for example, that

18   on a $100 tip, that you had talked to the owner and that you

19   were only go to give them 10- or $20 of the tip?

20   A.   We always give them everything.  We don't split it, for all

21   the people.

22   Q.   Are you aware of a single situation where delivery people

23   did not get 100 percent of the tip that was left by the

24   customer?

25   A.   We always give them everything.  I don't remember, like,

1    not giving them tips.  We always give them --

2    Q.  There's been specific testimony here by the plaintiffs --

3           MR. MULHOLLAND:  Objection.

4           MR. HOFFMANN:  I'll withdraw it.

5           Thank you, sir.

6           THE COURT:  Any questions, Mr. Mulholland?

7           MR. MULHOLLAND:  Yes.  Briefly.

8           MR. HOFFMANN:  Your Honor, I'm sorry.  Mr. Pizzimenti

9    really needs to use the restroom.  Is it OK if he left right

10   now?

11          THE COURT:  Yes.

12          MR. HOFFMANN:  He'll be right back.

13   CROSS-EXAMINATION

14   BY MR. MULHOLLAND:

15   Q.  Mr. solis, isn't it true that --

16          THE COURT:  We'll take a five-minute break.

17          Mr. Solis, you're under cross-examination, so you're

18   not to discuss your testimony with anyone during the break.

19          THE WITNESS:  OK.

20          THE COURT:  We'll resume in five minutes.

21          MR. HOFFMANN:  Thank you.  Why don't you stay right

22   there, Mr. Solis.

23          (Recess)

24          THE COURT:  Good morning again.  Please be seated.

25          You may continue, Mr. Mulholland.

1      MR. MULHOLLAND:  Thank you, your Honor.

2    Q.  Mr. Solis, isn't it true that on an almost daily basis,

3    you'd get a large order from a company called Yahoo at 244 West

4    44th Street?

5    A.  We did.  We used to get that order.

6    Q.  Yeah, used to.  In 2014, 2015, isn't that true?

7    A.  I start working with the deliveries in the last month of

8    2015.

9    Q.  Yeah.  So in 2015?

10   A.  OK.

11   Q.  Wasn't it a big order that came in every week?

12   A.  Big order.

13   Q.  Over $500 a day?

14   A.  I don't want to say over 500.  It would be like 200, 250.

15   Q.  OK.  Sir, isn't it true that you told the plaintiffs here

16   that when there's a large tip, that you would divide that up

17   with the cooks in the back?

18   A.  No, that's not true.

19   Q.  Isn't it true that when a large order came in with a large

20   tip, you would call Mr. Pizzimenti and ask him how to divide

21   that tip up among the staff?

22   A.  We always give them everything.

23   Q.  And you testified earlier that a cashier never helped bring

24   out a delivery?  Is that your testimony?

25   A.  Yeah, not that I remember.

I1oWadoT                      Solis - Cross

1   Q.  Yeah, but that's not true, is it?

2   A.  I mean, I never seen -- I can't say somebody went or

3   somebody didn't when I didn't see them.  We always have

4   delivery guys that -- they go.

5   Q.  Would it surprise you to know that Mr. Pizzimenti and

6   Mr. Zakari testified that cashiers would, indeed, sometimes

7   help bring out deliveries?

8   A.  They would most of the time, would tell me working in the

9   front, because I was a cook.  They used to work with somebody,

10  the other managers, not me.

11  Q.  What other manager was that?

12  A.  Ricardo.

13  Q.  How long did Ricardo work at Al Horno?

14  A.  Maybe a year, I believe.

15  Q.  When did Mr. Djibril Zakari start working as a manager at

16  Al Horno?

17  A.  When I started working there, I see him some hours.  I

18  mean, I work in the kitchen.  Used to be sometimes in front, so

19  I wouldn't see him, like, all the time, because I was in the

20  kitchen.

21          THE COURT:  Mr. Solis, speak out as if you expect

22  Mr. Mulholland to hear you without the microphone.

23          THE WITNESS:  OK.

24          THE COURT:  Thank you.

25  BY MR. MULHOLLAND:

1   Q.  Isn't it true that when a delivery worker delivered an

2   order that had an error, you would withhold some of the tips as

3   punishment for making the error?

4   A.  That's not true.  We always give them everything.  We don't

5   hold nothing.

6   Q.  How long have you worked for Mr. Pizzimenti?

7   A.  How long have I been working?

8   Q.  For Mr. Pizzimenti.

9   A.  Four years.

10  Q.  Are you working with him today?

11  A.  Yes.

12  Q.  Is it your only job?

13  A.  Yes.

14  Q.  Do you intend to continue working for Mr. Pizzimenti in the

15  future?

16  A.  Yes.

17  Q.  What is your title today at Al Horno?

18  A.  What's my position?

19  Q.  Yeah.

20  A.  I'm a manager.

21  Q.  Had you ever been a manager before working for

22  Mr. Pizzimenti?

23  A.  No.

24  Q.  Do you like your job with Mr. Pizzimenti?

25  A.  I do, yeah.

1          MR. MULHOLLAND:  No further questions, your Honor.

2          THE COURT:  Thank you.

3          MR. HOFFMANN:  No further questions, and the defense

4     rests, your Honor.

5          THE COURT:  Thank you, Mr. Solis.  You may step down.

6          THE WITNESS:  All right.

7          THE COURT:  Your testimony is concluded.

8          THE WITNESS:  Can I go?

9          THE COURT:  Yes.  Thank you.

10          (Witness excused)

11          THE COURT:  Do plaintiffs rest on their entire case?

12          MR. MULHOLLAND:  Yes, your Honor.

13          THE COURT:  Very well, then.  The presentation of

14     testimony is concluded.

15          Did you both wish to make oral closing remarks?

16          MR. HOFFMANN:  Very brief, your Honor.  Like ten

17     minutes.

18          THE COURT:  You would get to go first, because of

19     course, the plaintiff always goes second in a civil case.

20          Mr. Mulholland, are you prepared to proceed at this

21     time?

22          MR. MULHOLLAND:  Yes.  I just want to clarify, if we

23     go forward with oral summations today, would we also be

24     submitting our pretrial submissions -- sorry, our posttrial

25     briefs, submissions, written materials?

1        THE COURT:  You would also be submitting the updated

2   proposed findings and conclusions, keyed to the record.

3        MR. MULHOLLAND:  OK.

4        THE COURT:  If you do an oral summation today, I would

5   not expect an additional written version of the summation.

6        MR. MULHOLLAND:  OK.  Plaintiff is prepared to go

7   forward with an oral summation.

8        THE COURT:  All right.

9        Mr. Hoffmann.

10       MR. HOFFMANN:  Thank you, your Honor.

11       First, on behalf of my clients, I do want to express

12   our gratitude for the kindness and really great treatment that

13   you showed to everyone in the courtroom.  It's a pleasure to

14   try a case before you, your Honor, and we do appreciate it.

15   And I know I speak for everybody when I say that.

16       THE COURT:  Thank you.

17       MR. HOFFMANN:  I would respectfully suggest to you,

18   your Honor, that this is really a manufactured case.  And I

19   have great admiration for Mr. Mulholland, so none of this is

20   directed at him personally.  But I think if you look at the

21   cases filed by the Faillace firm -- and there are many, many,

22   many -- the stories that these plaintiffs have told are

23   repeated in every one of their cases.  It's a pattern, and that

24   is part of my argument as to the fact that it's manufactured.

25       THE COURT:  The claims and presentations of evidence

1    in other cases are not part of the record of this case.

2              MR. HOFFMANN:  They're not, your Honor.

3              THE COURT:  And so how do you expect me to draw

4    inferences or conclusions from matters that are outside of the

5    record in this case?

6              MR. HOFFMANN:  Well, I know that your Honor's probably

7    had many, many of these same cases, so I'd just ask you to take

8    judicial notice of it.  But I'm happy to move on.  That's all I

9    want to say about it.

10             THE COURT:  All right.  I will tell you now, just so

11   that you know, I decline to take judicial notice of the

12   specifics of claims in litigation in other cases.

13             MR. HOFFMANN:  OK.

14             THE COURT:  My memory is good, but it's not that good.

15             MR. HOFFMANN:  OK.

16             I think if you start out by comparing the allegations

17   in the complaint, that tells one story, and then you look at

18   the record you have before you regarding the deposition

19   testimony, and then you compare it to the testimony at trial,

20   they're all very different.  They all can't be correct.

21             The suggestion that the deposition testimony was

22   inaccurate because the plaintiffs felt intimidated at the

23   deposition doesn't really hold water.

24             First of all, they were represented at the deposition

25   by Mr. Mulholland, who is a very able attorney, and I think

1    it's unrealistic to think that he was going to allow his

2    clients to be bullied to the point where they weren't able to

3    testify truthfully.

4          Secondly, you have a situation where, for example, one

5    of the witnesses at trial says "I spent 40 percent of my time

6    doing nondelivery work," but at his deposition, he said he

7    spent 85 percent of his time doing deliveries.  How does

8    intimidation change the percentages?  It just doesn't make

9    sense.  I think the change in the testimony reflects a

10   concerted effort among the plaintiffs to create a factual

11   record which is actually not accurate.

12         I think if I could be presumptuous enough to say, I

13   think as a fact finder, the place to start is with the wage

14   notices, because there you have the most disparate kind of

15   testimony.  The plaintiffs are saying half the forms were not

16   filled out, Mr. Zakari wasn't there.  And you have the

17   testimony of Mr. Zakari.  He says, I was there, everything was

18   filled out.

19         I would respectfully suggest to you that the

20   plaintiffs' story really doesn't make much sense.  The key is

21   they admitted, every one of them admitted they signed the wage

22   notices themselves, and when you recognize -- and also, the

23   information that's contained in the wage notice is exactly how

24   they were paid.  So how is it that the employer would benefit

25   by kind of faking up the wage notices?  The information was

1    correct.

2           I would respectfully suggest that there are employers

3    that "fraudulate" the wage notices either after the case is

4    filed, when they know they don't have the forms and they forge

5    the employee's signature, that makes sense.  There, the

6    employer's trying to create a record that did not exist.  Or

7    where you have an employer that pays somebody a weekly salary,

8    and they're trying to show that they actually were paid by the

9    hour, it would make sense to "fraudulate" a wage notice in that

10   instance.

11          Here, there was no benefit to the employer not to do

12   it the right way.  And you had Mr. Zakari come in and testify.

13   He's a very earnest witness.  He's a self-made person.  He's

14   working very hard.  Why in the world would he lie about that?

15   There was no benefit to the employer.

16          And I think if you find that the plaintiffs were not

17   honest about the wage notice -- and again, their testimony is

18   all the same.  They all say that Mr. Zakari wasn't there,

19   despite the fact Mr. Zakari signed it.  They all say that

20   pretty much the same portions of the form were left blank when

21   they signed it.  It suggests a concerted effort to manufacture

22   testimony, and if they weren't honest about that, then the

23   80-20 issue becomes really very clear.

24          Their testimony about their side duties just makes

25   absolutely no sense.  Why in the world would Mr. Pizzimenti pay

to have a fully staffed restaurant in the morning to have two

delivery people make a handful of deliveries?  The economics --

no businessperson would.

Mr. Zakari and Mr. Pizzimenti indicated they had 25

workers in the morning, and that's enough to keep those two

delivery people busy the whole day.  They had 3- to 400

delivery orders a day.  That was 90 percent of their business.

They brought in 10 delivery people.  It would make no sense for

any business owner to bring in 12 delivery people in the

afternoon to have them spend half their time doing side work.

You also heard Mr. Pizzimenti, and again, he's not

Google, he's not SpaceX.  This is a small mom-and-pop business

He's not Google and he's not SpaceX and he's not General

Motors.  He started this business on his own.  He's a

quintessential small employer, and I would respectfully suggest

to you the efforts that this gentleman made to comply with the

law were extraordinary.  And maybe he got a week or two wrong,

or maybe he paid the spread of hour, but it wasn't reflected in

the beginning when he was busy opening up a store, but to

demand that kind of perfection from a small-business owner, who

is working feverishly to create a business and goes through the

trouble of logging on to Pacer to read cases and to be in

constant contact with the wage-and-hour people, and to train

his -- look how much Mr. Zakari knows about wage-and-hour law.

He's a manager.  That's unusual in small business.

1          The record absolutely demonstrates the efforts that

2     Mr. Pizzimenti has made to comply with the law.  This is his

3     life, your Honor.  This is his business.  He wants to grow it,

4     and it's really very, very unfair that plaintiffs file a

5     complaint and make all kinds of blunderbuss allegations against

6     him that are not really proven in the testimony.

7          He then has to produce all these documents, and now

8     the plaintiffs pick through, Well, maybe this one wasn't right

9     and that one wasn't right, when 99 percent of it's accurate.

10    And then he has to face financial ruin with -- because if he's

11    found liable for any of it, the attorney's fees are going to

12    put him out of business.  It's just terribly unfair, and I

13    would just ask your Honor to have some compassion and to look

14    at the bigger picture with Mr. Pizzimenti, a small-business

15    person who has made it extraordinarily important, he's gone

16    much further than most small-business people to comply with the

17    law.

18         He's done everything that he possibly can, and I ask

19    you to consider that when you review this case, your Honor.

20         Thank you so much.

21         THE COURT:  Thank you.

22         Mr. Mulholland.

23         MR. MULHOLLAND:  Absolutely.

24         As I'm sure your Honor's aware, the wage-and-hour laws

25    in New York are very, very strict, and they place a very high

1    burden on employers.  The reason for that is because the laws

2    are designed to protect people who are least able to defend

3    themselves in these matters, for two reasons.

4            One, because the plaintiffs in these cases are not

5    people who have access to records or the ability to maintain

6    records; and also because they come from a sector of society

7    who has the least amount -- the least amount -- of familiarity

8    with the legal process.

9            Part of our state's wage-and-hour laws is where the

10   state is, and the federal government has placed very strict

11   regulations, is the application of a tip credit.

12           The ability to pay someone below the minimum wage is a

13   privilege that our legislature has widely decided must be very,

14   very strictly reviewed, and one of the elements that employers

15   have to comply with is they can't hire someone at a lower

16   tip-credit rate and then use them for jobs outside of the tip

17   duties.  You can't hire delivery people at the lower

18   service-employee rate, then expect to use them as your porter,

19   use them as your custodian.

20           And that's so often the problem in these cases.  It's

21   a way for businesses to save money, and it's a great idea from

22   an accounting perspective, but it's not right to the workers,

23   who are not getting the benefit of the minimum wage and at the

24   same time are being used outside of that tip-duty context.

25           The law also places the burden on the employers to

1    prove their right to take the tip credit, not only to take the

2    tip credit, but to take any allowance or any deduction from the

3    minimum wage or any deduction for tips.  It's the plaintiffs'

4    contention that defendants here have not met their burden to

5    prove that they're entitled to take tip credit and that they

6    were ever entitled to take deductions for credit card service

7    fees.

8            The problem that defendants have in this case is they

9    haven't produced anyone with personal knowledge of the

10   day-to-day activities of the plaintiffs.  Mr. Pizzimenti

11   himself admitted that he didn't spend very much time at Al

12   Horno, nor did Mr. Zakari, who testified he split his time

13   between as many as three restaurants between 2014 and 2015 and

14   presumably 2016.  And the records themselves that defendants

15   have offered show unmistakably violations of the weekly wage

16   statement law.

17           When you take a look at the records, you'll see that

18   there are no signed pay receipts from any time before October

19   2014, and you'll also see that there are no spread-of-hour

20   payments made until May of 2014.  Even if you take a look at

21   the wage statements prior to May of 2014 and you do the math,

22   you will see that there was no spread-of-hours pay placed into

23   the amount that was purportedly given to my clients, even in

24   circumstances where they worked more than ten hours in a single

25   day.

1          And the tip deductions, each of the plaintiffs

2     testified consistently that there was a practice, a habit and

3     practice at Al Horno of holding back a significant portion of

4     the tips that were associated with large catering orders.  That

5     was one of the things they testified consistently about and

6     across the board.

7          They testified that they were aware of the value.  At

8     least three of the plaintiffs testified that they were aware of

9     the value of these tips because they kept track of it on a

10    daily basis when they received -- when they retained the

11    receipt which reflected the amount of the tip that should be

12    going to delivery people.  And they told the Court that it was

13    both Samuel Solis and Ricardo, and even at times Mr. Pizzimenti

14    himself, who told them that they would not be receiving the

15    full value of those catering-order tips.  Any sort of

16    deduction -- unjustified deduction -- from the tips completely

17    eviscerates the defendants' claim for tip credits.

18         I think the bigger picture of this case is that we

19    have a restaurant, a new restaurant, not new to Mr. Pizzimenti,

20    who had already had experience working at or running two prior

21    restaurants, but a new location, and you can see in the records

22    that defendants have submitted that it was around 2016 when

23    they began to take compliance a lot more seriously.  But what

24    you see is that in the first five or six months, when the

25    business began, there was very little effort to comply with the

1    wage-and-hour laws.

2            In late 2014 and 2015, they made slightly more effort

3    to comply by asking my clients to sign wage statements.  The

4    wage statements aren't always accurate.  They don't always line

5    up with the amount of time that is registered on the timecards.

6    The wage statements were not furnished -- actually furnished --

7    to my clients during that period of time, in violation of the

8    law.  And as I stated before, there's no spread of hours

9    reflected on any of the statements before May of 2014 -- May of

10   2015.

11           It was towards 2016 when the management of Al Horno

12   became a little wiser and hired a payroll company, Paychex, to

13   begin issuing more proper statements and more proper paychecks,

14   but prior to that time, they were not, as Mr. Hoffmann argued,

15   a model of compliance with the wage-and-hour laws.

16           One of the biggest issues in these cases is assessment

17   of credibility, and I would submit that the testimony of

18   Mr. Pizzimenti was not credible.  It was not credible for

19   several reasons:

20           One, because he lacks personal knowledge.  He told the

21   Court that he -- when he answered questions from his attorney,

22   he was discussing what would have happened, what should have

23   happened, what he instructed people to do, rather than telling

24   the Court what actually happened and what he actually observed

25   in terms of the duties that were fulfilled by my clients and

1    the pay practices that were actually practiced at Al Horno in

2    2015 and 2016, 2014, 2015 and 2016.

3          He offered no proof about whether the 3 percent

4    service fee was something that was actually charged at the rate

5    that was actually charged by as many as five different

6    companies through which Al Horno accepted delivery orders and

7    processed tips.  And I would also submit to the Court that

8    Mr. Pizzimenti's demeanor was quite evasive.  He spent a lot of

9    time trying to avoid answering some pretty simple questions

10   about his experiences at Al Horno, his pay practices and the

11   records.

12         In regards to the notices, the annual notices, my

13   clients were quite consistent that Mr. Zakari did not become a

14   manager at Al Horno until sometime in 2015 and that the notices

15   that they've offered that purported to be signed by Mr. Zakari

16   in 2014 were not actually signed in 2014 and that they were,

17   perhaps, backdated at some later time.  And in fact, in the

18   case of Mr. Aranda, we're completely missing a notice from 2016

19   that accurately reflects his hourly rate of pay.  There is a

20   notice that indicates $9 an hour for the minimum wage.  This

21   notice is undated.  It purports to apply a tip credit of 3.10.

22   When you compare -- presuming that that notice was for 2016,

23   when you compare his hourly rate of pay in 2016 with the 2016

24   records, you'll see that he was being paid 7.50 an hour and not

25   5.90.  The defect of that notice alone eviscerates the

1    defendants' ability to claim a tip credit.

2           Likewise, Mr. Hermenegildo Mercenario lacks any notice

3    with anything for 2015.  There is a purported notice given in

4    2014, which Mr. Mercenario explained was not signed in 2014.

5    There is a notice that purports to be signed in 2016, but

6    there's no notice for Mr. Mercenario, Hermenegildo Mercenario,

7    that would have covered 2015, again, a defect that eviscerates

8    the ability for the defendants to claim a tip credit for that

9    period of time.

10          Thank you, your Honor.  That is all.

11          THE COURT:  Thank you.  I want to thank you all for

12   your work in this case, for your presentations and for your

13   demeanor with the Court.

14          I thank the interpreters and the court reporter as

15   well and all of the court personnel.

16          I will take this matter under advisement.  The updated

17   and expanded proposed findings and conclusions keyed to the

18   trial record from the defense are due two weeks from today,

19   which is Wednesday, the 7th of February, and the plaintiffs'

20   revised and updated submission is due on Wednesday, the 14th of

21   February.

22          MR. HOFFMANN:  Your Honor --

23          THE COURT:  Yes.

24          MR. HOFFMANN:  I am leaving for Hong Kong for a week

25   in the morning and I'm wondering if we can push those dates

I1oWadoT

1  back one week so I have two weeks to do it.

2  THE COURT:  So you want the 14th as your due date.

3  All right.

4  MR. HOFFMANN:  Thank you, your Honor.

5  THE COURT:  2/14 for the defendants and 2/21 for the

6  plaintiffs' submission.

7  MR. HOFFMANN:  Thank you so much.

8  THE COURT:  Thank you.

9  I will put the notebooks here that you indicated you

10  needed to update.  The deposition transcripts, which were not

11  entered into evidence -- they were read into the record -- are

12  here.  They're on top of the notebooks, so you can take those

13  back.  And I think you must have taken -- oh, no.  Here it is.

14  I've put the plaintiffs' trial exhibit book there as

15  well, and so if you like, you can take them and send them back.

16  Ms. Beale also has a set that would need to be updated, and so

17  I will leave it to you to work that out.

18  Again, I thank you all, wish you well.  I look forward

19  to the further submissions and you'll be notified by an ECF

20  filing when I render my decision.

21  MR. HOFFMANN:  Thank you.

22  MR. MULHOLLAND:  Thank you so much, your Honor.

23  (Adjourned)

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    CHRISTOPHER PIZZIMENTI

 4    Direct By Mr. Hoffmann . . . . . . . . . . . 332

 5    Cross By Mr. Mulholland  . . . . . . . . . . 359

 6    DJIBRIL ZAKARI

 7    Direct By Mr. Hoffmann . . . . . . . . . . . 364

 8    Cross By Mr. Mulholland  . . . . . . . . . . 385

 9    SAMUEL SOLIS

10    Direct By Mr. Hoffmann . . . . . . . . . . . 403

11    Cross By Mr. Mulholland  . . . . . . . . . . 408

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```